Filed
D.C. Superior Court
12/17/2020 17:47PM
Clerk of the Court

## SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

|  |  |  |
|---|---|---|
| JOHN DOE<br>11260 Roger Bacon Drive, Suite 201<br>Reston, Virginia 20190<br><br>Plaintiff,<br><br>v.<br><br>DAVERSA PARTNERS<br>1718 Connecticut Ave,, N.W., Suite 350<br>Washington, D.C.  20009<br><br>Serve:  Corporate Creations Network<br>          1629 K Street, N.W., Suite 300<br>          Washington, D.C.  20006<br>          Registered Agent<br><br>          and<br><br>RESOURCE SYSTEMS GROUP INC.<br> t/a DAVERSA PARTNERS<br>55 Greens Farms Road, 2nd Floor<br>Westport, Connecticut 06880<br><br>Serve:  Corporate Creations Network<br>          1629 K Street, N.W., Suite 300<br>          Washington, D.C.  20006<br>          Registered Agent<br><br>          and<br><br>BRUCE BROWN<br>3250 Fessenden Street, N.W.<br>Washington, D.C. 20008<br><br>          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **COMPLAINT**<br><br>Case No. _____ |

## COMPLAINT

Plaintiff JOHN DOE, by counsel, hereby moves this Court for entry of judgment in his favor, and against DAVERSA PARTNERS, RESOURCE SYSTEMS GROUP INC. t/a DAVERSA PARTNERS, and BRUCE BROWN, jointly and severally, and in support thereof, states as follows:

## SUMMARY

Daversa Partners hired Mr. Doe right out of college to work in their DC office. Daversa assigned him to work directly for its second-in-Command, Bruce Brown, who, according to Mr. Brown, was best friends with the Owner of Daversa, Paul Daversa. During Mr. Doe's tenure, Mr. Brown sexually battered Mr. Doe on three separate occasions, including Mr. Brown grabbing at Mr. Doe's genitals outside of his clothing and then forcibly restraining Mr. Doe and forcing his fingers into Mr. Doe's underwear.

Mr. Brown also constantly used his authority and status at Daversa to force Mr. Doe to spend time with him, drink alcohol with him, and even sleep in the same bed with him, in hopes that he could get Mr. Doe in a state where Mr. Brown could become intimate with him. Mr. Brown told Mr. Doe that when they met for Mr. Doe's first interview, he knew something was "unique" about Mr. Doe, saying, "I knew you went both ways; you can get fucked or you can fuck…I knew I was going to hire you then. I do not care what the rest of my team has to say, I make the decisions."

Mr. Brown would regularly engage in inappropriate conversations discussing sex and Mr. Doe's sexuality. Mr. Brown told Mr. Doe that he had been in love with another man during his college years, revealed he liked fingers in his anus when having sex with his wife, and said that

2

he had always dreamed of "going both ways" but it had not been "acceptable" when he was growing up.

Mr. Brown made his conditions of employment clear in other ways – and, on all company business trips (with the exception of one incentive trip), Mr. Brown insisted that Mr. Doe share the same hotel room him.  When Mr. Doe asked why he could not have his own hotel room, Mr. Brown responded that the trip was a reward enough, and that if he wanted his own room, he would have to pay for it himself.  On two such occasions, Mr. Brown intentionally reserved a room with one king size bed.

When Mr. Doe would try to distance himself Mr. Brown and resist the abuse (and at other times), Mr. Brown would make demeaning comments to Mr. Doe about his sexuality, calling him such names as "Queen," "Drama Queen," "Feminine bitch," and "Fruit Loops."

Mr. Doe complained to Mr. Brown, and other supervisors and employees.  Many others at Daversa witnessed Mr. Brown's behaviors and raised concerns to Mr. Doe.  Yet, Daversa did nothing to protect Mr. Doe and had no system to address and remedy Mr. Doe's concerns. Daversa did not even have a Human Resources department that Mr. Doe could go to for help (despite Daversa having more than 150 employees).  When Mr. Doe raised his concerns to Mr. Brown on one occasion, Mr. Brown reminded Mr. Doe that Mr. Daversa was his "best friend" and that Mr. Doe could not do anything to change that.

When Mr. Doe was unable to take the discrimination, harassment and ridicule any longer, coupled with his fear of further sexual assault, that Mr. Brown's conduct would never stop, and that Daversa would never take steps to protect him, even after being sexually assaulted by Mr. Brown on several occasions, Mr. Doe resigned.  During this conversation, Mr. Brown threatened Mr. Doe saying the world was "too small" and "I will find out where your next position is and

make sure you do not have another role in the tech industry." Daversa later terminated Mr. Doe before his departure date, announcing publicly that Mr. Doe had left the company inappropriately and falsely blaming him for Daversa's negative reviews on social media.

As a consequence of the sexual batteries, assaults and behaviors of Mr. Brown and Daversa, Mr. Doe was traumatized and suffered physical injury and severe emotional and psychological injuries with continuing physical manifestations, necessitating his treatment with medical professionals and prescribed medicines to treat the physical and emotional manifestations.

## **NATURE OF ACTION**

1.      This is a civil action by Plaintiff John Doe against his former employers, Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners, and against Bruce Brown, an individual Partner at Daversa Partners, arising out of discrimination and harassment on the basis of sexual orientation in the course of Plaintiff's employment, and for violations of the D.C. Wage Payment and Wage Collection Law ("DCWPWCL"), D.C. Code 32-1301, *et seq.*, for failure to pay Plaintiff overtime pay and commissions to which he was entitled.

2.      This action also states a claims for negligent supervision of employee (Bruce Brown) and gross negligence, assault and battery against the individual Defendant, Bruce Brown, and a claim for intentional infliction of emotional distress against all Defendants.

3.      This action is brought under the District of Columbia Human Rights Act, D.C. Code §2-1401.01 *et seq.*, the D.C. Wage Payment and Wage Collection Law ("DCWPWCL") , D.C. Code 32-1301, *et seq.*, and under the common law of the District of Columbia.

4

## PARTIES

4.      Plaintiff John Doe ("Mr. Doe") is a resident and citizen of the State of New York. At all times relevant hereto, Mr. Doe was a resident and citizen of the District of Columbia, and employed by the Defendants in Washington, D.C.

5.      Defendant Daversa Partners is a leading headhunting company with five offices across the nation, including in Washington, D.C., serving the technology sector in North America, with a reputation for building out management teams and recruiting "Material Impact Executives" for today's relevant consumer and enterprise businesses, such as Dropbox, Twitter, Palo Alto Networks, Compass, Airbnb, DocuSign, Uber, Snapchat, DoorDash, Boston Dynamics, TaskRabbit, Google, Nike, Peloton and HubSpot.

6.      Defendant Resource Systems Group, Inc. is the entity that appears on Plaintiff's paystubs, and on his W-2, through which Plaintiff was paid as an employee of Daversa Partners, in Washington, D.C.  The name Daversa Partners is a trademark name owned by Resource Systems Group Inc., which was, until approximately mid to late 2012, the former name of Daversa Partners. [1]

7.      Defendant Resource Systems Group, Inc. is a foreign corporation registered to do business in the District of Columbia and which maintains an agent for service of process in Washington, D.C.

8.      Defendants Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners are collectively referred to herein as "Daversa."

9.      Defendant Bruce Brown ("Mr. Brown') is a resident and citizen of the District of Columbia, and was (and is) the Managing Partner and second in command at Daversa Partners,

---

[1] https://trademarks.justia.com/856/13/daversa-85613465.html

working in the D.C. Office.  Mr. Brown was Plaintiff's direct supervisor at all times relevant to this Complaint.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction over Mr. Doe's claims under the common law of the District of Columbia.

11.    The amount in controversy exceeds the jurisdictional minimum amount for this Court.

12.    At all times relevant hereto, Daversa was Mr. Doe's "employer" within the meaning of D.C. Code § 2-401.02(10) and D.C. Code § 32-1301(1).

13.    Mr. Doe was an "employee" of Daversa within the meaning of D.C. Code § 32-1301(2).

14.    Daversa is present in and conducts business in the District of Columbia, and is therefore subject to the personal jurisdiction of this Court.

15.    Mr. Brown is subject to the personal jurisdiction of this Court pursuant to D.C. Code §§ 13-422 and 13-423.

16.    The majority of the tortious acts alleged in this Complaint were committed in the District of Columbia.

17.    Jurisdiction and venue are proper in this Court.

## BACKGROUND

18.    Mr. Doe began interviewing with Daversa in September 2018 while he was still an undergraduate at Boston College. The conversation commenced with an hour-long discussion with Jonathan Krodel, the firm's leader for internal hiring.

19.     In April 2019, Mr. Doe resumed conversations with Daversa while weighing his post-college options (grad school or employment).  Mr. Doe's uncle had been one of the first ten employees at Daversa Partners (when it was known as Resource Systems Group) and had enjoyed tremendous success during his tenure there.

