# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VAUGHN FEIGHAN | ) | |
| 11 East 7th Street | ) | |
| New York,  New York 10003 | ) | |
|  | ) | |
| Plaintiff, | ) | C.A. No. 1:20cv3759 (BAH) |
|  | ) | |
| v. | ) | |
|  | ) | |
| DAVERSA PARTNERS, *et al.* | ) | |
|  | ) | |
| Defendants. | ) | |
|  | ) | |

## CORRECTED COMPLAINT

Plaintiff VAUGHN FEIGHAN, by counsel, hereby moves this Court for entry of judgment in his favor, and against DAVERSA PARTNERS, RESOURCE SYSTEMS GROUP INC. t/a DAVERSA PARTNERS, and BRUCE BROWN, jointly and severally, and in support thereof, states as follows:

## SUMMARY

Daversa Partners hired Mr. Feighan right out of college to work in their DC office. Daversa assigned him to work directly for its second-in-Command, Bruce Brown, who, according to Mr. Brown, was best friends with the Owner of Daversa, Paul Daversa.  During Mr. Feighan's tenure, Mr. Brown sexually battered Mr. Feighan on three separate occasions, including Mr. Brown grabbing at Mr. Feighan's genitals outside of his clothing and then forcibly restraining Mr. Feighan and forcing his fingers into Mr. Feighan's underwear.

Mr. Brown also constantly used his authority and status at Daversa to force Mr. Feighan to spend time with him, drink alcohol with him, and even sleep in the same bed with him, in hopes that he could get Mr. Feighan in a state where Mr. Brown could become intimate with

him.  Mr. Brown told Mr. Feighan that when they met for Mr. Feighan's first interview, he knew something was "unique" about Mr. Feighan, saying, "I knew you went both ways; you can get fucked or you can fuck…I knew I was going to hire you then.  I do not care what the rest of my team has to say, I make the decisions."

Mr. Brown would regularly engage in inappropriate conversations discussing sex and Mr. Feighan's sexuality.  Mr. Brown told Mr. Feighan that he had been in love with another man during his college years, revealed he liked fingers in his anus when having sex with his wife, and said that he had always dreamed of "going both ways" but it had not been "acceptable" when he was growing up.

Mr. Brown made his conditions of employment clear in other ways – and, on all company business trips (with the exception of one incentive trip), Mr. Brown insisted that Mr. Feighan share the same hotel room him.  When Mr. Feighan asked why he could not have his own hotel room, Mr. Brown responded that the trip was a reward enough, and that if he wanted his own room, he would have to pay for it himself.  On two such occasions, Mr. Brown intentionally reserved a room with one king size bed.

When Mr. Feighan would try to distance himself Mr. Brown and resist the abuse (and at other times), Mr. Brown would make demeaning comments to Mr. Feighan about his sexuality, calling him such names as "Queen," "Drama Queen," "Feminine bitch," and "Fruit Loops."

Mr. Feighan complained to Mr. Brown, and other supervisors and employees.  Many others at Daversa witnessed Mr. Brown's behaviors and raised concerns to Mr. Feighan.  Yet, Daversa did nothing to protect Mr. Feighan and had no system to address and remedy Mr. Feighan's concerns.  Daversa did not even have a Human Resources department that Mr. Feighan could go to for help (despite Daversa having more than 150 employees).  When Mr.

Feighan raised his concerns to Mr. Brown on one occasion, Mr. Brown reminded Mr. Feighan that Mr. Daversa was his "best friend" and that Mr. Feighan could not do anything to change that.

When Mr. Feighan was unable to take the discrimination, harassment and ridicule any longer, coupled with his fear of further sexual assault, that Mr. Brown's conduct would never stop, and that Daversa would never take steps to protect him, even after being sexually assaulted by Mr. Brown on several occasions, Mr. Feighan resigned.  During this conversation, Mr. Brown threatened Mr. Feighan saying the world was "too small" and "I will find out where your next position is and make sure you do not have another role in the tech industry."  Daversa later terminated Mr. Feighan before his departure date, announcing publicly that Mr. Feighan had left the company inappropriately and falsely blaming him for Daversa's negative reviews on social media.

As a consequence of the sexual batteries, assaults and behaviors of Mr. Brown and Daversa, Mr. Feighan was traumatized and suffered physical injury and severe emotional and psychological injuries with continuing physical manifestations, necessitating his treatment with medical professionals and prescribed medicines to treat the physical and emotional manifestations.

## **NATURE OF ACTION**

1.      This is a civil action by Plaintiff Vaughn Feighan against his former employers, Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners, and against Bruce Brown, an individual Partner at Daversa Partners, arising out of discrimination and harassment on the basis of sexual orientation in the course of Plaintiff's employment, and for violations of the D.C. Wage Payment and Wage Collection Law ("DCWPWCL"), D.C. Code 32-1301, *et seq.*,

for failure to pay Plaintiff overtime pay and commissions to which he was entitled.

2.      This action also states a claims for negligent supervision of employee (Bruce Brown) and gross negligence, assault and battery against the individual Defendant, Bruce Brown, and a claim for intentional infliction of emotional distress against all Defendants.

3.      This action is brought under the District of Columbia Human Rights Act, D.C. Code §2-1401.01 *et seq*., the D.C. Wage Payment and Wage Collection Law ("DCWPWCL") , D.C. Code 32-1301, *et seq.*, and under the common law of the District of Columbia.

## PARTIES

4.      Plaintiff Vaughn Feighan ("Mr. Feighan") is a resident and citizen of the State of New York.  At all times relevant hereto, Mr. Feighan was a resident and citizen of the District of Columbia, and employed by the Defendants in Washington, D.C.

5.      Defendant Daversa Partners is a leading headhunting company with five offices across the nation, including in Washington, D.C., serving the technology sector in North America, with a reputation for building out management teams and recruiting "Material Impact Executives" for today's relevant consumer and enterprise businesses, such as Dropbox, Twitter, Palo Alto Networks, Compass, Airbnb, DocuSign, Uber, Snapchat, DoorDash, Boston Dynamics, TaskRabbit, Google, Nike, Peloton and HubSpot.  Daversa partners with Khosla Ventures, General Catalyst, Andreesen, Kleiner, Sequoia, Accel and Benchmark.

6.      Defendant Resource Systems Group, Inc. is the entity that appears on Plaintiff's paystubs, and on his W-2, through which Plaintiff was paid as an employee of Daversa Partners, in Washington, D.C.  The name Daversa Partners is a trademark name owned by Resource Systems Group Inc., which was, until approximately mid to late 2012, the former name of

Daversa Partners.[1]  For more than eight years, Daversa operated in Washington, DC without a license.

7.      Defendant Resource Systems Group, Inc. is a foreign corporation registered to do business in the District of Columbia and which maintains an agent for service of process in Washington, D.C.

8.      Defendants Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners are collectively referred to herein as "Daversa."

9.      Defendant Bruce Brown ("Mr. Brown') is a resident and citizen of the District of Columbia, and was (and is) the Managing Partner and second in command at Daversa Partners, working in the D.C. Office.  Mr. Brown was Plaintiff's direct supervisor at all times relevant to this Complaint.

## JURISDICTION AND VENUE

10.      This Court has jurisdiction over Mr. Feighan's claims under the common law of the District of Columbia.

11.      The amount in controversy exceeds the jurisdictional minimum amount for this Court.

12.      At all times relevant hereto, Daversa was Mr. Feighan's "employer" within the meaning of D.C. Code § 2-401.02(10) and D.C. Code § 32-1301(1).

13.      Mr. Feighan was an "employee" of Daversa within the meaning of D.C. Code § 32-1301(2).

14.      Daversa is present in and conducts business in the District of Columbia, and is therefore subject to the personal jurisdiction of this Court.

---

[1] https://trademarks.justia.com/856/13/daversa-85613465.html

15.     Mr. Brown is subject to the personal jurisdiction of this Court pursuant to D.C. Code §§ 13-422 and 13-423.

16.     The majority of the tortious acts alleged in this Complaint were committed in the District of Columbia.

17.     Jurisdiction and venue are proper in this Court.

## BACKGROUND

18.     Mr. Feighan began interviewing with Daversa in September 2018 while he was still an undergraduate at Boston College. The conversation commenced with an hour-long discussion with Jonathan Krodel, the firm's leader for internal hiring.

19.     In April 2019, Mr. Feighan resumed conversations with Daversa while weighing his post-college options (grad school or employment).  Mr. Feighan's uncle had been one of the first ten employees at Daversa Partners (when it was known as Resource Systems Group) and had enjoyed tremendous success during his tenure there.

20.     During Mr. Feighan's final interview process with Daversa, Bruce Brown asked if Mr. Feighan was a "crier."  He later explained that because the Washington D.C. office had such high turnover rate (one of the highest, if not the top, in the company), they could not waste their time on people who cried or "could not take the culture."  He also asked Mr. Feighan if he enjoyed consuming marijuana.

21.     Mr. Feighan accepted a written offer of employment from Daversa in April 2019, after he graduated from Boston College in May 2019, and started working as a full-time "Consultant" (the name given to the newest class of full-time hires) on July 8, 2019 in the Washington D.C. office, reporting jointly to Reece Breault and Bruce Brown.  Subsequent to this, Mr. Brown removed Mr. Breault from Mr. Feighan's reporting line, so that Mr. Feighan

reported directly (and only) to Mr. Brown.  This was unprecedented as Consultants normally reported to an Associate, Senior Associate, or Director, and never directly to a Partner of Mr. Brown's stature in the Company.

22.     Daversa was Mr. Feighan's first full-time job after graduating college and he was looking forward to having a professional and formative experience out of college, with strong leadership and a mentor who would provide exposure to multiple opportunities in the tech world. It was one of Mr. Feighan's dreams to work in the startup tech community, given the ingenuity and fast-pace of the industry.