20.     During Mr. Doe's final interview process with Daversa, Bruce Brown asked if Mr. Doe was a "crier."  He later explained that because the Washington D.C. office had such high turnover rate (one of the highest, if not the top, in the company), they could not waste their time on people who cried or "could not take the culture."  He also asked Mr. Doe if he enjoyed consuming marijuana.

21.     Mr. Doe accepted a written offer of employment from Daversa in April 2019, after he graduated from Boston College in May 2019, and started working as a full-time "Consultant" (the name given to the newest class of full-time hires) on July 8, 2019 in the Washington D.C. office, reporting jointly to Reece Breault and Bruce Brown.  Subsequent to this, Mr. Brown removed Mr. Breault from Mr. Doe's reporting line, so that Mr. Doe reported directly (and only) to Mr. Brown.  This was unprecedented as Consultants normally reported to an Associate, Senior Associate, or Director, and never directly to a Partner of Mr. Brown's stature in the Company.

22.     Daversa was Mr. Doe's first full-time job after graduating college and he was looking forward to having a professional and formative experience out of college, with strong leadership and a mentor who would provide exposure to multiple opportunities in the tech world. It was one of Mr. Doe's dreams to work in the startup tech community, given the ingenuity and fast-pace of the industry.

23.     From the outset, Mr. Doe proved himself to be a valuable employee, and soon was recognized as the firm's top young hires because of his exemplary performance, record-breaking activity, and work ethic.  This was recognized and reaffirmed by Mr. Brown, and Daversa CEO, Paul Daversa ("Mr. Daversa") in numerous emails.

24.     Mr. Doe never received any substantive negative feedback regarding his performance.

25.     From the outset of his employment, Mr. Doe was exposed to a work environment and culture that often centered around alcohol and drinking, often times to excess.

26.     On August 2, 2019, Mr. Doe received a text message from Mr. Brown, during the work day, to "Come down stairs solo and meet me Northside @ 3:30..make up something." Northside Tavern is a bar close to the Washington D.C. office where Mr. Brown spent many afternoons.  Mr. Doe was summoned to Northside – or other bars throughout the city – by Mr. Brown more than any other individual on the team.

27.     On Friday, October 18, 2019, Mr. Brown summoned Mr. Doe, by text, to Dulles International Airport, from work, simply so Mr. Brown could drive home with Mr. Doe.  Mr. Doe obliged, since he was only four months into the job and Mr. Brown was his supervisor and a Partner.  Before Mr. Doe left for the airport, Mr. Brown texted and instructed, "Please do not share with Reece or others..don't want to think I'm giving you special treatment etc."

28.     Mr. Brown confessed to Mr. Doe that when they met for Mr. Doe's first interview in Westport, Connecticut he knew something was "unique" about Mr. Doe, saying, "I knew you went both ways; you can get fucked or you can fuck…I knew I was going to hire you then.  I do not care what the rest of my team has to say, I make the decisions."  Mr. Brown was referring to Mr. Doe's sexuality.  Mr.  Doe was shocked and completely taken aback by Mr. Brown's

8

inappropriate and unprofessional statement, and his lewd characterization of Mr. Doe's identity as a gay man.

29.     On Friday morning, August 23, 2019, a little over one month into the job, Mr. Doe received a text message from Mr. Brown asking for his address.  Mr. Brown then drove to Mr. Doe's apartment to pick him up on the pretext of wanting to conduct a 1:1 discussion of a vision board assignment Mr. Doe was working on.  At lunch, Mr. Brown ordered whiskey, and told Mr. Doe drinking whiskey was "not optional."  Mr. Doe was extremely uncomfortable, but since this was his first job out of college, and Mr. Brown was his supervisor as well as the longest standing Partner of Daversa, Mr. Doe felt he had no choice other than comply, or else risk angering Mr. Brown and jeopardizing his job.

30.     As part of his job, Mr. Doe was required to travel with Mr. Brown.  On September 11, 2019, during a trip to California, at dinner in San Jose following a day of client and candidate meetings, an intoxicated woman sitting across the bar from Mr. Doe and Mr. Brown bought them champagne.  The woman proceeded to make sexual gestures to Mr. Doe from across the bar. After she was asked to leave by the bar's management, Mr. Brown commented to Mr. Doe that they had just "lived the beginning of a small dream" of his.  Mr. Brown told Mr. Doe he would "love to take that woman in the bathroom, fuck her and pull her hair while she screamed and [Mr. Doe] watched…if [Mr. Doe] did not want to join."  Mr. Doe was stunned by the inappropriate and vulgar comments, and did not know how to respond.

31.     After that night, Mr. Brown shared with Mr. Doe explicit sexual details about his life, including describing a "threesome" with an Asian woman and another man with whom he had fallen in love during his college years, revealing he liked fingers in his anus when having sex with his wife, that he had always dreamed of "going both ways" but it had not been "acceptable"

when he was growing up, and that he would like to sleep with multiple senior members at Daversa.  Mr. Doe was always extremely uncomfortable during these one-sided conversations with his supervisor, not knowing how (or whether) to respond, or how to stop them from occurring at all.

32.     Mr. Doe sent text messages to Mr. Brown asking him to stop, including the following exchange:

> Mr. Brown:   This note wasn't about Reece but YOU. I never once mentioned him in my thank you so I'm thinking that deep down you have a hard on for him…that's cool! Dealing with your maniac personality forces me to be a better manager/leader & the bonus is that we are friends/fierce competitors who respect each other! We all need a Reece in our lives to drive us so stay focus king/queen bitch!!  There is no need for a response to that
>
> Mr. Doe:      I don't like when you make sex jokes about Reece and I, it makes me uncomfortable
>
> Mr. Brown:   It wasn't meant to be..it was more about your constant focus on him via steamrolling etc…sorry for making you feel uncomfortable..I'll pull back and keep it simple with you moving forward
>
> Mr. Doe:      Yeah but I have told you the same thing over and over again with Reece and the sex jokes but it has obviously not changed and is really pissing me off…So stop

33.     Mr. Brown frequently instructed Mr. Doe to "make sure you capitalize on everything I am giving you…do you know what I [am] referring to?  People only make their way to the top by two ways."  Mr. Brown was referring to networking/connections, and "sleeping" your way to the top.

34.     Other text messages Mr. Doe received from Mr. Brown included:

- "I'm hanging with Paul and his wife. You should be here but for now keep your head down and just know there's another trip in the bay/LA in your future" (October 15, 2019)

- "Don't share with Reece or others..don't want to think I'm giving you special treatment etc."  (October 18, 2019)

- "Please cover me and not share with the group that we are grabbing a drink…" (October 22, 2019)

- "I have an incentive for you"…"If u don't achieve, then dinner with Reece where you cook for him @ your apartment" (November 1, 2019)

- "Cool..be there in 5..get 2 seats at the bar.." (November 3, 2019 - a weekend. Mr. Brown texted Mr. Doe under guise of having received negative feedback about Mr. Doe ((a ploy he used several times), always admitting there was no negative feedback)

- "I'm still with Reece but know that you are my guy..didn't fuck it up!!!!" (November 4, 2019)

- "Let's keep crushing tommy!!! Fuck it..take it all the way…no looking back!! And if Reece doesn't keep up..you'll me [sic] taking him down too" (November 10, 2019)

- "Lol…I feel bad riding you on a Sunday b/c I'm actually taking out my frustration with Reece on you!!!" (November 10, 2019)

- "BTW: If Reece or anyone else gets a hold of our text exchanges then you'll be assigned to Reece for the rest of your Daversa career!!!" (November 11, 2019)

- "I intentionally like to fuck with you!!!! Net net..you are my Bryce!!" (November 22, 2019)

- "This was your best week..ran your own search cal via Zycada and operated with a sense of urgency/communicated well and got your hustle on!!! I fucking you!!!" (November 26, 2019)

- "I'll make a decision by 10 to fuck with you!!!" (January 8, 2020)

- "We can't spend anymore time together..need to keep the team in check so they don't feel that we are spending too much time together!!!" (January 10, 2020)

- "I didn't let the haters hold me back..instead I leveraged that to drive me all the way to the fucking top!!!...beat them at their game by being humble." (January 12, 2020)

- "I fucking love you although you are a nut job, how does one not want to be your friend!!! Fuck the haters and take it to another level…we are committed to doing 1 road trip a month in the field and let's figure out joe to get in front of investors in London!!!!!!!" (February 2, 2020)

- "Don't let me beg fucker…I just want to hang with you!! Barry's, smoothie and craft your killer email for Redmarlin. We think you're great!!" Attached with this text was a picture of Mr. Daversa and Mr. Brown. (February 22, 2020)

- You little fucker..You should be paying me for the amazing experience I'm giving you!!! You little Barry bitch!!! Btw you and I Just fucking steam roll them!!! I can't hold back winners so let's go after it!!" (February 23, 2020)

35.     On Thursday, November 14, 2019, Mr. Brown invited Mr. Doe to dinner at a location near Mr. Doe's apartment, for the purported reason of needing to speak to Mr. Doe based on feedback he received from Paul Daversa, CEO of Daversa.  Although Mr. Doe believed such a meeting should have taken place during working hours, he had only been with Daversa five months, and had been told by Mr. Brown and others on several occasions about the tools required to succeed in the firm – "You need to drop everything you are doing and make sure work comes first, especially in the first year…your personal life will be there after you make it to the one-year mark."