23.     From the outset, Mr. Feighan proved himself to be a valuable employee, and soon was recognized as the firm's top young hires because of his exemplary performance, record-breaking activity, and work ethic.  This was recognized and reaffirmed by Mr. Brown, and Daversa CEO, Paul Daversa ("Mr. Daversa") in numerous emails.

24.     Mr. Feighan never received any substantive negative feedback regarding his performance.

25.     From the outset of his employment, Mr. Feighan was exposed to a work environment and culture that often centered around alcohol and drinking, often times to excess.

26.     On August 2, 2019, Mr. Feighan received a text message from Mr. Brown, during the work day, to "Come down stairs solo and meet me Northside @ 3:30..make up something." Northside Tavern is a bar close to the Washington D.C. office where Mr. Brown spent many afternoons.  Mr. Feighan was summoned to Northside – or other bars throughout the city – by Mr. Brown more than any other individual on the team.

27.     On Friday, October 18, 2019, Mr. Brown summoned Mr. Feighan, by text, to Dulles International Airport, from work, simply so Mr. Brown could drive home with Mr.

Feighan.  Mr. Feighan obliged, since he was only four months into the job and Mr. Brown was

his supervisor and a Partner.  Before Mr. Feighan left for the airport, Mr. Brown texted and

instructed, "Please do not share with Reece or others..don't want to think I'm giving you special

treatment etc."

28.     Mr. Brown confessed to Mr. Feighan that when they met for Mr. Feighan's first

interview in Westport, Connecticut he knew something was "unique" about Mr. Feighan, saying,

"I knew you went both ways; you can get fucked or you can fuck…I knew I was going to hire

you then.  I do not care what the rest of my team has to say, I make the decisions."  Mr. Brown

was referring to Mr. Feighan's sexuality.  Mr. Feighan was shocked and completely taken aback

by Mr. Brown's inappropriate and unprofessional statement, and his lewd characterization of Mr.

Feighan's identity as a gay man.

29.     On Friday morning, August 23, 2019, a little over one month into the job, Mr.

Feighan received a text message from Mr. Brown asking for his address.  Mr. Brown then drove

to Mr. Feighan's apartment to pick him up on the pretext of wanting to conduct a 1:1 discussion

of a vision board assignment Mr. Feighan was working on.  At lunch, Mr. Brown ordered

whiskey, and told Mr. Feighan drinking whiskey was "not optional."  Mr. Feighan was extremely

uncomfortable, but since this was his first job out of college, and Mr. Brown was his supervisor

as well as the longest standing Partner of Daversa, Mr. Feighan felt he had no choice other than

comply, or else risk angering Mr. Brown and jeopardizing his job.

30.     As part of his job, Mr. Feighan was required to travel with Mr. Brown.  On

September 11, 2019, during a trip to California, at dinner in San Jose following a day of client

and candidate meetings, an intoxicated woman sitting across the bar from Mr. Feighan and Mr.

Brown bought them champagne.  The woman proceeded to make sexual gestures to Mr. Feighan

from across the bar.  After she was asked to leave by the bar's management, Mr. Brown

commented to Mr. Feighan that they had just "lived the beginning of a small dream" of his.  Mr.

Brown told Mr. Feighan he would "love to take that woman in the bathroom, fuck her and pull

her hair while she screamed and [Mr. Feighan] watched…if [Mr. Feighan] did not want to join."

Mr. Feighan was stunned by the inappropriate and vulgar comments, and did not know how to

respond.

31.     After that night, Mr. Brown shared with Mr. Feighan explicit sexual details about

his life, including describing a "threesome" with an Asian woman and another man with whom

he had fallen in love during his college years, revealing he liked fingers in his anus when having

sex with his wife, that he had always dreamed of "going both ways" but it had not been

"acceptable" when he was growing up, and that he would like to sleep with multiple senior

members at Daversa.  Mr. Feighan was always extremely uncomfortable during these one-sided

conversations with his supervisor, not knowing how (or whether) to respond, or how to stop

them from occurring at all.

32.     Mr. Feighan sent text messages to Mr. Brown asking him to stop, including the

following exchange:

> Mr. Brown:     This note wasn't about Reece but YOU. I never once mentioned him
> in my thank you so I'm thinking that deep down you have a hard on
> for him…that's cool! Dealing with your maniac personality forces me
> to be a better manager/leader & the bonus is that we are friends/fierce
> competitors who respect each other! We all need a Reece in our lives
> to drive us so stay focus king/queen bitch!!  There is no need for a
> response to that
>
> Mr. Feighan:   I don't like when you make sex jokes about Reece and I, it makes me
> uncomfortable
>
> Mr. Brown:     It wasn't meant to be..it was more about your constant focus on him
> via steamrolling etc…sorry for making you feel uncomfortable..I'll
> pull back and keep it simple with you moving forward

Mr. Feighan:   Yeah but I have told you the same thing over and over again with Reece and the sex jokes but it has obviously not changed and is really pissing me off…So stop

33.     Mr. Brown frequently instructed Mr. Feighan to "make sure you capitalize on everything I am giving you…do you know what I [am] referring to?  People only make their way to the top by two ways."  Mr. Brown was referring to networking/connections, and "sleeping" your way to the top.

34.     Other text messages Mr. Feighan received from Mr. Brown included:

- "I'm hanging with Paul and his wife. You should be here but for now keep your head down and just know there's another trip in the bay/LA in your future" (October 15, 2019)

- "Don't share with Reece or others..don't want to think I'm giving you special treatment etc."  (October 18, 2019)

- "Please cover me and not share with the group that we are grabbing a drink…" (October 22, 2019)

- "I have an incentive for you"…"If u don't achieve, then dinner with Reece where you cook for him @ your apartment" (November 1, 2019)

- "Cool..be there in 5..get 2 seats at the bar.." (November 3, 2019 - a weekend. Mr. Brown texted Mr. Feighan under guise of having received negative feedback about Mr. Feighan ((a ploy he used several times), always admitting there was no negative feedback)

- "I'm still with Reece but know that you are my guy..didn't fuck it up!!!!" (November 4, 2019)

- "Let's keep crushing tommy!!! Fuck it..take it all the way…no looking back!! And if Reece doesn't keep up..you'll me [sic] taking him down too" (November 10, 2019)

- "Lol…I feel bad riding you on a Sunday b/c I'm actually taking out my frustration with Reece on you!!!" (November 10, 2019)

- "BTW: If Reece or anyone else gets a hold of our text exchanges then you'll be assigned to Reece for the rest of your Daversa career!!!" (November 11, 2019)

- "I intentionally like to fuck with you!!!! Net net..you are my Bryce!!" (November 22, 2019)

- "This was your best week..ran your own search cal via Zycada and operated with a sense of urgency/communicated well and got your hustle on!!! I fucking you!!!" (November 26, 2019)

- "I'll make a decision by 10 to fuck with you!!!" (January 8, 2020)

- "We can't spend anymore time together..need to keep the team in check so they don't feel that we are spending too much time together!!!" (January 10, 2020)

- "I didn't let the haters hold me back..instead I leveraged that to drive me all the way to the fucking top!!!...beat them at their game by being humble." (January 12, 2020)

- "I fucking love you although you are a nut job, how does one not want to be your friend!!! Fuck the haters and take it to another level…we are committed to doing 1 road trip a month in the field and let's figure out joe to get in front of investors in London!!!!!!!" (February 2, 2020)

- "Don't let me beg fucker…I just want to hang with you!! Barry's, smoothie and craft your killer email for Redmarlin. We think you're great!!" Attached with this text was a picture of Mr. Daversa and Mr. Brown. (February 22, 2020)

- You little fucker..You should be paying me for the amazing experience I'm giving you!!! You little Barry bitch!!! Btw you and I Just fucking steam roll them!!! I can't hold back winners so let's go after it!!" (February 23, 2020)

35.     On Thursday, November 14, 2019, Mr. Brown invited Mr. Feighan to dinner at a location near Mr. Feighan's apartment, for the purported reason of needing to speak to Mr. Feighan based on feedback he received from Paul Daversa, CEO of Daversa.  Although Mr. Feighan believed such a meeting should have taken place during working hours, he had only been with Daversa five months, and had been told by Mr. Brown and others on several occasions about the tools required to succeed in the firm – "You need to drop everything you are doing and

make sure work comes first, especially in the first year…your personal life will be there after you make it to the one-year mark."

36.     Mr. Brown was on his way back from dropping Mr. Daversa at BWI Airport, and texted Mr. Feighan "Let's meet at a cool restaurant near your apartment. Got good feedback from Paul…" and "Pick something close to your place other than busy boys."  Mr. Feighan followed that with, "Ava just asked me to do a mentor/mentee drink.  Should I invite her or what should I say?"  Mr. Brown responded, "This is btw you and I..stop being so political…I want to hang with you solo!! And don't share."

37.     Mr. Brown took Mr. Feighan to Centrolina, an Italian restaurant in City Center, and they sat at the bar.  Mr. Brown immediately started drinking, and after a few drinks, began to act in an extremely inappropriate and unprofessional manner towards Mr. Feighan.

38.     Mr. Brown asked Mr. Feighan about his sexuality, if Mr. Feighan would be his best friend, if Mr. Feighan trusted him, if Mr. Feighan loved him, if Mr. Feighan thought he was attractive, and asked if they could go back to Mr. Feighan's apartment.

39.     Mr. Brown strongly pressured Mr. Feighan throughout the evening to drink alcohol to such an extent that when Mr. Brown went to the bathroom before the main course arrived, Mr. Feighan explicitly asked the bartender to pretend he was making alcoholic drinks for Mr. Feighan, but to substitute lime juice and seltzer to make it look like alcohol.