36.     Mr. Brown was on his way back from dropping Mr. Daversa at BWI Airport, and texted Mr. Doe "Let's meet at a cool restaurant near your apartment. Got good feedback from Paul…" and "Pick something close to your place other than busy boys."  Mr. Doe followed that with, "Ava just asked me to do a mentor/mentee drink.  Should I invite her or what should I say?"  Mr. Brown responded, "This is btw you and I..stop being so political…I want to hang with you solo!! And don't share."

12

37.     Mr. Brown took Mr. Doe to Centrolina, an Italian restaurant in City Center, and they sat at the bar.  Mr. Brown immediately started drinking, and after a few drinks, began to act in an extremely inappropriate and unprofessional manner towards Mr. Doe.

38.     Mr. Brown asked Mr. Doe about his sexuality, if Mr. Doe would be his best friend, if Mr. Doe trusted him, if Mr. Doe loved him, if Mr. Doe thought he was attractive, and asked if they could go back to Mr. Doe's apartment.

39.     Mr. Brown strongly pressured Mr. Doe throughout the evening to drink alcohol to such an extent that when Mr. Brown went to the bathroom before the main course arrived, Mr. Doe explicitly asked the bartender to pretend he was making alcoholic drinks for Mr. Doe, but to substitute lime juice and seltzer to make it look like alcohol.

40.     When they left the restaurant, based on the number of drinks delivered to Mr. Doe – at Mr. Brown's direction – Mr. Brown likely believed Mr. Doe was heavily intoxicated.

41.     When they left the restaurant, Mr. Brown forced Mr. Doe to ride with him back to Mr. Doe's apartment, refusing to give Mr. Doe his backpack (which was in Mr. Brown's trunk) unless he rode back with him.

42.     Mr. Brown said, "Do anything you want to me," and "Let's just go back to your apartment, my wife will not ask about it."  Mr. Brown often told Mr. Doe about the various times he had wanted to cheat on his wife with someone else.

43.     Before they reached the car, though, Mr. Brown started tickling Mr. Doe as they walked and then grabbed Mr. Doe's genitals/crotch area (outside of his pants) and said words to the effect of, "I always imagined you had a massive dick."

44.     Mr. Doe was in shock, and told Mr. Brown he would take an Uber home.  Mr. Brown told Mr. Doe he would not return his backpack unless he rode with him.  Mr. Doe feared

for his safety, but felt he had no choice other than to comply, and attempt to placate, Mr. Brown, who had complete control over Mr. Doe's job and the start of his career.

45. When Mr. Doe got in the car, Mr. Brown continued to remark on the size of Mr. Doe's penis, and when they arrived at Mr. Doe's apartment, Mr. Brown began to tickle Mr. Doe again.

46. When Mr. Doe reached for the door and unbuckled his seat belt, Mr. Brown threw his right arm across Mr. Doe's chest to keep him restrained and held him down. Mr. Brown unbuckled his seat belt as Mr. Doe struggled under him, and Mr. Brown forced his other hand down Mr. Doe's pants, placing several fingers inside Mr. Doe's underwear.

47. After that, Mr. Doe was then able to push Mr. Brown off, get out of the car, retrieve his backpack and leave.

48. Mr. Doe received a text message from Mr. Brown later that night saying, "Great hanging out tonight..you want to be better than Bryce? 24 months." Mr. Doe responded that he wanted to be better but would not commit to staying two years with Mr. Brown. Mr. Brown responded, "Come on…you and I have taken it to another level..there is no turning back…it's either you, Ava or Reece. I love how you like to play hard to get even after I delivered Frank and Paul..I get it…it's a control thing for you…I'll get Reece to lock you in."

49. The following morning, Mr. Brown called Mr. Doe and said, "I apologize I crossed a line last night but if you want to be successful, capitalize on our relationships and do whatever it takes. Let's keep this our secret."

50. Mr. Brown's sexual assault and battery of Mr. Doe was intentional and premeditated, as evidenced by his text messages to Mr. Doe that the supposed "work" dinner was only between them, that Mr. Brown wanted to "hang" with Mr. Doe alone, that Mr. Doe should

not share their plans with anyone, attempting to ply Mr. Doe with alcohol, and that Mr. Doe

should keep what happened (Mr. Brown's sexual assault and battery of Mr. Doe) a secret.

51.     On November 22, 2019, Mr. Brown texted Mr. Doe, "I have your back and will

do what it takes to ensure that u crush it!!! I intentionally like to fuck with you!!!!"

52.     On December 12, 2019 the entire Washington D.C. office flew into White Plains

(NY) Airport to attend the company holiday party being held that evening in Connecticut.

53.     Given the tremendous success the team had achieved the prior year, the team was

treated to an afternoon at the Ritz Carlton Hotel and Spa before leaving for their overnight

accommodations in Connecticut.  The men and women separated into their prospective spa suites

and spent the afternoon working out in the gym and alternating between steam room, sauna, and

receiving massages.

54.     Mr. Doe was alone in the sauna, wearing only a towel (per spa rule) when Mr.

Brown entered and sat next to him.  Mr. Doe moved away since the sauna was empty and he did

not want to sit directly next to Mr. Brown.  Mr. Brown then moved to be next to Mr. Doe again.

55.     While Mr. Doe was in the sauna, Mr. Brown placed a hand on Mr. Doe's exposed

thigh and started to move his hand up Mr. Doe's leg.  Mr. Doe quickly covered his exposed skin

and got up to leave, but Mr. Brown pulled on Mr. Doe's towel to expose his buttocks as Mr. Doe

exited the spa.  Mr. Brown laughed as Mr. Doe left.  Mr. Doe then broke into tears.

56.     After the trip, Mr. Brown continued to send Mr. Doe inappropriate,

discriminatory and harassing text messages.  Examples include:

- "Grow some balls and make the call..you work for me now Bitch!!"
  (December 19, 2019)

- "Don't let Ryan slap you around Unless that's [what] you're into!!"
  (January 13, 2020)

- "Go downstairs and call me…don't let anyone know u are on the call with me or London is off the table" (January 16, 2020)

- "I'm taking gummies to work today & tomorrow so that I can pass the time in chill mode while you're out!!!" (January 23, 2020; referring to marijuana edibles)

- "Pull back and go get fucked!!! Please you are stressing me out…I love you but I need time to stay on top of all moving parts!!! Good night!!!" (January 26, 2020)

- "So know that I've got your back/want to set you up for success even when I jam u up with Reece!!! So next time you get all twisted up, I'll throw up on you!!" (February 4, 2020)

57.    On February 7, 2020, Mr. Doe was in Jamaica with his team on a reward/incentive trip since the D.C. office had reached approximately $10M+ in revenue. During the day, the group took a trip to a small sandbar island where they spent the afternoon drinking and smoking marijuana.

58.    Mr. Brown liberally purchased marijuana to share with the team, and he kept constant pressure on Mr. Doe to smoke more and more, even when Mr. Doe declined.  Mr. Doe had also stopped drinking alcohol when he noticed Mr. Brown becoming agitated at his refusal to smoke more marijuana.

59.    Later, after the team arrived back at their residences to shower and dress for dinner, they were instructed to meet for pre-dinner drinks at the main house where Mr. Brown and the more senior people on the team were staying.  Most everyone was inebriated, but Mr. Doe had switched to water while others continued to drink alcohol.  Before the trip, and earlier in the day, Mr. Doe asked his co-worker, Isabella Diodato ("Ms. Diodato"), if she would accompany him during various activities during the trip because he did not want to be alone with Mr. Brown.

60.    While walking to the van which would transport them to dinner, Mr. Brown came up behind Mr. Doe and grabbed Mr. Doe's buttocks with both hands.  Mr. Doe physically turned,

16

pushed him away, and told Mr. Brown that if Mr. Brown ever touched him again, he would

report him to Paul Daversa.  Mr. Brown just laughed and told Mr. Doe that Mr. Daversa was his

best friend and would not do anything to change it.  Mr. Brown then added,  "I am the boss, you

are my bitch now.  I do what I want."

61.     Mr. Doe was stunned and frightened by Mr. Brown's comment.  Daversa was Mr.

Doe's first job out of college, and his first professional workplace situation since graduating.

Mr. Brown preyed up on this, and on Mr. Doe's inexperience and desire to succeed, fully

realizing that he was in a position of power over Mr. Doe, who had no professional workplace

experience to draw from to know how to handle the situation which involved his direct

supervisor – a very high level Daversa executive – treating him in an inappropriate and illegal

manner, or to know how to properly report it and demand that Daversa take steps to protect him,

all the while worried about the repercussions of doing so, and of losing his job.