40.     When they left the restaurant, based on the number of drinks delivered to Mr. Feighan – at Mr. Brown's direction – Mr. Brown likely believed Mr. Feighan was heavily intoxicated.

41.     When they left the restaurant, Mr. Brown forced Mr. Feighan to ride with him back to Mr. Feighan's apartment, refusing to give Mr. Feighan his backpack (which was in Mr. Brown's trunk) unless he rode back with him.

42.     Mr. Brown said, "Do anything you want to me," and "Let's just go back to your apartment, my wife will not ask about it."  Mr. Brown often told Mr. Feighan about the various times he had wanted to cheat on his wife with someone else.

43.     Before they reached the car, though, Mr. Brown started tickling Mr. Feighan as they walked and then grabbed Mr. Feighan's genitals/crotch area (outside of his pants) and said words to the effect of, "I always imagined you had a massive dick."

44.     Mr. Feighan was in shock, and told Mr. Brown he would take an Uber home.  Mr. Brown told Mr. Feighan he would not return his backpack unless he rode with him.  Mr. Feighan feared for his safety, but felt he had no choice other than to comply, and attempt to placate, Mr. Brown, who had complete control over Mr. Feighan's job and the start of his career.

45.     When Mr. Feighan got in the car, Mr. Brown continued to remark on the size of Mr. Feighan's penis, and when they arrived at Mr. Feighan's apartment, Mr. Brown began to tickle Mr. Feighan again.

46.     When Mr. Feighan reached for the door and unbuckled his seat belt, Mr. Brown threw his right arm across Mr. Feighan's chest to keep him restrained and held him down. Mr. Brown unbuckled his seat belt as Mr. Feighan struggled under him, and Mr. Brown forced his other hand down Mr. Feighan's pants, placing several fingers inside Mr. Feighan's underwear.

47.     After that, Mr. Feighan was then able to push Mr. Brown off, get out of the car, retrieve his backpack and leave.

48.     Mr. Feighan received a text message from Mr. Brown later that night saying, "Great hanging out tonight..you want to be better than Bryce? 24 months."  Mr. Feighan responded that he wanted to be better but would not commit to staying two years with Mr. Brown.  Mr. Brown responded, "Come on…you and I have taken it to another level..there is no turning back…it's either you, Ava or Reece. I love how you like to play hard to get even after I delivered Frank and Paul..I get it…it's a control thing for you…I'll get Reece to lock you in."

49.     The following morning, Mr. Brown called Mr. Feighan and said, "I apologize I crossed a line last night but if you want to be successful, capitalize on our relationships and do whatever it takes. Let's keep this our secret."

50.     Mr. Brown's sexual assault and battery of Mr. Feighan was intentional and premeditated, as evidenced by his text messages to Mr. Feighan that the supposed "work" dinner was only between them, that Mr. Brown wanted to "hang" with Mr. Feighan alone, that Mr. Feighan should not share their plans with anyone, attempting to ply Mr. Feighan with alcohol, and that Mr. Feighan should keep what happened (Mr. Brown's sexual assault and battery of Mr. Feighan) a secret.

51.     On November 22, 2019, Mr. Brown texted Mr. Feighan, "I have your back and will do what it takes to ensure that u crush it!!! I intentionally like to fuck with you!!!!"

52.     On December 12, 2019 the entire Washington D.C. office flew into White Plains (NY) Airport to attend the company holiday party being held that evening in Connecticut.

53.     Given the tremendous success the team had achieved the prior year, the team was treated to an afternoon at the Ritz Carlton Hotel and Spa before leaving for their overnight accommodations in Connecticut.  The men and women separated into their prospective spa suites

and spent the afternoon working out in the gym and alternating between steam room, sauna, and receiving massages.

54.     Mr. Feighan was alone in the sauna, wearing only a towel (per spa rule) when Mr. Brown entered and sat next to him.  Mr. Feighan moved away since the sauna was empty and he did not want to sit directly next to Mr. Brown.  Mr. Brown then moved to be next to Mr. Feighan again.

55.     While Mr. Feighan was in the sauna, Mr. Brown placed a hand on Mr. Feighan's exposed thigh and started to move his hand up Mr. Feighan's leg.  Mr. Feighan quickly covered his exposed skin and got up to leave, but Mr. Brown pulled on Mr. Feighan's towel to expose his buttocks as Mr. Feighan exited the spa.  Mr. Brown laughed as Mr. Feighan left.  Mr. Feighan then broke into tears.

56.     After the trip, Mr. Brown continued to send Mr. Feighan inappropriate, discriminatory and harassing text messages.  Examples include:

- "Grow some balls and make the call..you work for me now Bitch!!" (December 19, 2019)

- "Don't let Ryan slap you around Unless that's [what] you're into!!" (January 13, 2020)

- "Go downstairs and call me…don't let anyone know u are on the call with me or London is off the table" (January 16, 2020)

- "I'm taking gummies to work today & tomorrow so that I can pass the time in chill mode while you're out!!!" (January 23, 2020; referring to marijuana edibles)

- "Pull back and go get fucked!!! Please you are stressing me out…I love you but I need time to stay on top of all moving parts!!! Good night!!!" (January 26, 2020)

- "So know that I've got your back/want to set you up for success even when I jam u up with Reece!!! So next time you get all twisted up, I'll throw up on you!!" (February 4, 2020)

57.     On February 7, 2020, Mr. Feighan was in Jamaica with his team on a reward/incentive trip since the D.C. office had reached approximately $10M+ in revenue. During the day, the group took a trip to a small sandbar island where they spent the afternoon drinking and smoking marijuana.

58.     Mr. Brown liberally purchased marijuana to share with the team, and he kept constant pressure on Mr. Feighan to smoke more and more, even when Mr. Feighan declined. Mr. Feighan had also stopped drinking alcohol when he noticed Mr. Brown becoming agitated at his refusal to smoke more marijuana.

59.     Later, after the team arrived back at their residences to shower and dress for dinner, they were instructed to meet for pre-dinner drinks at the main house where Mr. Brown and the more senior people on the team were staying.  Most everyone was inebriated, but Mr. Feighan had switched to water while others continued to drink alcohol.  Before the trip, and earlier in the day, Mr. Feighan asked his co-worker, Isabella Diodato ("Ms. Diodato"), if she would accompany him during various activities during the trip because he did not want to be alone with Mr. Brown.

60.     While walking to the van which would transport them to dinner, Mr. Brown came up behind Mr. Feighan and grabbed Mr. Feighan's buttocks with both hands.  Mr. Feighan physically turned, pushed him away, and told Mr. Brown that if Mr. Brown ever touched him again, he would report him to Paul Daversa.  Mr. Brown just laughed and told Mr. Feighan that Mr. Daversa was his best friend and would not do anything to change it.  Mr. Brown then added, "I am the boss, you are my bitch now.  I do what I want."

61.     Mr. Feighan was stunned and frightened by Mr. Brown's comment.  Daversa was Mr. Feighan's first job out of college, and his first professional workplace situation since

graduating.  Mr. Brown preyed up on this, and on Mr. Feighan's inexperience and desire to

succeed, fully realizing that he was in a position of power over Mr. Feighan, who had no

professional workplace experience to draw from to know how to handle the situation which

involved his direct supervisor – a very high level Daversa executive – treating him in an

inappropriate and illegal manner, or to know how to properly report it and demand that Daversa

take steps to protect him, all the while worried about the repercussions of doing so, and of losing

his job.

62.     On February 8, 2020 Mr. Feighan texted Ms. Diodato, "Bruce wants us to get

drinks when we get back.  Supposedly he only wants the two of us which I feel is a little fucked

up and might cause some problems."  Mr. Feighan asked Ms. Diodato to accompany him.

63.     At the time, despite having more than 150 employees, Daversa had no Human

Resources Department and thus no independent place where Mr. Feighan could report what was

happening to him.   Mr. Feighan had already told him not to bother trying to report him since the

Owner of the Company was, according to Mr. Brown, Mr. Brown's best friend.

64.     Because he did not know how to make Mr. Brown's conduct stop, after explicitly

confronting Mr. Brown about the behavior and comments, Mr. Feighan, recognizing that Mr.

Brown held the fate of his fledgling career in his hands, began to take the path of least resistance

which he believed would placate Mr. Brown and make him less angry at Mr. Feighan.  Mr.

Feighan started to engage in the unprofessional commentary in the hopes of turning Mr. Brown's

attention away from him.