62.      On February 8, 2020 Mr. Doe texted Ms. Diodato, "Bruce wants us to get drinks

when we get back.  Supposedly he only wants the two of us which I feel is a little fucked up and

might cause some problems."  Mr. Doe asked Ms. Diodato to accompany him.

63.     At the time, despite having more than 150 employees, Daversa had no Human

Resources Department and thus no independent place where Mr. Doe could report what was

happening to him.   Mr. Doe had already told him not to bother trying to report him since the

Owner of the Company was, according to Mr. Brown, Mr. Brown's best friend.

64.     Because he did not know how to make Mr. Brown's conduct stop, after explicitly

confronting Mr. Brown about the behavior and comments, Mr. Doe, recognizing that Mr. Brown

held the fate of his fledgling career in his hands, began to take the path of least resistance which

he believed would placate Mr. Brown and make him less angry at Mr. Doe.  Mr. Doe started to

engage in the unprofessional commentary in the hopes of turning Mr. Brown's attention away

from him.

65.     Mr. Brown's incessant, inappropriate, harassing and discriminatory text

messaging continued:

- Mr. Brown sent Mr. Doe a picture of KY Jelly in reference to a client.  Mr. Brown had previously commented that he liked to imagine this client pinning Mr. Doe down and "fucking [Mr. Doe] while [he] screamed.
(February 11, 2020)

- "I'm your mirror..you can't run away from me so just man up! I know I can be over the top but you like when I drive you! Fuck going to the bathroom to cry solo…get everyone on FaceTime to cry it out."  (February 12, 2020)

- "Everyone just trying to fuck you literally or fuck with you…it is what it is" (February 23, 2020)

- "Fuck you!!!! Only incentive for you is getting slapped!" (February 24, 2020)

- Mr. Brown fixated on meeting Mr. Doe's boyfriend as referenced in multiple texts including, "Btw: When do I get to meet Bart!!!" (March 5, 2020)

- Btw: I know you know this but last week when I called you Fruit Loops while getting manny pedi my intent wasn't to be disrespectful. Cool?" (March 15, 2020)

- "If I Ruin you and who else besides Paul would I have to fuck with!!! So we are 2 peas in a pod." (March 15, 2020)

- "You're fucked up! Sick/twisted…but I love it" (March 16, 2020)

- "Why are u still texting me…go slap around your BF and close him or u will be a loser like Tom!" (March 17, 2020)

- "I love you man!!! If you weren't here I would be really fucked!!! I love fucking with you b/c you're so sensitive!!" (March 17, 2020)

- "Grow some balls and close him, if not you and Tom can hook up and start a business together" (March 19, 2020)

- "Time to get your ass kicked, you spoiled/entitled bitch" (March 22, 2020)

- Net you are one scary, selfish power hungry fucking BITCH.." (April 7, 2020)

- "Grab a pair of balls" (June 2, 2020)

- "Can we grab a drink after work today or tomorrow?" "Let's plan for today after the samurai session."  After Mr. Doe asked if he was in trouble:  "Cool!!! For the 1st time in our working relationship you are NOT in trouble..it's just a thank you…I want to hang with my boy!!! No string attached"

- "It was good to be on top while it lasted!!! Now Tommy will be riding you the way you rode the horse for the video." and "Just in case you need a visual…I'll also share with Tommy." [The next text was a picture of Mr. Doe riding a  horse for the office's fun music video.]

- "Go get fucked."

- "Exploration amongst friends! Screw integrity! Don't share this with anyone or you will be working for a Reece/Ava/Ryan immediately." This same text message included an individual (later confirmed by Mr. Brown to be CEO Paul Daversa) pretending to suck Mr. Brown's penis when they were in Jackson Hole, Wyoming during the "Partner's Offsite."

66.     In addition to the sexually inappropriate, discriminatory and harassing text messages, Mr. Doe also received a course of threatening text messages from Mr. Brown during his employment, including:

- "Fuck you, don't expose me" (April 6, 2020)

- "Fuck you! I'm going to knock your teeth out the next time I'm in the office..focus on recruiting for [client] and running down Frank vs time off!!!!!" (February 3, 2020)

- "Fuck up/undermine me and it will be a hard fall from grace" (February 19, 2020)

- "You're such a head case & bitch…Whatever drama king" (February 21, 2020)

- "You should be worried if you screw up on your asset framework tomorrow" (March 8, 2020)

- "I am going to start bitch slamming you around more based on Ryan's feedback" (March 11, 2020)

- "…keep your head down and don't tell anyone!!! Enjoy and if I find out that you bragged about being in London then I'll make sure Paige and Ava out you!!!" (March 22, 2020)

- "Fuck you!! If u were here I would punch you in the face!!! I'm going to break you down" (March 23, 2020)

- "Trust me, the minute you fall from grace I'll have your Chelsea boots ready to step on your neck!!!" (March 23, 2020)

- "I will let Reece come after you! I'll make sure he puts you on a head lock and have you cry like a bitch!" (March 23, 2020)

67. Over the course of 11 months, in addition to the egregious conduct above, Mr.

Doe was subjected to the following conduct by his supervisor:

- On all company business trips, with the exception of the incentive trip to Jamaica, Mr. Brown insisted that Mr. Doe share the same hotel room. When Mr. Doe asked why he could not have his own hotel room, Mr. Brown responded that the trip was a reward enough, and that if he wanted his own room, he would have to pay for it himself. On two such occasions, Mr. Brown intentionally reserved a room with one King size bed, and asked Mr. Doe to share the bed with him. On one occasion, Mr. Doe slept on the floor, and on the other occasion, at The Battery Hotel in San Francisco he, slept on a cot on the other side of the room.

- Mr. Brown sent videos of himself working out to Mr. Doe.

- Mr. Brown actively reached out to Partners at other Daversa office locations (including but not limited to Geri Allen, Jamie Sanger, Julie Wrapp, Jack Dunn, and Jason Slattery), most of whom had not met or worked with Mr. Doe, to ask for their advice or feedback concerning Mr. Doe.

- Mr. Brown showed Mr. Doe photographs of himself shirtless in the hot tub holding a glass of wine.

- Mr. Brown randomly Venmoed Mr. Doe approximately $5,284 in gift money over the course of Mr. Doe's Daversa career. Most of the time, the Venmo payments would arrive after Mr. Doe asked to have time apart from Mr. Brown. Mr. Doe believes that after he would reject Mr. Brown's advances, Mr. Brown would send him money to bribe him to keep speaking with him.

- Mr. Brown sent Mr. Doe videos of himself with his personal trainer, with captions such as "I need abs like yours," and "I am just trying to keep up with you and Reece."

- Mr. Brown frequently brought up the topic of Mr. Doe's sexuality in the work place, and during the work day, often at one-on-one lunches. Mr. Brown discussed intricacies and explicit details of how he imagined Mr. Doe's sex life. Mr. Brown confided in Mr. Doe that he suspected his [relative] was gay, and he used this as a common segue to bring up the topic of Mr. Doe's sexuality.

- Mr. Brown attempted place Mr. Doe at odds with D.C. Managing Director Paige Kuderka by telling Mr. Doe that Ms. Kuderka had been speaking poorly about Mr. Doe to other Directors and Partners.  When Mr. Doe called Ms. Kuderka to discuss the issue with her, she denied ever making such statements about Mr. Doe.

- During a lunch at a ramen restaurant approximately two miles from the office in March 2020, Mr. Brown started drinking and by the end of the afternoon (lunch lasted approximately four hours), Mr. Doe had cried in the bathroom because of Mr. Brown's unrelenting harassment.  At the same lunch, Mr. Brown suggested that Mr. Doe and another new hire have a "threesome" with him, and that Mr. Doe and the other hire should "hook up."  Two other consultants were present at this lunch.

- When Mr. Doe stayed late in the office to finish projects, Mr. Brown would remind Mr. Doe that Mr. Brown could see him on Ring (the company security cameras).

- Mr. Brown searched for, and found, shirtless pictures of Mr. Doe (professional modeling pictures) on the internet and sent them to Mr. Doe, and frequently viewed Mr. Doe's Instagram account and "liked" random pictures.

- Mr. Brown bought tickets for himself and Mr. Doe to attend a Post Malone concert at the Capital One Arena as a "reward" for completing a search.  Mr. Brown referred to the concert as "a date" both while at the concert and afterwards.  On this same night, he presented Mr. Doe with a book of whiskeys with the inscription, "To my dog, when a great opportunity presents itself, you do not say no."  He signed the book "Double B" (Bruce Brown) – a nickname used for him by his wife.

- Mr. Brown asked on several occasions if Mr. Doe was on "the gay medication" (referring to PrEP – an HIV prevention medication), told Mr. Doe on several occasions to "take your  medication," and referred to Mr. Doe as "head case" in the presence of other Daversa employees

- While in Jamaica, Mr. Brown forced Mr. Doe to make the determination as to how to divvy up the team bonus pool among himself and his co-workers, after telling Mr. Doe that he was going to keep $50,000 of the $200,000 bonus pool for himself, for "a rainy day."  This request was extremely inappropriate for Mr. Brown to make of Mr. Doe, who should not have been placed in such a position.