65.     Mr. Brown's incessant, inappropriate, harassing and discriminatory text

messaging continued:

- Mr. Brown sent Mr. Feighan a picture of KY Jelly in reference to a client.  Mr. Brown had previously commented that he liked to imagine this client pinning Mr. Feighan down and "fucking [Mr. Feighan] while [he] screamed. (February 11, 2020)

- "I'm your mirror..you can't run away from me so just man up! I know I can be over the top but you like when I drive you! Fuck going to the bathroom to cry solo…get everyone on FaceTime to cry it out."  (February 12, 2020)

- "Everyone just trying to fuck you literally or fuck with you…it is what it is" (February 23, 2020)

- "Fuck you!!!! Only incentive for you is getting slapped!" (February 24, 2020)

- Mr. Brown fixated on meeting Mr. Feighan's boyfriend as referenced in multiple texts including, "Btw: When do I get to meet Bart!!!" (March 5, 2020)

- Btw: I know you know this but last week when I called you Fruit Loops while getting manny pedi my intent wasn't to be disrespectful. Cool?" (March 15, 2020)

- "If I Ruin you and who else besides Paul would I have to fuck with!!! So we are 2 peas in a pod." (March 15, 2020)

- "You're fucked up! Sick/twisted…but I love it" (March 16, 2020)

- "Why are u still texting me…go slap around your BF and close him or u will be a loser like Tom!" (March 17, 2020)

- "I love you man!!! If you weren't here I would be really fucked!!! I love fucking with you b/c you're so sensitive!!" (March 17, 2020)

- "Grow some balls and close him, if not you and Tom can hook up and start a business together" (March 19, 2020)

- "Time to get your ass kicked, you spoiled/entitled bitch" (March 22, 2020)

- Net you are one scary, selfish power hungry fucking BITCH.." (April 7, 2020)

- "Grab a pair of balls" (June 2, 2020)

- "Can we grab a drink after work today or tomorrow?" "Let's plan for today after the samurai session."  After Mr. Feighan asked if he was in trouble:  "Cool!!! For the 1st time in our working relationship you are NOT in trouble..it's just a thank you…I want to hang with my boy!!! No string attached"

- "It was good to be on top while it lasted!!! Now Tommy will be riding you the way you rode the horse for the video." and "Just in case you need a visual…I'll also share with Tommy." [The next text was a picture of Mr. Feighan riding a horse for the office's fun music video.]

- "Go get fucked."

- "Exploration amongst friends! Screw integrity! Don't share this with anyone or you will be working for a Reece/Ava/Ryan immediately." This same text message included an individual (later confirmed by Mr. Brown to be CEO Paul Daversa) pretending to suck Mr. Brown's penis when they were in Jackson Hole, Wyoming during the "Partner's Offsite."

66.    In addition to the sexually inappropriate, discriminatory and harassing text messages, Mr. Feighan also received a course of threatening text messages from Mr. Brown during his employment, including:

- "Fuck you, don't expose me" (April 6, 2020)

- "Fuck you! I'm going to knock your teeth out the next time I'm in the office..focus on recruiting for [client] and running down Frank vs time off!!!!!" (February 3, 2020)

- "Fuck up/undermine me and it will be a hard fall from grace" (February 19, 2020)

- "You're such a head case & bitch…Whatever drama king" (February 21, 2020)

- "You should be worried if you screw up on your asset framework tomorrow" (March 8, 2020)

- "I am going to start bitch slamming you around more based on Ryan's feedback" (March 11, 2020)

- "…keep your head down and don't tell anyone!!! Enjoy and if I find out that you bragged about being in London then I'll make sure Paige and Ava out you!!!" (March 22, 2020)

- "Fuck you!! If u were here I would punch you in the face!!! I'm going to break you down" (March 23, 2020)

- "Trust me, the minute you fall from grace I'll have your Chelsea boots ready to step on your neck!!!" (March 23, 2020)

19

- "I will let Reece come after you! I'll make sure he puts you on a head lock and have you cry like a bitch!" (March 23, 2020)

67.    Over the course of 11 months, in addition to the egregious conduct above, Mr.

Feighan was subjected to the following conduct by his supervisor:

- On all company business trips, with the exception of the incentive trip to Jamaica, Mr. Brown insisted that Mr. Feighan share the same hotel room.  When Mr. Feighan asked why he could not have his own hotel room, Mr. Brown responded that the trip was a reward enough, and that if he wanted his own room, he would have to pay for it himself.  On two such occasions, Mr. Brown intentionally reserved a room with one King size bed, and asked Mr. Feighan to share the bed with him.  On one occasion, Mr. Feighan slept on the floor, and on the other occasion, at The Battery Hotel in San Francisco he, slept on a cot on the other side of the room.

- Mr. Brown sent videos of himself working out to Mr. Feighan.

- Mr. Brown told Mr. Feighan that he had stripped into his underwear during the Partner offsite when he was drinking and went into the hot tub with the younger Managing Directors and Directors – Mr. Brown said it was acceptable as Mr. Daversa had engaged in similar conduct. He told Mr. Feighan that Mr. Daversa stripped naked with senior members of General Catalyst in a hot tub in Martha's Vineyard.

- Mr. Brown would often text Mr. Feighan while on video conferences with clients and Mr. Daversa, asking him to "smile and look pretty" for the client because he did not look attractive without smiling.

- Mr. Brown  actively reached out to Partners at other Daversa office locations (including but not limited to Geri Allen, Jamie Sanger, Julie Wrapp, Jack Dunn, and Jason Slattery), most of whom had not met or worked with Mr. Feighan, to ask for their advice or feedback concerning Mr. Feighan.

- Mr. Brown showed Mr. Feighan photographs of himself shirtless in the hot tub holding a glass of wine.

- Mr. Brown randomly Venmoed Mr. Feighan approximately $5,284 in gift money over the course of Mr. Feighan's Daversa career.  Most of the time, the Venmo payments would arrive after Mr. Feighan asked to have time apart from Mr. Brown.  Mr. Feighan believes that after he would reject Mr. Brown's advances, Mr. Brown would send him money to bribe him to keep speaking with him.

- Mr. Brown sent Mr. Feighan videos of himself with his personal trainer, with captions such as "I need abs like yours," and "I am just trying to keep up with you and Reece."

- Mr. Brown frequently brought up the topic of Mr. Feighan's sexuality in the work place, and during the work day, often at one-on-one lunches.  Mr. Brown discussed intricacies and explicit details of how he imagined Mr. Feighan's sex life.  Mr. Brown confided in Mr. Feighan that he suspected his [relative] was gay, and he used this as a common segue to bring up the topic of Mr. Feighan's sexuality.

- Mr. Brown attempted place Mr. Feighan at odds with D.C. Managing Director Paige Kuderka by telling Mr. Feighan that Ms. Kuderka had been speaking poorly about Mr. Feighan to other Directors and Partners.  When Mr. Feighan called Ms. Kuderka to discuss the issue with her, she denied ever making such statements about Mr. Feighan.

- Mr. Brown often would implore to Mr. Feighan to look at *all options* of recruiting. He would often ask Mr. Feighan to recruit from Daversa's own clients even though Daversa Partners has a non-solicitation clause between 6 months to a year after placements. In one such case, he asked Mr. Feighan to recruit from Collibra given a client's affinity for the company. Daversa has a strong partnership with Collibra but Mr. Brown did not care. This happened with numerous clients." Leslie has these emails as proof…Bruce excusing himself from the project so he could not take the blame of recruiting for a client.

- During a lunch at a ramen restaurant approximately two miles from the office in February 2020, Mr. Brown started drinking and by the end of the afternoon (lunch lasted approximately four hours), Mr. Feighan had cried in the bathroom because of Mr. Brown's unrelenting harassment.  At the same lunch, Mr. Brown suggested that Mr. Feighan and another new hire have a "threesome" with him, and that Mr. Feighan and the other hire should "hook up."  Two other consultants were present at this lunch.

- When Mr. Feighan stayed late in the office to finish projects, Mr. Brown would remind Mr. Feighan that Mr. Brown could see him on Ring (the company security cameras).

- Mr. Brown searched for, and found, shirtless pictures of Mr. Feighan (professional modeling pictures) on the internet and sent them to Mr. Feighan, and frequently viewed Mr. Feighan's Instagram account and "liked" random pictures.

- Mr. Brown bought tickets for himself and Mr. Feighan to attend a Post Malone concert at the Capital One Arena as a "reward" for completing a search.  Mr. Brown referred to the concert as "a date" both while at the concert and afterwards.  On this same night, he presented Mr. Feighan with a book of whiskeys with the inscription, "To my dog, when a great opportunity presents itself, you do not say no."  He signed the book "Double B" (Bruce Brown) – a nickname used for him by his wife.

- Mr. Brown asked on several occasions if Mr. Feighan was on "the gay medication" (referring to PrEP – an HIV prevention medication), told Mr. Feighan on several

occasions to "take your medication," and referred to Mr. Feighan as "head case" in the presence of other Daversa employees

- While in Jamaica, Mr. Brown forced Mr. Feighan to make the determination as to how to divvy up the team bonus pool among himself and his co-workers, after telling Mr. Feighan that he was going to keep $50,000 of the $200,000 bonus pool for himself, for "a rainy day." This request was extremely inappropriate for Mr. Brown to make of Mr. Feighan, who should not have been placed in such a position.

- Mr. Brown called Mr. Feighan so frequently on weekends, holidays and PTO days that Mr. Feighan had to enlist the assistance of Kandace Elam (a Senior Associate) and Paige Kuderka (Managing Director). After they spoke to Mr. Brown, he no longer called Mr. Feighan on the weekends as often, but then started emailing him instead, often times while intoxicated.

- Mr. Brown used other members of Daversa Partner's Senior staff to book hotel rooms under the names of other members of Daversa's senior staff, as a way to conceal that he was only reserving a single room for himself and Mr. Feighan. Mr. Brown used Partner Bill Beer's membership at The Battery Hotel in San Francisco to secure one of the exclusive rooms.

- Mr. Brown went so far, that when Mr. Feighan was visiting his youngest sister at University of Georgia with his father, Mr. Brown called his father and told him what a great job his son was doing and how Mr. Brown was lucky to have him.

- On D.C. team outings, Mr. Brown often rearranged the entire table just so he could sit next to Mr. Feighan. The most notable of these occasions occurred at a holiday lunch near DuPont Circle when he ordered the entire table to change seats and then sat next to Mr. Feighan on the other side of the table.

- Mr. Feighan has been called such names as "Queen," "Drama Queen," "Feminine bitch," and "Fruit Loops" by Mr. Brown, because of his sexuality.

- As further proof of Mr. Brown's lewd behavior, at the Partner's Jackson Hole offsite in Wyoming, Mr. Brown stripped down into just his underwear and got in the hot tub with other Directors. Mr. Brown announced that he did not wear a bathing suit because he wanted Nicolette Stanise to see his "bulge."