- Mr. Brown called Mr. Doe so frequently on weekends, holidays and PTO days that Mr. Doe had to enlist the assistance of Kandace Elam (a Senior Associate) and Paige Kuderka (Managing Director).  After they spoke to Mr. Brown, he no longer called Mr. Doe on the weekends as often, but then started emailing him instead, often times while intoxicated.

- Mr. Brown used other members of Daversa Partner's Senior staff to book hotel rooms under the names of other members of Daversa's senior staff, as a way to conceal that

he was only reserving a single room for himself and Mr. Doe.  Mr. Brown used Partner Bill Beer's membership at The Battery Hotel in San Francisco to secure one of the exclusive rooms.

- Mr. Brown went so far, that when Mr. Doe was visiting his youngest sister at University of Georgia with his father, Mr. Brown called his father and told him what a great job his son was doing and how Mr. Brown was lucky to have him.

- On D.C. team outings, Mr. Brown often rearranged the entire table just so he could sit next to Mr. Doe.  The most notable of these occasions occurred at a holiday lunch near DuPont Circle when he ordered the entire table to change seats and then sat next to Mr. Doe on the other side of the table.

- Mr. Doe has been called such names as "Queen," "Drama Queen," "Feminine bitch," and "Fruit Loops" by Mr. Brown, because of his sexuality.

- As further proof of Mr. Brown's lewd behavior, at the Partner's Jackson Hole offsite in Wyoming, Mr. Brown stripped down into just his underwear and got in the hot tub with other Directors.  Mr. Brown announced that he did not wear a bathing suit because he wanted Nicolette Stanise to see his "bulge."

- In March 2020, Mr. Brown sent a text message asking Mr. Doe out on a date, and when Mr. Doe confronted him about it, Mr. Brown pretended his text was "meant for someone else" and said he was drunk when he sent it.  The invitation used the same language often used by Mr. Brown during his 1:1 time with Mr. Doe.

- Mr. Brown discussed Mr. Doe's sexuality with Paul Daversa, the firm's CEO, and with his wife.  On the day Mr. Doe resigned, Mr. Brown told his wife, and shared with Mr. Doe the text message he received from his wife, which said, "Is he the gay cutie???"

68.     Mr. Doe repeatedly told Mr. Brown to stop making sexual jokes about him and his sexuality, and jokes and suggestions about Mr. Doe sleeping with his coworkers, because it made Mr. Doe extremely uncomfortable.  In response, Mr. Brown acknowledged he might have been "overstepping."  As Managing Partner of Daversa, Mr. Brown was well aware his conduct was wrong, and should have known, as a supervisory employee, that it was illegal and discriminatory.

69.     At various times during his employment, Mr. Doe reported Mr. Brown's late night texts and phone calls to Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan

Wadsworth and Reece Breault – all more senior than Mr. Doe at Daversa.  He went to Kandace

Elam and Paige Kuderka within months of his start date; spoke with Ava Talbott when Mr.

Brown called Mr. Doe at 1:00 AM the morning after the company Christmas party; spoke with

Ryan Garikes at a bar when Mr. Brown called Mr. Doe three consecutive times on a Friday

night; and broached the subject with Reece Breault when Mr. Breault was Mr. Doe's manager.

72.     After Mr. Brown underwent mandatory sexual harassment training in the fall of

2019, he joked about the class and implemented the term "flag" which he shouted preemptively

whenever he was about to make an inappropriate comment.  After completing the training, Mr.

Brown continued to make inappropriate and harassing comments, but believed if he preceded his

comment by announcing "flag" that his behavior was acceptable

71.     Despite providing the mandatory sexual harassment training in September 2019,

Daversa still lacked an HR department, and did not provide any training or guidance for

employees about proper reporting procedures for employees who felt they were the victims of

any discrimination, harassment or retaliation, let alone who to report to if their harasser was their

own supervisor or someone at the highest levels at Daversa.

72.     Throughout all of this, Mr. Brown repeatedly threatened destroy Mr. Doe's career

if he reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Doe "on the side

of the road and focus on someone else."

73.     On June 30, 2020, defeated, demoralized, and unable to take the discrimination,

harassment and ridicule any longer, coupled with his fear of further sexual assault, that Mr.

Brown's conduct would never stop, and that Daversa would never take steps to protect him, even

after being sexually assaulted by Mr. Brown on several occasions, because of Mr. Brown's

position of power within Daversa, and over Mr. Doe, Mr. Doe submitted his verbal resignation

over the phone to Mr. Brown, as his supervisor, effective July 19, 2020.

74.     During this conversation, Mr. Brown threatened Mr. Doe saying the world was

"too small" and "I will find out where your next position is and make sure you do not have

another role in the tech industry."

75.     Despite the circumstances and his emotional state, Mr. Doe gave more than the

required notice so that he could finish is projects in progress, not leave his co-workers in a

difficult situation, and in order to depart in the most professional manner he could.

76.      After his resignation, Mr. Doe received the following text message from Mr.

Brown:

- "I'm 54 and I invested/backed you..I just want to know where you are going…super unprofessional/world is too small. I'm fine that you are moving on but do yourself/me a favor and just be honest…keep the whisky [sic] I'm good." (June 30, 2020)

- "I don't way [sic] whisky [sic]..keep it..I will match your base salary!!" (June 30, 2020)

- "We'll get beyond this but right now I'm broken!!! It doesn't feel good.." (June 30, 2020)

- "That book you got for me..you played me!!! You need to add Law 49/50…how to fuck your mentor!!" (June 30, 2020)

- "I deserve more than 2 weeks!! We are supposed to be friends??? Call your uncle Greg before you call me!! I called him tonight!!! You don't fuck your friends!!!" (June 30, 2020)

77.     Mr. Doe followed up his verbal resignation on July 6, 2020, submitting his

official, written resignation by email to Daversa's Controller, Tracey Allen, and Jonathan

Krodel, Head of Training and Development.  Despite his emotional state, Mr. Doe wanted to "do

the right thing" and give ample proper notice to his first post-college employer, so that he could complete his projects in progress and not leave his co-workers in a difficult situation.

78.     On July 9, 2020, after noticing that he could no longer access any of his accounts in progress, Mr. Doe called Mr. Brown.  During that conversation, Mr. Brown terminated Mr. Doe's employment, effective immediately.  Daversa Partners did not provide any official termination documentation or legitimate reason to justify its termination of Mr. Doe.

79.     Mr. Doe was not terminated for any performance based reason.  In fact, after Mr. Doe gave notice of his resignation, Mr. Brown sent him a text message (on June 30, 2020), offering to match the base salary of whatever position he was leaving for.

80.      Mr. Brown thanked Mr. Doe for his work, but said they were going to "cut the cord" because things had gotten "out of control in the firm, and we got wind that you were sending some emails around to people and it is just a bad situation all around."  Mr. Brown was referring to a single email that Mr. Doe sent to the members of his "class," letting them know he had resigned, and thanking each person individually for their friendship and support.

81.     Because Mr. Doe feared for his personal safety and Mr. Brown's power and influence in the industry and his ability to blackball Mr. Doe and ruin his career and reputation, Mr. Doe cited lack of compensation for hours worked and lack of upward mobility as his reasons for leaving in the email to his class colleagues.

82.     Mr. Doe was completely taken aback by his abrupt termination, in light of his resignation, which he had carried out in a professional manner, giving more than the notice required in spite of the circumstances, so that he could complete his work in progress.  After working so hard for Daversa – giving up nights, weekends and holidays – to be treated in this manner was devastating and demeaning.

83.     Prior to this departure, Mr. Brown and other partners contacted Mr. Doe, insisting he tell them where he was going next.  This only heightened Mr. Doe's fear that Mr. Brown and/or others at Daversa would attempt to interfere with him becoming re-employed in the industry, or elsewhere.  Following his termination, Mr. Doe became aware that at a team meeting, Partner Bill Beer commented to the team, "There is a right way to leave, and a wrong way to leave – like Vidur [a former employee who resigned] and [John]."  This only heightened Mr. Doe's fear that Mr. Brown and/or others at Daversa would attempt to interfere with him becoming re-employed in the industry, or elsewhere.

84.     Mr. Doe was not granted an exit interview, despite his request.

85.     After his departure, Mr. Doe became aware that CEO Paul Daversa and other Partners were making false statements about the reasons for Mr. Doe's departure, and falsely stating that Mr. Doe had been writing negative Glassdoor Reviews online.  It is common practice for Mr. Daversa to ask his employees to write positive Glassdoor Reviews for him.

86.     Throughout the entire course of Mr. Doe's employment, and up through and including the present, Mr. Doe has not been paid commission on *any* of his Daversa deals. Whenever Mr. Doe asked Mr. Brown when he would receive his commissions, Mr. Brown always responded, "Keep your head down, the money will come, and keep recruiting."

87.     The "Daversa Partners Compensation Plan" plan documents provide for a 10% bonus of all business development revenue generated, for all levels of employees, including Consultants.