- In March 2020, Mr. Brown sent a text message asking Mr. Feighan out on a date, and when Mr. Feighan confronted him about it, Mr. Brown pretended his text was "meant for someone else" and said he was drunk when he sent it. The invitation used the same language often used by Mr. Brown during his 1:1 time with Mr. Feighan.

- Mr. Brown discussed Mr. Feighan's sexuality with Paul Daversa, the firm's CEO, and with his wife. On the day Mr. Feighan resigned, Mr. Brown told his wife, and shared

with Mr. Feighan the text message he received from his wife, which said, "Is he the gay cutie???"

68.   Mr. Feighan repeatedly told Mr. Brown to stop making sexual jokes about him and his sexuality, and jokes and suggestions about Mr. Feighan sleeping with his coworkers, because it made Mr. Feighan extremely uncomfortable.  In response, Mr. Brown acknowledged he might have been "overstepping."  As Managing Partner of Daversa, Mr. Brown was well aware his conduct was wrong, and should have known, as a supervisory employee, that it was illegal and discriminatory.

69.   At various times during his employment, Mr. Feighan reported Mr. Brown's late night texts and phone calls to Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan Wadsworth and Reece Breault – all more senior than Mr. Feighan at Daversa.  He went to Kandace Elam and Paige Kuderka within months of his start date; spoke with Ava Talbott when Mr. Brown called Mr. Feighan at 1:00 AM the morning after the company Christmas party; spoke with Ryan Garikes at a bar when Mr. Brown called Mr. Feighan three consecutive times on a Friday night; and broached the subject with Reece Breault when Mr. Breault was Mr. Feighan's manager.

70.   After Mr. Brown underwent mandatory sexual harassment training in the fall of 2019, he joked about the class and implemented the term "flag" which he shouted preemptively whenever he was about to make an inappropriate comment.  After completing the training, Mr. Brown continued to make inappropriate and harassing comments, but believed if he preceded his comment by announcing "flag" that his behavior was acceptable

71.   Despite providing the mandatory sexual harassment training in September 2019, Daversa still lacked an HR department, and did not provide any training or guidance for employees about proper reporting procedures for employees who felt they were the victims of

any discrimination, harassment or retaliation, let alone who to report to if their harasser was their own supervisor or someone at the highest levels at Daversa.

72.     Throughout all of this, Mr. Brown repeatedly threatened destroy Mr. Feighan's career if he reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Feighan "on the side of the road and focus on someone else."

73.     On June 30, 2020, defeated, demoralized, and unable to take the discrimination, harassment and ridicule any longer, coupled with his fear of further sexual assault, that Mr. Brown's conduct would never stop, and that Daversa would never take steps to protect him, even after being sexually assaulted by Mr. Brown on several occasions, because of Mr. Brown's position of power within Daversa, and over Mr. Feighan, Mr. Feighan submitted his verbal resignation over the phone to Mr. Brown, as his supervisor, effective July 19, 2020.

74.     During this conversation, Mr. Brown threatened Mr. Feighan saying the world was "too small" and "I will find out where your next position is and make sure you do not have another role in the tech industry."

75.     Despite the circumstances and his emotional state, Mr. Feighan gave more than the required notice so that he could finish is projects in progress, not leave his co-workers in a difficult situation, and in order to depart in the most professional manner he could.

76.      After his resignation, Mr. Feighan received the following text message from Mr. Brown:

- "I'm 54 and I invested/backed you..I just want to know where you are going…super unprofessional/world is too small. I'm fine that you are moving on but do yourself/me a favor and just be honest…keep the whisky [sic] I'm good." (June 30, 2020)

- "I don't way [sic] whisky [sic]..keep it..I will match your base salary!!" (June 30, 2020)

- "We'll get beyond this but right now I'm broken!!! It doesn't feel good.." (June 30, 2020)

- "That book you got for me..you played me!!! You need to add Law 49/50…how to fuck your mentor!!" (June 30, 2020)

- "I deserve more than 2 weeks!! We are supposed to be friends??? Call your uncle Greg before you call me!! I called him tonight!!! You don't fuck your friends!!!" (June 30, 2020)

77.     Mr. Feighan followed up his verbal resignation on July 6, 2020, submitting his official, written resignation by email to Daversa's Controller, Tracey Allen, and Jonathan Krodel, Head of Training and Development.  Despite his emotional state, Mr. Feighan wanted to "do the right thing" and give ample proper notice to his first post-college employer, so that he could complete his projects in progress and not leave his co-workers in a difficult situation.

78.     On July 9, 2020, after noticing that he could no longer access any of his accounts in progress, Mr. Feighan called Mr. Brown.  During that conversation, Mr. Brown terminated Mr. Feighan's employment, effective immediately.  Daversa Partners did not provide any official termination documentation or legitimate reason to justify its termination of Mr. Feighan.

79.     Mr. Feighan was not terminated for any performance based reason.  In fact, after Mr. Feighan gave notice of his resignation, Mr. Brown sent him a text message (on June 30, 2020), offering to match the base salary of whatever position he was leaving for.

80.      Mr. Brown thanked Mr. Feighan for his work, but said they were going to "cut the cord" because things had gotten "out of control in the firm, and we got wind that you were sending some emails around to people and it is just a bad situation all around."  Mr. Brown was referring to a single email that Mr. Feighan sent to the members of his "class," letting them know he had resigned, and thanking each person individually for their friendship and support.

81.     Because Mr. Feighan feared for his personal safety and Mr. Brown's power and influence in the industry and his ability to blackball Mr. Feighan and ruin his career and reputation, Mr. Feighan cited lack of compensation for hours worked and lack of upward mobility as his reasons for leaving in the email to his class colleagues.

82.     Mr. Feighan was completely taken aback by his abrupt termination, in light of his resignation, which he had carried out in a professional manner, giving more than the notice required in spite of the circumstances, so that he could complete his work in progress.  After working so hard for Daversa – giving up nights, weekends and holidays – to be treated in this manner was devastating and demeaning.

83.     Prior to this departure, Mr. Brown and other partners contacted Mr. Feighan, insisting he tell them where he was going next.  This only heightened Mr. Feighan's fear that Mr. Brown and/or others at Daversa would attempt to interfere with him becoming re-employed in the industry, or elsewhere.  Following his termination, Mr. Feighan became aware that at a team meeting, Partner Bill Beer commented to the team, "There is a right way to leave, and a wrong way to leave – like Vidur [a former employee who resigned] and [John]."  This only heightened Mr. Feighan's fear that Mr. Brown and/or others at Daversa would attempt to interfere with him becoming re-employed in the industry, or elsewhere.

84.     Mr. Feighan was not granted an exit interview, despite his request.

85.     After his departure, Mr. Feighan became aware that CEO Paul Daversa and other Partners were making false statements about the reasons for Mr. Feighan's departure, and falsely stating that Mr. Feighan had been writing negative Glassdoor Reviews online.  It is common practice for Mr. Daversa to ask his employees to write positive Glassdoor Reviews for him.

86.     Throughout the entire course of Mr. Feighan's employment, and up through and including the present, Mr. Feighan has not been paid commission on *any* of his Daversa deals. Whenever Mr. Feighan asked Mr. Brown when he would receive his commissions, Mr. Brown always responded, "Keep your head down, the money will come, and keep recruiting."

87.     The "Daversa Partners Compensation Plan" plan documents provide for a 10% bonus of all business development revenue generated, for all levels of employees, including Consultants.

88.     Mr. Feighan is owned 10% of the retainer as commission on eight of the fourteen deals he closed while employed by Daversa, in a total amount of $62,500.

89.     In addition, Mr. Feighan was expected to work a substantial amount of overtime, including weekends and holidays, for which he was not compensated.  This does not include the numerous time Mr. Brown required Mr. Feighan to meet him on the weekend for drinks and/or lunch or dinner.

90.     Daversa was on notice and aware of its negligence in not having any identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment, since former Partner Leah Scanlan had an affair with a subordinate, even though her husband was working at Daversa at the same time.

91.     The DC office has extremely high turnover and Mr. Feighan is not the first employee to experience harassment.  For example, a sexual assault occurred, in a different office, where a young woman was assaulted by a superior.  Though she asked to be removed from working with the other individual, she was forced to continue working with him.

92.     Daversa was explicitly aware of Mr. Brown conduct towards Mr. Feighan, including the assaults and batteries of Mr. Feighan by Mr. Brown.  In a written exit interview

document from an employee who left prior to Mr. Feighan's departure, the employee wrote, "The way I've seen Bruce treat [John] is not only unacceptable for a personal relationship, but it is utterly inappropriate or a working relationship. The entire leadership has commented on it to me."  Mr. Feighan was privy to this written statement, and was made aware that Daversa received the document, because Mr. Brown called Mr. Feighan and reported the statement to him.

**COUNT ONE –**
**DISCRIMINATION AND HARASSMENT IN THE COURSE OF EMPLOYMENT**
**IN VIOLATION OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

93.     The allegations of the foregoing paragraphs are incorporated as if re-alleged herein.

94.     Mr. Feighan was an employee of Daversa within the meaning of D.C. Code § 2-1401.02(9).

95.     Daversa is an employer within the meaning of D.C. Code § 2-1401.02(10).

96.     Daversa, through its Partners, agents, officers and employees, discriminated against Mr. Feighan and subjected him to harassment on account of his sexual orientation, during the course of Mr. Feighan's employment.  This discrimination and harassment was with respect to the terms, conditions, and privileges of Mr. Feighan's employment, in violation of D.C. Code § 2-1402.11.