88.     Mr. Doe is owned 10% of the retainer as commission on eight of the fourteen deals he closed while employed by Daversa, in a total amount of $62,500.

89.     In addition, Mr. Doe was expected to work a substantial amount of overtime, including weekends and holidays, for which he was not compensated.  This does not include the numerous time Mr. Brown required Mr. Doe to meet him on the weekend for drinks and/or lunch or dinner.

90.     Daversa was on notice and aware of its negligence in not having any identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment, since former Partner Leah Scanlan had an affair with a subordinate, even though her husband was working at Daversa at the same time.

91.     The DC office has extremely high turnover and Mr. Doe is not the first employee to experience harassment.  For example, a sexual assault occurred, in a different office, where a young woman was assaulted by a superior.  Though she asked to be removed from working with the other individual, she was forced to continue working with him.

92.     Daversa was explicitly aware of Mr. Brown conduct towards Mr. Doe, including the assaults and batteries of Mr. Doe by Mr. Brown.  In a written exit interview document from an employee who left prior to Mr. Doe's departure, the employee wrote, "The way I've seen Bruce treat [John] is not only unacceptable for a personal relationship, but it is utterly inappropriate or a working relationship. The entire leadership has commented on it to me."  Mr. Doe was privy to this written statement, and was made aware that Daversa received the document, because Mr. Brown called Mr. Doe and reported the statement to him.

**COUNT ONE –**
**DISCRIMINATION AND HARASSMENT IN THE COURSE OF EMPLOYMENT**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

93.     The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

94.     Mr. Doe was an employee of Daversa within the meaning of D.C. Code § 2-1401.02(9).

95.     Daversa is an employer within the meaning of D.C. Code § 2-1401.02(10).

96.     Daversa, through its Partners, agents, officers and employees, discriminated against Mr. Doe and subjected him to harassment on account of his sexual orientation, during the course of Mr. Doe's employment.  This discrimination and harassment was with respect to the terms, conditions, and privileges of Mr. Doe's employment, in violation of D.C. Code § 2-1402.11.

97.     As set out above in this Complaint, the acts of discrimination and harassment by Daversa which commenced shortly after Mr. Doe's employment included, but were not limited to:  Mr. Doe being subjected to numerous comments based on stereotypes of gay men; Mr. Brown sending numerous inappropriate, lewd, discriminatory, and threatening text messages to Mr. Doe; Mr. Doe being called "Fruit Loops," "Queen," "Drama Queen," and a "feminine bitch;" Mr. Doe being summoned by his direct supervisor during the work day to a bar for drinks and being told to keep it a secret and "make something up;"  Mr. Brown demanding Mr. Doe meet him on nights and/or weekends for lunch or dinner, and drinks, usually on the false pretext of having "feedback" to share about Mr. Doe's performance; Mr. Brown initiating inappropriate and lewd conversations about Mr. Doe's sexuality and sex life, including asking for intimate details and sharing details of his own sexual fantasies with Mr. Doe; Mr. Brown discussing Mr. Doe's sexuality with other Daversa employees; Mr. Brown asking Mr. Doe to participate in a "threesome" with Mr. Brown and another co-worker, and suggesting Mr. Doe should hook up with his (male) co-worker; Mr. Brown commenting he knew Mr. Doe was "unique" from the beginning, and would be "adept" at his work because he "went both ways;" Mr. Brown sending

work-out videos of himself to Mr. Doe, and finding shirtless modeling photos of Mr. Doe and showing them to Mr. Doe, to let Mr. Doe know he had seen them (and had searched for them); Mr. Brown demanding that Mr. Doe share a hotel room with him on work related travel – even booking a room with a king bed and asking Mr. Doe to share it with him; Mr. Brown asking if Mr. Doe loved him and/or would he be his best friend," Mr. Brown asking Mr. Doe if they could go back to Mr. Doe's apartment (on the night Mr. Brown sexually assaulted Mr. Doe the first time); Mr. Brown making comments about the size of Mr. Doe's penis; and generally treating Mr. Doe in a discriminatory, hostile and harassing manner.

98.     Daversa engaged in the discriminatory conduct set forth above and throughout this Complaint based on Mr. Doe's sexual orientation, in violation of D.C. Code § 2-1402.11(a)(1).

99.     Daversa, through its Partners, agents, officers and employees, discriminated against Mr. Doe and subjected him to harassment on account of his sex, including forcible touching of his genital area, propositions for sexual conduct, and threats if Mr. Doe refused the conduct, during the course of Mr. Doe's employment.  This discrimination and harassment was with respect to the terms, conditions, and privileges of Mr. Doe's employment, in violation of D.C. Code § 2-1402.11

100.     This discrimination and harassment involved and affected the terms, conditions, and privileges of Mr. Doe' employment in violation of D.C. Code § 2-1402.11.

101.     The actions of Daversa had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401, *et seq*., in violation of D.C. Code § 2-1402.11.

102.     The discriminatory actions of Daversa were intentional, were actuated by malice, spite, and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for Mr. Doe's rights.

103.     As a direct and proximate result of the Defendants' conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

104.     As a direct and proximate result of Defendants' discrimination, Mr. Doe is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq*.

105.     Due to the character and severity of the Defendants' actions, and consistent with its intentional discrimination and harassment, Mr. Doe is also entitled to punitive damages.

### COUNT TWO –
### AIDING AND ABETTING DISCRIMINATION AND HARASSMENT
### IN THE COURSE OF EMPLOYMENT IN VIOLATION
### OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT
#### (against Bruce Brown)

106.     The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

107.     Through his individual actions, Mr. Brown aided and abetted the discrimination and harassment against Mr. Doe, as described in more detail in Count One above and throughout this Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Brown aided and abetted the

discrimination by Daversa because of his bias against gay workers in the workplace, and as

Managing Partner, representing Daversa.

108.    Acts of discrimination and harassment aided and abetted by Mr. Brown in

supporting, condoning and failing to bring an end to acts of discrimination by Daversa, as set

forth throughout the Complaint, include making numerous discriminatory comments to Mr. Doe

based on stereotypes of gay men; sending numerous inappropriate, lewd, discriminatory, and

threatening text messages to Mr. Doe; calling Mr. Doe "Fruit Loops," "Queen," "Drama Queen,"

and a "feminine bitch;" summoning Mr. Doe on numerous occasions, during the weekday to

meet at bar for drinks, while telling Mr. Doe to keep it a secret and "make something up;"

demanding Mr. Doe meet him on nights and/or weekends for lunch or dinner, and drinks, usually

on the false pretext of having "feedback" to share about Mr. Doe's performance; initiating

inappropriate and lewd conversations about Mr. Doe's sexuality and sex life, including asking

for intimate details and sharing details of his own sexual fantasies with Mr. Doe; discussing Mr.

Doe's sexuality with other Daversa employees; asking Mr. Doe to participate in a "threesome"

with Mr. Brown and suggesting Mr. Doe should "hook up" with his (male) co-worker; telling

Mr. Doe he knew he was "unique" from the beginning, and would be "adept" at his work

because he "went both ways;" sending work-out videos of himself to Mr. Doe, and finding

shirtless modeling photos of Mr. Doe online and sending them to Mr. Doe, to let Mr. Doe know

he had seen them (and had searched for them); demanding that Mr. Doe share a hotel room with

him on work related travel – even booking a room with a king bed and asking Mr. Doe to share it

with him; asking if Mr. Doe loved him and/or would he be his best friend," asking Mr. Doe if

they could go back to Mr. Doe's apartment (on the night Mr. Brown sexually assaulted Mr.

Doe); making comments about the size of Mr. Doe's penis; and generally treating Mr. Doe in a discriminatory, hostile and harassing manner.

109.     Through his individual actions, Mr. Brown aided and abetted the discrimination and harassment against Mr. Doe, as described in more detail in Count One above and throughout this Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Brown assaulted Mr. Doe, forcibly touched him in his genital area, propositioned him, and threated to punish him if he did not go along with the conduct.  He aided and abetted the discrimination by Daversa because of his sexual assault and harassment, and as Managing Partner, representing Daversa

110.     Additionally, Mr. Brown threatened Mr.  Doe, via text and verbally, not to expose his conduct, including warning him that complaining to Paul Daversa would not do any good since the CEO was Mr. Brown's close, personal friend.

111.     Mr. Brown's discriminatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Mr. Doe's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief.

112.     Mr. Brown's discriminatory, hostile and harassing conduct had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq.*, in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

113.     As a direct and proximate result of the Mr. Brown's conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary

expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and

profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

114.   As a direct and proximate result of the discrimination aided and abetted by Mr.

Brown, Mr. Doe is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described

in D.C. Code § 2-1403.13 and the Code of the D.C. Municipal Regulations, Title 4, Chapter 2, 4-

200 CDCR, *et seq.*

115.   Because of the character and severity of the conduct of Mr. Brown, as set forth

above, Mr. Doe is also entitled to punitive damages.