97.     As set out above in this Complaint, the acts of discrimination and harassment by Daversa which commenced shortly after Mr. Feighan's employment included, but were not limited to:  Mr. Feighan being subjected to numerous comments based on stereotypes of gay men; Mr. Brown sending numerous inappropriate, lewd, discriminatory, and threatening text messages to Mr. Feighan; Mr. Feighan being called "Fruit Loops," "Queen," "Drama Queen,"

and a "feminine bitch;" Mr. Feighan being summoned by his direct supervisor during the work day to a bar for drinks and being told to keep it a secret and "make something up;"  Mr. Brown demanding Mr. Feighan meet him on nights and/or weekends for lunch or dinner, and drinks, usually on the false pretext of having "feedback" to share about Mr. Feighan's performance; Mr. Brown initiating inappropriate and lewd conversations about Mr. Feighan's sexuality and sex life, including asking for intimate details and sharing details of his own sexual fantasies with Mr. Feighan; Mr. Brown discussing Mr. Feighan's sexuality with other Daversa employees; Mr. Brown asking Mr. Feighan to participate in a "threesome" with Mr. Brown and another co-worker, and suggesting Mr. Feighan should hook up with his (male) co-worker; Mr. Brown commenting he knew Mr. Feighan was "unique" from the beginning, and would be "adept" at his work because he "went both ways;" Mr. Brown sending work-out videos of himself to Mr. Feighan, and finding shirtless modeling photos of Mr. Feighan and showing them to Mr. Feighan, to let Mr. Feighan know he had seen them (and had searched for them); Mr. Brown demanding that Mr. Feighan share a hotel room with him on work related travel – even booking a room with a king bed and asking Mr. Feighan to share it with him; Mr. Brown asking if Mr. Feighan loved him and/or would he be his best friend," Mr. Brown asking Mr. Feighan if they could go back to Mr. Feighan's apartment (on the night Mr. Brown sexually assaulted Mr. Feighan the first time); Mr. Brown making comments about the size of Mr. Feighan's penis; and generally treating Mr. Feighan in a discriminatory, hostile and harassing manner.

98.     Daversa engaged in the discriminatory conduct set forth above and throughout this Complaint based on Mr. Feighan's sexual orientation, in violation of D.C. Code § 2-1402.11(a)(1).

99.     Daversa, through its Partners, agents, officers and employees, discriminated against Mr. Feighan and subjected him to harassment on account of his sex, including forcible touching of his genital area, propositions for sexual conduct, and threats if Mr. Feighan refused the conduct, during the course of Mr. Feighan's employment.  This discrimination and harassment was with respect to the terms, conditions, and privileges of Mr. Feighan's employment, in violation of D.C. Code § 2-1402.11.

100.     This discrimination and harassment involved and affected the terms, conditions, and privileges of Mr. Feighan' employment in violation of D.C. Code § 2-1402.11.

101.     The actions of Daversa had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401, *et seq*., in violation of D.C. Code § 2-1402.11.

102.     The discriminatory actions of Daversa were intentional, were actuated by malice, spite, and ill-will, were willful and wanton, and evinced a conscious and reckless disregard for Mr. Feighan's rights.

103.     As a direct and proximate result of the Defendants' conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

104.     As a direct and proximate result of Defendants' discrimination, Mr. Feighan is

entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code §2-

1403.13 and the Code of D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq.*

105.     Due to the character and severity of the Defendants' actions, and consistent with

its intentional discrimination and harassment, Mr. Feighan is also entitled to punitive damages.

**COUNT TWO –**
**AIDING AND ABETTING DISCRIMINATION AND HARASSMENT**
**IN THE COURSE OF EMPLOYMENT IN VIOLATION**
**OF THE DISTRICT OF COLUMBIA HUMAN RIGHTS ACT**
**(against Bruce Brown)**

106.     The allegations of the foregoing paragraphs are incorporated as if re-alleged

herein.

107.     Through his individual actions, Mr. Brown aided and abetted the discrimination

and harassment against Mr. Feighan, as described in more detail in Count One above and

throughout this Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Brown aided and abetted

the discrimination by Daversa because of his bias against gay workers in the workplace, and as

Managing Partner, representing Daversa.

108.     Acts of discrimination and harassment aided and abetted by Mr. Brown in

supporting, condoning and failing to bring an end to acts of discrimination by Daversa, as set

forth throughout the Complaint, include making numerous discriminatory comments to Mr.

Feighan based on stereotypes of gay men; sending numerous inappropriate, lewd, discriminatory,

and threatening text messages to Mr. Feighan; calling Mr. Feighan "Fruit Loops," "Queen,"

"Drama Queen," and a "feminine bitch;" summoning Mr. Feighan on numerous occasions,

during the weekday to meet at bar for drinks, while telling Mr. Feighan to keep it a secret and

"make something up;"  demanding Mr. Feighan meet him on nights and/or weekends for lunch

or dinner, and drinks, usually on the false pretext of having "feedback" to share about Mr.

Feighan's performance; initiating inappropriate and lewd conversations about Mr. Feighan's

sexuality and sex life, including asking for intimate details and sharing details of his own sexual

fantasies with Mr. Feighan; discussing Mr. Feighan's sexuality with other Daversa employees;

asking Mr. Feighan to participate in a "threesome" with Mr. Brown and suggesting Mr. Feighan

should "hook up" with his (male) co-worker; telling Mr. Feighan he knew he was "unique" from

the beginning, and would be "adept" at his work because he "went both ways;" sending work-out

videos of himself to Mr. Feighan, and finding shirtless modeling photos of Mr. Feighan online

and sending them to Mr. Feighan, to let Mr. Feighan know he had seen them (and had searched

for them); demanding that Mr. Feighan share a hotel room with him on work related travel –

even booking a room with a king bed and asking Mr. Feighan to share it with him; asking if Mr.

Feighan loved him and/or would he be his best friend," asking Mr. Feighan if they could go back

to Mr. Feighan's apartment (on the night Mr. Brown sexually assaulted Mr. Feighan); making

comments about the size of Mr. Feighan's penis; and generally treating Mr. Feighan in a

discriminatory, hostile and harassing manner.

109.    Through his individual actions, Mr. Brown aided and abetted the discrimination

and harassment against Mr. Feighan, as described in more detail in Count One above and

throughout this Complaint, in violation of D.C. Code § 2-1402.11.  Mr. Brown assaulted Mr.

Feighan, forcibly touched him in his genital area, propositioned him, and threated to punish him

if he did not go along with the conduct.  He aided and abetted the discrimination by Daversa

because of his sexual assault and harassment, and as Managing Partner, representing Daversa

110.     Additionally, Mr. Brown threatened Mr. Feighan, via text and verbally, not to expose his conduct, including warning him that complaining to Paul Daversa would not do any good since the CEO was Mr. Brown's close, personal friend.

111.     Mr. Brown's discriminatory conduct was intentional, and it evinced ill will, recklessness, and willful disregard of Mr. Feighan's rights, as well as wantonness, oppressiveness, maliciousness, and a spirit of mischief.

112.     Mr. Brown's discriminatory, hostile and harassing conduct had the effect and consequence of violating the provisions of the D.C. Human Rights Act, D.C. Code § 2-1401.1, *et seq.*, in violation of D.C. Code §§ 2-1402.68 and 2-1402.62.

113.     As a direct and proximate result of the Mr. Brown's conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

114.     As a direct and proximate result of the discrimination aided and abetted by Mr. Brown, Mr. Feighan is entitled to recover damages pursuant to D.C. Code § 2-1403.16, as described in D.C. Code § 2-1403.13 and the Code of the D.C. Municipal Regulations, Title 4, Chapter 2, 4-200 CDCR, *et seq.*

115.     Because of the character and severity of the conduct of Mr. Brown, as set forth above, Mr. Feighan is also entitled to punitive damages.

## COUNT THREE –
## ASSAULT AND BATTERY
### (Against Bruce Brown)

116.    The allegations of the foregoing paragraphs are incorporated as if realleged

herein.

117.    Mr. Brown's physical touchings of Mr. Feighan in a sexual manner, all of which

were unwelcome, unprivileged, uninvited, unwarranted, and illegal, included:

- On November 14, 2019:  Tickling him in a sexual manner, grabbing at Mr. Feighan's genitals outside of his clothing, restraining Mr. Feighan and forcing his fingers into Mr. Feighan's underwear;

- On December 12, 2019:  While seated next to Mr. Feighan in a sauna, while Mr. Feighan was wearing only a towel, placing his hand on Mr. Feighan's thigh, rubbing his thigh, and moving his hand upwards towards Mr. Feighan's genitals, and then pulling Mr. Feighan's towel as Mr. Feighan walked away, intentionally exposing Mr. Feighan's buttocks; and

- On February 7, 2020:  On a company sponsored trip to Jamaica, while walking to the van which would transport them to dinner, Mr. Brown came up behind Mr. Feighan and grabbed Mr. Feighan's buttocks with both hands.

118.    Mr. Feighan protested, opposed and resisted each instance of Mr. Brown's

assaults and batteries, and let him know (verbally, and by resisting, fighting him off, and leaving)

that his behavior was uninvited, unwelcome and made him extremely uncomfortable.

119.    Mr. Brown's conduct, as set forth above, caused in Mr. Feighan extreme fear,

anxiety, and reasonable apprehension of bodily harm and of further offensive sexual misconduct.

Consequently, Mr. Brown's conduct, as set forth above, constituted assaults on Mr. Feighan.

120.    Mr. Brown's touchings of Mr. Feighan on the occasions described above were

without consent, unwelcome, unprivileged, uninvited, unwarranted, and illegal, and amounted to

batteries.

121.    Mr. Brown's assaults and batteries were done with malice, ill will and spite, and evinced a conscious disregard for the rights of Mr. Feighan.