**COUNT THREE –**
**ASSAULT AND BATTERY**
**(Against Bruce Brown)**

116.   The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

117.   Mr. Brown's physical touchings of Mr. Doe in a sexual manner, all of which were

unwelcome, unprivileged, uninvited, unwarranted, and illegal, included:

- On November 14, 2019:  Tickling him in a sexual manner, grabbing at Mr. Doe's genitals outside of his clothing, restraining Mr. Doe and forcing his fingers into Mr. Doe's underwear;

- On December 12, 2019:  While seated next to Mr. Doe in a sauna, while Mr. Doe was wearing only a towel, placing his hand on Mr. Doe's thigh, rubbing his thigh, and moving his hand upwards towards Mr. Doe's genitals, and then pulling Mr. Doe's towel as Mr. Doe walked away, intentionally exposing Mr. Doe's buttocks; and

- On February 7, 2020:  On a company sponsored trip to Jamaica, while walking to the van which would transport them to dinner, Mr. Brown came up behind Mr. Doe and grabbed Mr. Doe's buttocks with both hands.

118.     Mr. Doe protested, opposed and resisted each instance of Mr. Brown's assaults and batteries, and let him know (verbally, and by resisting, fighting him off, and leaving) that his behavior was uninvited, unwelcome and made him extremely uncomfortable.

119.     Mr. Brown's conduct, as set forth above, caused in Mr. Doe extreme fear, anxiety, and reasonable apprehension of bodily harm and of further offensive sexual misconduct. Consequently, Mr. Brown's conduct, as set forth above, constituted assaults on Mr. Doe.

120.     Mr. Brown's touchings of Mr. Doe on the occasions described above were without consent, unwelcome, unprivileged, uninvited, unwarranted, and illegal, and amounted to batteries.

121.     Mr. Brown's assaults and batteries were done with malice, ill will and spite, and evinced a conscious disregard for the rights of Mr. Doe.

122.     As a direct and proximate result of Mr. Brown's conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

123.     Due to the severity of Mr. Brown's conduct, Mr. Doe is entitled to punitive damages.

**COUNT FOUR –**
**ASSAULT AND BATTERY –**
***RESPONDEAT SUPERIOR LIABILITY***
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

124.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

125.     As part of the performance of his duties as a Partner of Daversa, Mr. Brown was required to communicate with Daversa employees, specifically Mr. Doe, and they were required to communicate with each other.

126.     As part of the performance of his duties as an employee of Daversa, Mr. Doe was required to communicate with his fellow employees, including Mr. Brown, who had direct and supervisory authority over Mr. Doe, and who Mr. Doe rightfully believed held the fate of his job, and his career, in his hands.

127.     Mr. Brown's actions, in physically touching Mr. Doe in a sexual manner on more than one occasion, and using the veiled threat of his power and authority over Mr. Doe's job, and while acting in his capacity as a Partner of Daversa and as Mr. Doe's direct supervisor, with complete authority over him, were unwelcome, unprivileged, uninvited, unwarranted, and illegal, and his actions made Mr. Doe fear for his safety.

128.     During and following Mr. Brown's assaults and batteries on Mr. Doe, Mr. Doe told Mr. Brown that his actions were unwelcome and inappropriate in the workplace, and that they made Mr. Doe extremely uncomfortable.  Mr. Doe's protests, resistance and verbal objections to Mr. Brown's behaviors, and his demand that Mr. Doe never touch him again, had no effect on Mr. Brown.  Mr. Brown was aware that this was Mr. Doe's first job after graduating from college, and that he was young and vulnerable, with no prior full-time workplace experience to draw from, and he preyed upon that.

35

129.     Daversa continued to permit Mr. Brown to engage in behavior that was demeaning and degrading to Mr. Doe, allowed him to engage in repeated assaults and batteries against him, and took no action to protect Mr. Doe from Mr. Brown.

130.     Despite the fact that Daversa routinely hires and employs other young adults directly out of college, there were no effective policies in place to prevent what happened to Mr. Doe, and Daversa does not have an identifiable HR department, or clear reporting procedures.

131.     Defendants in effect ratified Mr. Brown's conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur and by refusing to take effective remedial action to prevent the activities from occurring.

132.     Defendants' actions were done with malice, ill will and spite, and evinced a conscious disregard for the rights of Mr. Doe.

133.     As a direct and proximate result of the Defendants' conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

134.     Defendants are further responsible for the actions of Mr. Brown because he was acting in the scope of his employment, and with the express authority over Mr. Doe that was granted to him a Partner of Daversa.

135.     Due to the severity of Defendants' conduct, Mr. Doe is entitled to punitive damages.

**COUNT FIVE -**
**NEGLIGENT SUPERVION AND RETENTION OF EMPLOYEE (BRUCE BROWN)**
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

136.    The allegations of the foregoing paragraphs are incorporated in this count as if re-alleged here in full.

137.    Daversa had a duty to its employees, including Mr. Doe, not to retain employees whom they knew or should have known were likely to harm its employees and/or to violate laws designed to protect the public.

138.    Daversa had, or should have had, actual and constructive knowledge that Mr. Brown was engaging in discriminatory, harassing, and illegal behavior towards Mr. Doe, including but not limited to sexual harassment, based, in part, on reports by Mr. Doe to Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan Wadsworth and Reece Breault – all more senior than Mr. Doe at Daversa.

139.    Despite this knowledge, Daversa placed and retained Mr. Brown in a position of superiority and supervisory authority over Mr. Doe, which Mr. Brown used to prey upon Mr. Doe, and to silence Mr. Doe by repeatedly threatening destroy Mr. Doe's career if he reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Doe "on the side of the road and focus on someone else."

140.    Mr. Doe, a young adult in his first post-college job, was extremely vulnerable had had no full-time workplace experience to draw from in order to navigate the situation and know the proper course of action when the person preying upon him was his supervisor, particularly in light of Daversa's lack of an HR department or clearly defined reporting procedures, and Mr. Doe feared for his job security, over which Mr. Brown had control.

141.    Daversa retained Mr. Brown in a position in which he could harass, threaten, harm and sexually assault Mr. Doe, and permitted Mr. Brown to continue to engage in illegal behavior towards Mr. Doe.

142.    In fact, Daversa, after becoming aware of the conduct of Mr. Brown, continued to retain Mr. Brown as a supervisory employee in a position to direct and influence Mr. Doe's employment, and after learning all of the details of Mr. Brown's sexual assaults and other treatment of Mr. Doe, including in another employee's written exit interview, continues to retain Mr. Brown as a supervisory employee in a position to direct and influence the careers and livelihood of other young adult employees under his supervision.

143.    Daversa was, and is, negligent in its supervision and retention of Mr. Brown after it learned, or should have learned, that he had a history of engaging in these behaviors.

144.    Had Daversa promptly and properly removed Mr. Brown from the workplace, he would not have had the opportunity to continue to engage in this conduct, to harm Mr. Doe, or to continue to harm Mr. Doe further.

145.    This conduct by Defendant was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregard for the rights of Mr. Doe.

146.    Mr. Doe suffered, and continues to suffer, harm as a result of Daversa's negligent supervision and retention of Mr. Brown, including loss of advancement and career opportunities and the attendant employment benefits.

147.    Daversa's negligent supervision and retention of Mr. Brown, in the face of knowledge of his illegal conduct, constitutes gross negligence and evinced a conscious disregard for the rights of Mr. Doe.

148.     Daversa's retention of Mr. Brown as an employee, and its failure to protect Mr. Doe from Mr. Brown, was willful and wanton in that it exhibited a conscious disregard for the rights of Mr. Doe.  Daversa was aware of the propensity of Mr. Brown to engage in illegal conduct that would harm Mr. Doe and the public, including based on Mr. Doe's reports to more senior Daversa employees.

149.     Daversa exhibited a reckless indifference in its failure to protect Mr. Doe in retaining Mr. Brown and in allowing Mr. Brown to continue in his position of supervisory authority over Mr. Doe.  Daversa was aware from the existing circumstances that its failure to act to protect Mr. Doe (by terminating Mr. Brown and discontinuing his illegal conduct) would likely result in further harm to Mr. Doe.

150.     Daversa ratified and condoned the conduct of Mr. Brown by refusing to take any action to prevent him from taking further action against Mr. Doe.  Daversa refused to take action despite awareness that Mr. Brown's conduct was growing progressively more aggressive, and knowing he had the potential to continue to escalate his behavior.

151.     Daversa also ratified and condoned the conduct of Mr. Brown by leaving him in Mr. Doe's chain of command as Mr. Doe's direct supervisor and continuing to allow him to be in a position of authority over Mr. Doe.

152.     Daversa is further responsible for the actions of Mr. Brown because as he was acting in the scope of his employment, and with the express authority over Mr. Doe that was granted to him as Daversa's agent.