122.    As a direct and proximate result of Mr. Brown's conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

123.    Due to the severity of Mr. Brown's conduct, Mr. Feighan is entitled to punitive damages.

**COUNT FOUR –**
**ASSAULT AND BATTERY –**
***RESPONDEAT SUPERIOR LIABILITY***
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

124.    The allegations of the foregoing paragraphs are incorporated as if realleged herein.

125.    As part of the performance of his duties as a Partner of Daversa, Mr. Brown was required to communicate with Daversa employees, specifically Mr. Feighan, and they were required to communicate with each other.

126.    As part of the performance of his duties as an employee of Daversa, Mr. Feighan was required to communicate with his fellow employees, including Mr. Brown, who had direct and supervisory authority over Mr. Feighan, and who Mr. Feighan rightfully believed held the fate of his job, and his career, in his hands.

127.    Mr. Brown's actions, in physically touching Mr. Feighan in a sexual manner on more than one occasion, and using the veiled threat of his power and authority over Mr. Feighan's job, and while acting in his capacity as a Partner of Daversa and as Mr. Feighan's direct supervisor, with complete authority over him, were unwelcome, unprivileged, uninvited, unwarranted, and illegal, and his actions made Mr. Feighan fear for his safety.

128.    During and following Mr. Brown's assaults and batteries on Mr. Feighan, Mr. Feighan told Mr. Brown that his actions were unwelcome and inappropriate in the workplace, and that they made Mr. Feighan extremely uncomfortable.  Mr. Feighan's protests, resistance and verbal objections to Mr. Brown's behaviors, and his demand that Mr. Feighan never touch him again, had no effect on Mr. Brown.  Mr. Brown was aware that this was Mr. Feighan's first job after graduating from college, and that he was young and vulnerable, with no prior full-time workplace experience to draw from, and he preyed upon that.

129.    Daversa continued to permit Mr. Brown to engage in behavior that was demeaning and degrading to Mr. Feighan, allowed him to engage in repeated assaults and batteries against him, and took no action to protect Mr. Feighan from Mr. Brown.

130.    Despite the fact that Daversa routinely hires and employs other young adults directly out of college, there were no effective policies in place to prevent what happened to Mr. Feighan, and Daversa does not have an identifiable HR department, or clear reporting procedures.

131.    Defendants in effect ratified Mr. Brown's conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur and by refusing to take effective remedial action to prevent the activities from occurring.

132.     Defendants' actions were done with malice, ill will and spite, and evinced a conscious disregard for the rights of Mr. Feighan.

133.     As a direct and proximate result of the Defendants' conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

134.     Defendants are further responsible for the actions of Mr. Brown because he was acting in the scope of his employment, and with the express authority over Mr. Feighan that was granted to him a Partner of Daversa.

135.     Due to the severity of Defendants' conduct, Mr. Feighan is entitled to punitive damages.

## COUNT FIVE -
## NEGLIGENT SUPERVION AND RETENTION OF EMPLOYEE (BRUCE BROWN)
### (against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)

136.     The allegations of the foregoing paragraphs are incorporated in this count as if re-alleged here in full.

137.     Daversa had a duty to its employees, including Mr. Feighan, not to retain employees whom they knew or should have known were likely to harm its employees and/or to violate laws designed to protect the public.

138.     Daversa had, or should have had, actual and constructive knowledge that Mr. Brown was engaging in discriminatory, harassing, and illegal behavior towards Mr. Feighan,

including but not limited to sexual harassment, based, in part, on reports by Mr. Feighan to

Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan Wadsworth and Reece Breault

– all more senior than Mr. Feighan at Daversa.

139.     Despite this knowledge, Daversa placed and retained Mr. Brown in a position of

superiority and supervisory authority over Mr. Feighan, which Mr. Brown used to prey upon Mr.

Feighan, and to silence Mr. Feighan by repeatedly threatening destroy Mr. Feighan's career if he

reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Feighan "on the side of

the road and focus on someone else."

140.     Mr. Feighan, a young adult in his first post-college job, was extremely vulnerable

had had no full-time workplace experience to draw from in order to navigate the situation and

know the proper course of action when the person preying upon him was his supervisor,

particularly in light of Daversa's lack of an HR department or clearly defined reporting

procedures, and Mr. Feighan feared for his job security, over which Mr. Brown had control.

141.     Daversa retained Mr. Brown in a position in which he could harass, threaten,

harm and sexually assault Mr. Feighan, and permitted Mr. Brown to continue to engage in illegal

behavior towards Mr. Feighan.

142.     In fact, Daversa, after becoming aware of the conduct of Mr. Brown, continued to

retain Mr. Brown as a supervisory employee in a position to direct and influence Mr. Feighan's

employment, and after learning all of the details of Mr. Brown's sexual assaults and other

treatment of Mr. Feighan, including in another employee's written exit interview, continues to

retain Mr. Brown as a supervisory employee in a position to direct and influence the careers and

livelihood of other young adult employees under his supervision.

143.    Daversa was, and is, negligent in its supervision and retention of Mr. Brown after it learned, or should have learned, that he had a history of engaging in these behaviors.

144.    Had Daversa promptly and properly removed Mr. Brown from the workplace, he would not have had the opportunity to continue to engage in this conduct, to harm Mr. Feighan, or to continue to harm Mr. Feighan further.

145.    This conduct by Defendant was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregard for the rights of Mr. Feighan.

146.    Mr. Feighan suffered, and continues to suffer, harm as a result of Daversa's negligent supervision and retention of Mr. Brown, including loss of advancement and career opportunities and the attendant employment benefits.

147.    Daversa's negligent supervision and retention of Mr. Brown, in the face of knowledge of his illegal conduct, constitutes gross negligence and evinced a conscious disregard for the rights of Mr. Feighan.

148.    Daversa's retention of Mr. Brown as an employee, and its failure to protect Mr. Feighan from Mr. Brown, was willful and wanton in that it exhibited a conscious disregard for the rights of Mr. Feighan.  Daversa was aware of the propensity of Mr. Brown to engage in illegal conduct that would harm Mr. Feighan and the public, including based on Mr. Feighan's reports to more senior Daversa employees.

149.    Daversa exhibited a reckless indifference in its failure to protect Mr. Feighan in retaining Mr. Brown and in allowing Mr. Brown to continue in his position of supervisory authority over Mr. Feighan.  Daversa was aware from the existing circumstances that its failure to act to protect Mr. Feighan (by terminating Mr. Brown and discontinuing his illegal conduct) would likely result in further harm to Mr. Feighan.

150.     Daversa ratified and condoned the conduct of Mr. Brown by refusing to take any action to prevent him from taking further action against Mr. Feighan.  Daversa refused to take action despite awareness that Mr. Brown's conduct was growing progressively more aggressive, and knowing he had the potential to continue to escalate his behavior.

151.     Daversa also ratified and condoned the conduct of Mr. Brown by leaving him in Mr. Feighan's chain of command as Mr. Feighan's direct supervisor and continuing to allow him to be in a position of authority over Mr. Feighan.

152.     Daversa is further responsible for the actions of Mr. Brown because as he was acting in the scope of his employment, and with the express authority over Mr. Feighan that was granted to him as Daversa's agent.

153.     As a direct and proximate result of the Defendant's conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

154.     Due to the character and severity of Daversa's conduct, Mr. Feighan is entitled to punitive damages.

### COUNT SIX - NEGLIGENCE OR GROSS NEGLIGENCE
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

155.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

156.     Daversa had a duty to use care to protect its employees from harm.

157.     Daversa permitted Mr. Brown to engage in behavior that was demeaning and degrading to Mr. Feighan, allowed Mr. Brown to engage in repeated assaults and batteries against Mr. Feighan, and took no action to protect Mr. Feighan from Mr. Brown.

158.     Despite the fact that Daversa routinely hires and employs other young adults directly out of college, there were no effective policies in place to prevent what happened to Mr. Feighan, and Daversa does not have an identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment.

159.     In addition, at various times during his employment, Mr. Feighan reported Mr. Brown's inappropriate late night texts and phone calls to Kandace Elam, Paige Kuderka, Ava Talbott, Ryan Garikes, Dylan Wadsworth and Reece Breault – all more senior than Mr. Feighan at Daversa.

160.     Throughout all of this, Mr. Brown repeatedly threatened destroy Mr. Feighan's career if he reported Mr. Brown's illegal conduct, remarking that he would leave Mr. Feighan "on the side of the road and focus on someone else."

161.     Daversa was on notice and aware of its negligence in not having any identifiable HR department, or clear reporting procedures, or any mechanism to address, respond and investigate claims of sexual assault and harassment, since another associate of the firm had been previously sexually assaulted by a partner and nothing was done to address it.

162.     Daversa in effect ratified Mr. Brown's conduct by permitting the continuation of a working environment in which this type of activity was allowed to occur and by refusing to take effective remedial action to prevent the activities from occurring.  Daversa failed or refused to

create or enforce policies and procedures prohibiting this type of activity, and for instructing

employees on the proper procedures for reporting this type of conduct, and failed to establish or

follow any guidelines for addressing and investigating such conduct, despite its knowledge of a

prior sexual assault of an employee by a partner

163.    As a result of Daversa's failure to protect Mr. Feighan, Mr. Feighan was sexually

harassed and sexually assaulted by Mr. Brown on several occasions.