153.     As a direct and proximate result of the Defendant's conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including

39

retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

154.     Due to the character and severity of Daversa's conduct, Mr. Doe is entitled to punitive damages.

## COUNT SIX -
## NEGLIGENCE OR GROSS NEGLIGENCE
### (against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)

155.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

156.     Daversa had a duty to use care to protect its employees from harm.

157.     Daversa permitted Mr. Brown to engage in behavior that was demeaning and degrading to Mr. Doe, allowed Mr. Brown to engage in repeated assaults and batteries against Mr. Doe, and took no action to protect Mr. Doe from Mr. Brown.

158.     Despite the fact that Daversa routinely hires and employs other young adults directly out of college, there were no effective policies in place to prevent what happened to Mr. Doe, and Daversa does not have an identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment.

159.     In addition, at various times during his employment, Mr. Doe reported Mr. Brown's inappropriate late night texts and phone calls to Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan Wadsworth and Reece Breault – all more senior than Mr. Doe at Daversa.

160.    Throughout all of this, Mr. Brown repeatedly threatened destroy Mr. Doe's career if he reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Doe "on the side of the road and focus on someone else."

161.    Daversa was on notice and aware of its negligence in not having any identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment, since another associate of the firm had been previously sexually assaulted by a partner and nothing was done to address it.

162.    Daversa in effect ratified Mr. Brown's conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur and by refusing to take effective remedial action to prevent the activities from occurring.  Daversa failed or refused to create or enforce policies and procedures prohibiting this type of activity, and for instructing employees on the proper procedures for reporting this type of conduct, and failed to establish or follow any guidelines for addressing and investigating such conduct, despite its knowledge of a prior sexual assault of an employee by a partner

163.    As a result of Daversa's failure to protect Mr. Doe, Mr. Doe was sexually harassed and sexually assaulted by Mr. Brown on several occasions.

164.    As a direct and proximate result of the Defendant's conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

165.     Daversa's willful refusal to take any effective remedial or corrective action in response to Mr. Doe's reports, and its failure to establish clear reporting channels and procedures for investigating reports of sexual harassment, even in the face of knowing that another partner had sexually assaulted another employee, demonstrates that Daversa acted with gross negligence, an utter disregard of caution, and amounted to neglect of Mr. Doe's safety, such that it would offend fair minded and ordinary people.

166.     Daversa's failure to protect Mr. Doe was willful and wanton, in that it exhibited a conscious disregard for the rights of Mr. Doe.

167.     Due to the severity of Daversa's conduct, Mr. Doe is entitled to punitive damages.

**COUNT SEVEN –**
**VIOLATION OF THE D.C. WAGE PAYMENT AND WAGE COLLECTION LAW**
**(D.C. CODE § 32-1301, *et seq*.)**
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

168.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

169.     By terminating Mr. Doe and failing to pay him for any overtime worked, and by failing to pay him for *any* commissions earned throughout the course of his employment totaling $62,500, to which he is entitled and had earned pursuant to the terms of compensation set forth in the Daversa Partners Compensation Plan, Defendants are in violation of the D.C. Wage Payment and Wage Collection Law.

170.     In addition to unpaid commissions, Mr. Doe was compensated for 80 hours per pay period, but consistently worked from 8 AM until 10 or 11 PM at night, five days a week, for the duration of his employment, and frequently worked weekends and holidays in addition to that.

171.    As such, Mr. Doe is entitled to payment for the overtime worked, and
commissions earned, plus quadruple/statutory damages, attorney's fees and costs, and
appropriate injunctive relief.

### COUNT EIGHT -
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (against All Defendants)

172.    The allegations of the foregoing paragraphs are incorporated as if realleged
herein.

173.    Defendants' conduct was intentional and reckless in that it had the specific
purpose of inflicting emotional distress on Mr. Doe, was fully intended, and Defendants knew or
should have known, that severe emotion distress would likely result, or knew or should have
known that severe emotional distress was substantially certain to result from their conduct.

174.    Daversa is responsible and liable for Mr. Brown's intentional and reckless
conduct because these acts were committed while in the course and scope of Mr. Brown's
employment by, and as a Partner of, Daversa, and these acts arose out of the execution of his
duties on behalf of Daversa.

175.    The actions and conduct of Defendants, as set forth above, and more specifically
in ¶¶ 26-51, 54-56, 58, 60, 63-67, 69-70, 72, 74, 76, 78, 80, and 83-85, and elsewhere, were
intentional or reckless in that they had the specific purpose of inflicting emotional distress on Mr.
Doe, Defendants fully intended their conduct, and knew or should have known that severe
emotional distress would likely result.

176.    Furthermore, Daversa inflicted further and greater emotional distress on Mr. Doe
by failing to offer any assistance or support to Mr. Doe, despite knowing he was suffering as a
result of Mr. Brown's actions, and despite knowing that Mr. Brown was preying upon a young

adult as started his career in his first post-college job, who was vulnerable had had no full-time workplace experience to draw from in order to navigate the situation and know the proper course of action, particularly in light of Daversa's lack of an HR department or clearly defined reporting procedures; and that he feared for his job security.

177.     Due to Daversa's failure to take any action or to further protect Mr. Doe, Mr. Doe suffered, and continues to suffer, severe emotional distress with physical manifestations including frequent panic attacks, anxiety, irritability, nausea, lack of motivation, insomnia, erectile dysfunction, feelings of helplessness and hopelessness, loss of self-worth, and powerlessness, all due to the egregious nature of the sexual harassment, assaults and batteries Mr. Doe was forced to endure, on a continual and persistent basis.

178.     As a direct result of the sexual assaults and batteries, and Mr. Brown's incessant and egregious sexual harassment, which intended to, and did, destroy Mr. Doe's self-worth and cause him to feel trapped and afraid, Mr. Doe began to suffer from frequent panic attacks whenever he attempted intimacy with his romantic partners.  Mr. Doe broke off his relationship with his boyfriend as a result of the emotional distress caused by Defendants' treatment of him, which made him unable to achieve, or maintain, erections.  Mr. Doe has lost a significant amount of weight, suffers from insomnia, cannot sleep without the use of sleep aids, and has nightmares. He now has regular and constant headaches, and is frequently nauseous.

179.     In addition to the negative effects on his romantic relationships, Mr. Doe's friends and acquaintances have commented on his irritability and "shortness" in the past months.  Mr. Doe has no sex drive, and lacks motivation to get out of bed in the mornings.  Whereas prior to these events, Mr. Doe was up at 5 AM to work out, he now sleeps until 9 or 10 AM.  Mr. Doe sought (and continues to undergo) medical treatment and has been diagnosed with Post

Traumatic Stress Disorder and Major Depressive Disorder, Single Episode, for which he was prescribed medication.

180.    Mr. Doe was forced to quit his job in order to protect himself – and then was fired before he could work out his notice period – during a time of an international pandemic and global economic downturn.  With no source of income, Mr. Doe was forced to move out of his apartment in Washington, D.C., and relocate, because he would no longer afford to pay rent.

181.    Defendants' conduct towards Mr. Doe was outrageous and intolerable, offending generally accepted standards of decency and morality.

182.    As described above, this conduct by Defendants was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregards for the rights of Mr. Doe.

183.    As a direct and proximate result of the Defendants' conduct, Mr. Doe has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

184.    Mr. Doe also sustained pecuniary loss, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

185.    Daversa is responsible and liable for Mr. Brown's intentional infliction of emotional distress of Mr. Doe while he was employed under the doctrine of *respondeat superior*.

186.     Mr. Brown was performing his employer's services and acting within the scope of his employment as a Partner at Daversa when he sexually harassed and discriminated against Mr. Doe, and sexually assaulted and battered him on several occasions, causing him severe emotional distress.  Daversa, as Mr. Brown's employer, is therefore vicariously liable for his actions and the injuries Mr. Doe sustained under the theory of *respondeat superior.*

187.     Due to the severity of Defendants' conduct, Mr. Doe is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff JOHN DOE requests that this Court enter judgment in his favor, and jointly and severally against Defendants, DAVERSA PARTNERS, RESOURCE SYSTEMS GROUP INC. t/a DAVERSA PARTNERS, and BRUCE BROWN, jointly and severally, on the above Counts; and further:

(a)     Award Mr. Doe compensatory damages to be determined by a jury, and in no event to exceed $20 Million Dollars ($20 million), plus demonstrated past and future pecuniary damages on each of the above-stated Counts One through Eight (including pre-judgment interest); and in addition

(b)     Award Mr. Doe punitive and exemplary damages, to be determined by a jury, on the above stated Counts One, Two, Three, Four, Five, Six and Eight; and in addition

(c)     Award Mr. Doe quadruple damages on Count Seven; and in addition

(d)     Award Mr. Doe reasonable attorneys' fees and the costs of this action, including expert witness fees; and in addition

(e)     Declare that the Defendants have violated the District of Columbia Human Rights

Act; and in addition

(f)     Enjoin the Defendants from further violations of the District of Columbia Human

Rights Act; and in addition,

(g)     Award Mr. Doe such other and further relief as may be appropriate under the

circumstances.

## JURY DEMAND

**PLAINTIFF JOHN DOE DEMANDS A TRIAL BY JURY.**

December 17, 2020                      Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, D.C. Bar No. 474097
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, John Doe*