164.    As a direct and proximate result of the Defendant's conduct, Mr. Feighan has

suffered, and will in the future continue to suffer injury, severe physical and emotional distress,

and great damages including loss of past and future income, loss of employee benefits including

retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of

career and business opportunities and advancement, past pecuniary expenses, future pecuniary

expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and

profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

165.    Daversa's willful refusal to take any effective remedial or corrective action in

response to Mr. Feighan's reports, and its failure to establish clear reporting channels and

procedures for investigating reports of sexual harassment, even in the face of knowing that

another partner had sexually assaulted another employee, demonstrates that Daversa acted with

gross negligence, an utter disregard of caution, and amounted to neglect of Mr. Feighan's safety,

such that it would offend fair minded and ordinary people.

166.    Daversa's failure to protect Mr. Feighan was willful and wanton, in that it

exhibited a conscious disregard for the rights of Mr. Feighan.

167.    Due to the severity of Daversa's conduct, Mr. Feighan is entitled to punitive

damages.

**COUNT SEVEN –**
**VIOLATION OF THE D.C. WAGE PAYMENT AND WAGE COLLECTION LAW**
**(D.C. CODE § 32-1301, *et seq*.)**
**(against Daversa Partners and Resource Systems Group Inc. t/a Daversa Partners)**

168.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

169.     By terminating Mr. Feighan and failing to pay him for any overtime worked, and by failing to pay him for *any* commissions earned throughout the course of his employment totaling $62,500, to which he is entitled and had earned pursuant to the terms of compensation set forth in the Daversa Partners Compensation Plan, Defendants are in violation of the D.C. Wage Payment and Wage Collection Law.

170.     In addition to unpaid commissions, Mr. Feighan was compensated for 80 hours per pay period, but consistently worked from 8 AM until 10 or 11 PM at night, five days a week, for the duration of his employment, and frequently worked weekends and holidays in addition to that.

171.     As such, Mr. Feighan is entitled to payment for the overtime worked, and commissions earned, plus quadruple/statutory damages, attorney's fees and costs, and appropriate injunctive relief.

**COUNT EIGHT -**
**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**
**(against All Defendants)**

172.     The allegations of the foregoing paragraphs are incorporated as if realleged herein.

173.     Defendants' conduct was intentional and reckless in that it had the specific purpose of inflicting emotional distress on Mr. Feighan, was fully intended, and Defendants

knew or should have known, that severe emotion distress would likely result, or knew or should have known that severe emotional distress was substantially certain to result from their conduct.

174.    Daversa is responsible and liable for Mr. Brown's intentional and reckless conduct because these acts were committed while in the course and scope of Mr. Brown's employment by, and as a Partner of, Daversa, and these acts arose out of the execution of his duties on behalf of Daversa.

175.    The actions and conduct of Defendants, as set forth above, and more specifically in ¶¶ 26-51, 54-56, 58, 60, 63-67, 69-70, 72, 74, 76, 78, 80, and 83-85, and elsewhere, were intentional or reckless in that they had the specific purpose of inflicting emotional distress on Mr. Feighan, Defendants fully intended their conduct, and knew or should have known that severe emotional distress would likely result.

176.    Furthermore, Daversa inflicted further and greater emotional distress on Mr. Feighan by failing to offer any assistance or support to Mr. Feighan, despite knowing he was suffering as a result of Mr. Brown's actions, and despite knowing that Mr. Brown was preying upon a young adult as started his career in his first post-college job, who was vulnerable had had no full-time workplace experience to draw from in order to navigate the situation and know the proper course of action, particularly in light of Daversa's lack of an HR department or clearly defined reporting procedures; and that he feared for his job security.

177.    Due to Daversa's failure to take any action or to further protect Mr. Feighan, Mr. Feighan suffered, and continues to suffer, severe emotional distress with physical manifestations including frequent panic attacks, anxiety, irritability, nausea, lack of motivation, insomnia, erectile dysfunction, feelings of helplessness and hopelessness, loss of self-worth, and

powerlessness, all due to the egregious nature of the sexual harassment, assaults and batteries Mr. Feighan was forced to endure, on a continual and persistent basis.

178.    As a direct result of the sexual assaults and batteries, and Mr. Brown's incessant and egregious sexual harassment, which intended to, and did, destroy Mr. Feighan's self-worth and cause him to feel trapped and afraid, Mr. Feighan began to suffer from frequent panic attacks whenever he attempted intimacy with his romantic partners.  Mr. Feighan broke off his relationship with his boyfriend as a result of the emotional distress caused by Defendants' treatment of him, which made him unable to achieve, or maintain, erections.  Mr. Feighan has lost a significant amount of weight, suffers from insomnia, cannot sleep without the use of sleep aids, and has nightmares.  He now has regular and constant headaches, and is frequently nauseous.

179.    In addition to the negative effects on his romantic relationships, Mr. Feighan's friends and acquaintances have commented on his irritability and "shortness" in the past months. Mr. Feighan has no sex drive, and lacks motivation to get out of bed in the mornings.  Whereas prior to these events, Mr. Feighan was up at 5 AM to work out, he now sleeps until 9 or 10 AM. Mr. Feighan sought (and continues to undergo) medical treatment and has been diagnosed with Post Traumatic Stress Disorder and Major Depressive Disorder, Single Episode, for which he was prescribed medication.

180.    Mr. Feighan was forced to quit his job in order to protect himself – and then was fired before he could work out his notice period – during a time of an international pandemic and global economic downturn.  With no source of income, Mr. Feighan was forced to move out of his apartment in Washington, D.C., and relocate, because he would no longer afford to pay rent.

181.    Defendants' conduct towards Mr. Feighan was outrageous and intolerable, offending generally accepted standards of decency and morality.

182.    As described above, this conduct by Defendants was actuated by malice, spite, and ill will; was willful and wanton; and evinced conscious disregards for the rights of Mr. Feighan.

183.    As a direct and proximate result of the Defendants' conduct, Mr. Feighan has suffered, and will in the future continue to suffer injury, severe physical and emotional distress, and great damages including loss of past and future income, loss of employee benefits including retirement funds and paydown of student loans, relocation expenses, medical expenses, loss of career and business opportunities and advancement, past pecuniary expenses, future pecuniary expenses, embarrassment, humiliation, inconvenience, a sense of betrayal, isolation and profound injustice, damage to his reputation, mental anguish, stress, pain and suffering.

184.    Mr. Feighan also sustained pecuniary loss, past and future loss of income and benefits of employment, lost career and business opportunities and advancement, other past pecuniary losses, future pecuniary losses, and other non-pecuniary losses.

185.    Daversa is responsible and liable for Mr. Brown's intentional infliction of emotional distress of Mr. Feighan while he was employed under the doctrine of *respondeat superior*.

186.    Mr. Brown was performing his employer's services and acting within the scope of his employment as a Partner at Daversa when he sexually harassed and discriminated against Mr. Feighan, and sexually assaulted and battered him on several occasions, causing him severe emotional distress.  Daversa, as Mr. Brown's employer, is therefore vicariously liable for his actions and the injuries Mr. Feighan sustained under the theory of *respondeat superior.*

187.    Due to the severity of Defendants' conduct, Mr. Feighan is entitled to punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff VAUGHN FEIGHAN requests that this Court enter judgment in his favor, and jointly and severally against Defendants, DAVERSA PARTNERS, RESOURCE SYSTEMS GROUP INC. t/a DAVERSA PARTNERS, and BRUCE BROWN, jointly and severally, on the above Counts; and further:

(a)    Award Mr. Feighan compensatory damages to be determined by a jury, and in no event to exceed $20 Million Dollars ($20 million), plus demonstrated past and future pecuniary damages on each of the above-stated Counts One through Eight (including pre-judgment interest); and in addition

(b)    Award Mr. Feighan punitive and exemplary damages, to be determined by a jury, on the above stated Counts One, Two, Three, Four, Five, Six and Eight; and in addition

(c)    Award Mr. Feighan quadruple damages on Count Seven; and in addition

(d)    Award Mr. Feighan reasonable attorneys' fees and the costs of this action, including expert witness fees; and in addition

(e)    Declare that the Defendants have violated the District of Columbia Human Rights Act; and in addition

(f)    Enjoin the Defendants from further violations of the District of Columbia Human Rights Act; and in addition,

(g)    Award Mr. Feighan such other and further relief as may be appropriate under the circumstances.

## JURY DEMAND

**PLAINTIFF VAUGHN FEIGHAN DEMANDS A TRIAL BY JURY.**

March 5, 2021                        Respectfully submitted,

*/S/ CARLA D. BROWN*
Carla D. Brown, D.C. Bar No. 474097
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Vaughn Feighan*

## CERTIFICATE OF SERVICE

I hereby certify on the 5th day of March, 2021, I electronically filed the foregoing with the Clerk of court using the CM/ECF system, which will send a notification of such filing (NEF) to the following:

Stephen M. Silvestri, Esq.
Charles J. Kresslein, Esq.
JACKSON LEWIS P.C.
2800 Quarry Lake Drive, Suite 200
Baltimore, Maryland 21209
Phone:  (410) 415-2000
Fax:  (410) 415-2001
Stephen.silvestri@jacksonlewis.com
Charles.kresslein@jacksonlewis.com
*Counsel for Defendant Resource Systems Group*
 *Inc. t/a Daversa Partners*

Leslie Paul Machado, Esq.
O'HAGAN MEYER PLLC
2560 Huntington Avenue, Suite 204
Alexandria, Virginia 22303
Phone:  (703) 775-8607
Fax:  (804) 403-7110
lmachado@ohaganmeyer.com
*Counsel for Defendant Bruce Brown*

*CARLA D. BROWN*
Carla D. Brown, D.C. Bar No. 474097
cbrown@cbcblaw.com
CHARLSON BREDEHOFT COHEN & BROWN, P.C.
11260 Roger Bacon Drive, Suite 201
Reston, VA  20190
(703) 318-6800  Telephone
(703) 318-6808  Facsimile
*Counsel for Plaintiff, Vaughn Feighan*