**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| VAUGHN FEIGHAN,<br>Plaintiff,<br>v.<br>RESOURCE SYSTEMS GROUP INC.,<br>Defendant. | Civil Action No. 20-03759 (BAH)<br>Chief Judge Beryl A. Howell |

**MEMORANDUM OPINION**

In this diversity action, plaintiff Vaughn Feighan asserts seven claims against his former employer, defendant Resource Systems Group Inc. ("RSG"), commonly referred to as Daversa Partners, which claims arise from the persistent sexual harassment to which plaintiff allegedly was subjected by his former supervisor, defendant's ex-partner Bruce Brown, including claimed violations of the District of Columbia Human Rights Act ("DCHRA"), D.C. Code §2-1401.01 *et seq.*, the D.C. Wage Payment and Wage Collection Law ("DCWPCL"), D.C. Code 32-1301, *et seq.*, and common law tort claims alleging vicarious liability for Brown's alleged batteries and intentional infliction of emotional distress, and negligence for failure to supervise Brown, *see generally*, Amended Complaint ("Am. Compl."), ECF No. 26. Plaintiff seeks compensatory, punitive, and exemplary damages, as well as injunctive relief under the DCHRA. *Id.* at 50.

After nearly a year of discovery, defendant has moved for summary judgment on all claims, pursuant to Federal Rule of Civil Procedure Rule 56. Def.'s Mot. for Summ. J., at 1 ("Def.'s Mot"), ECF No. 36. For the reasons set out below, defendant's motion is granted in part and denied in part. While plaintiff's hostile work environment claim under the DCHRA, negligent supervision

claims, DCWPCL claim, and IIED claims (Counts I, V, VI, VII, and VIII) survive summary judgment, defendant's motion is granted as to plaintiff's battery and DCHRA retaliation claims (Counts IV and IX). [1]

## I. BACKGROUND

The factual background and procedural history of this case is summarized below.

### A. Factual Background

Defendant, founded by its Chief Executive Officer Paul Daversa in 1991, is a hiring and recruitment firm with seven offices across the U.S., including an office in Washington, D.C. Def.'s SMF ¶ 1, ECF No. 36-2. For over twenty years, from 1999 until his resignation in December 2020, Bruce Brown was a partner at defendant, and during plaintiff's employment there, was the Managing Partner of the company's D.C. office, with responsibility for the day-to-day operations of that office and serving as one of the company's "the highest-level managers." *Id.* ¶¶ 3-4, 13. Brown and Paul Daversa have been close friends for over twenty years, and Brown was one of the company's highest billing partners when he was with the firm. Pl.'s SMF ¶ 7, ECF No. 39-1. From July 2019 to July 2020, Daversa had between 120 to 150 employees. *See* Def.'s SMF ¶ 2; Pl.'s SMF ¶ 2.

#### 1. *Plaintiff's Employment at Defendant*

Many of the facts set out in the Amended Complaint regarding plaintiff's employment at defendant and his interactions with Brown are not disputed. In April 2019, plaintiff accepted an offer of employment at defendant while still an undergraduate student, and began his employment after completing his college degree, at a starting salary of $55,000 per year, which salary increased

[1] The portion of the claim, in Count VII, asserting plaintiff's entitlement to unpaid overtime wages, Am. Compl. ¶¶ 172-73, has been withdrawn, *see* Pl.'s Mem. In Opp. to Def.'s Mot. Summ. J. at 42 n.16 ("Pl.'s Opp'n"), ECF No. 39, and thus defendant's motion for summary judgment as to that portion of the claim is denied as moot.

in 2020 to about $56,000. *See* Def's SMF ¶¶ 14, 17-18; Am. Compl. ¶ 15. Plaintiff is bisexual, and he believes that some of his coworkers knew he was bisexual, including Brown. *See* Def.'s SMF ¶ 16; Pl.'s SMF ¶ 16. Plaintiff's first supervisor was Reece Breault and, following a restructuring, Brown became plaintiff's direct and only supervisor. Def.'s SMF ¶ 18; Pl.'s SMF ¶ 18.[2] As a result of this restructuring, plaintiff reported to Brown and was subject to Brown's direction. Def.'s SMF ¶ 18; Pl.'s SMF ¶ 18.

Plaintiff was hired as a recruiter at defendant, and all parties agree he performed well in that role. Defendant's recruiters "handle all aspects of the search process for clients[,]" including conferring with clients to evaluate the skills and qualifications for the positions sought, recruiting and interviewing prospective candidates, deciding which candidates to refer to the client, and "[h]andling all aspects of searches independently with little or no supervision." Def.'s SMF ¶ 22; Pl.'s SMF ¶ 22. Recruiters are also involved in business development, such as identifying and pitching prospective clients using their reasoned judgment and skill. Def.'s SMF ¶ 23; Pl.'s SMF ¶ 23. During his relatively short tenure as defendant's employee, plaintiff successfully closed nine executive placements, including for Vice President of Business Development for Alation; a Chief Operating Officer for Big Health; a Vice President for Marketing for BirdEye; a Chief Commercial Officer for Constellation; a Vice President of Sales for PeerNova; a Vice President of Sales for RedMarlin; a Director of Customer of Success for RedMarlin; a Vice President of Sales for Testim; and a Chief Executive Officer for Zycada, Pl.'s Opp'n, Ex. 2, Pl.'s Opp'n, Obj. & Resp. Def.'s First Set of Interrog. at 26–27, ECF No. 39-3; *accord* Def.'s SMF ¶¶ 25, 29; Pl.'s SMF ¶¶ 25, 29.

2 The parties dispute the reason for reassigning plaintiff's supervision to Brown. Defendant's position is that the reassignment was due to plaintiff having friction with Breault, Def.'s SMF ¶ 18; Brown Dep. at 64:10–65:18, while plaintiff posits that the reassignment occurred so Brown "could have direct, daily access to [plaintiff] to create a hostile work environment for [him] based on sexual orientation[,]" citing examples Brown's untoward, crude, and harassing behavior towards plaintiff, Pl.'s SMF ¶ 18.

Brown repeatedly praised plaintiff for successfully closing nine executive placements, and internal billing records show that defendant received payment from each of these clients for each of these placements. Pl.'s SMF ¶ 17.

### *2. Brown's Sexual Harassment of Plaintiff*

From the time he began interviewing for a position with defendant, plaintiff claims that Brown acted inappropriately towards plaintiff. Am. Compl. ¶ 20. For example, during the final interview, Brown made inappropriate comments, asking plaintiff if he was a "crier," and stating that "[the company] could not waste their time on people who cried or 'could not take the culture.'" *Id.* During the interview, Brown asked him whether he enjoyed consuming marijuana. *Id.* These initial comments were merely a harbinger of Brown's inappropriate and unprofessional demeanor that continued throughout plaintiff's employment with the company.

Brown indisputably and persistently made remarks to plaintiff, in the form of text messages and verbal statements, and texted photographs to him, that were sexually-related or otherwise inappropriate. For example, Brown shared explicit details about his life with plaintiff, including fantasies of violent and anal sex, bragging to plaintiff about his sexual adventures, such as "threesomes" with others, and called plaintiff various names with derogatory sexual innuendo and commentary on his sexual orientation in front of coworkers, including "Queen," "Drama Queen," Feminine Bitch," and "Fruit Loops." Pl.'s SMF ¶ 18; *see also* Def.'s SMF ¶ 35 (recounting that Brown, *inter alia*, told plaintiff that plaintiff needed therapy for his "mommy issues" and "coming out as gay and being gay;" brought up plaintiff's sexuality to an entire table of coworkers at a dinner on December 2, 2019; asked plaintiff intimate questions about his boyfriend, including whether he was the "top" in the relationship or the "bottom," referring to sexual positions; commented on plaintiff's shirtless pictures of himself on his social media account; and sent

plaintiff unsolicited shirtless videos and pictures of himself). In one instance, Brown sent plaintiff an image of Paul Daversa and Brown at a company event in Jackson Hole, Wyoming, which plaintiff maintains shows Daversa with his head faced closely on the crotch of Brown with both men fully clothed in ski gear. Pl.'s SMF ¶ 7 ("Brown-Daversa Photo"). Brown sent the photo with the message "Exploration amongst friends; Screw Integrity!!!![,]" and went on to tell plaintiff, "We are taking it to another level . . . after hanging with you last week in the bay nothing is off limits with you!" *Id.*[3]

Throughout plaintiff's employment at RSG, Brown undisputedly texted plaintiff inappropriate messages, telling him that he liked to "fuck" with him, calling him a "fucker" or a "bitch," and making other insulting comments or jokes towards plaintiff, some targeting plaintiff's sexual orientation. Pl.'s SMF ¶ 18. Examples include the following messages sent from Brown to plaintiff:

- "I intentionally like to fuck with you!!!!" (November 22, 2019).
- "I fucking you!!!" (November 26, 2019).
- "Grow some balls and make the call . . . you work for me now Bitch!!" (December 19, 2019).
- "I'll make a decision by 10 to fuck with you!!!" (January 8, 2020).
- "Don't let Ryan slap you around Unless that's [what] you're into!!" (January 13, 2020)
- "Don't let me beg fucker . . . I just want to hang with you!! (February 22, 2020).
- You little fucker . . . You should be paying me for the amazing experience I'm giving you!!! You little Barry bitch!!! . . . (February 23, 2020).
- "Fuck you!!!! Only incentive for you is getting slapped!" (February 24, 2020).
- "You're fucked up! Sick/twisted . . . but I love it[.]" (March 16, 2020).
- "Grow some balls and close him, if not you and Tom can hook up and start a business together[.]" (March 19, 2020).
- "Fuck you!! If u were here I would punch you in the face!!! I'm going to break you down[.]" (March 23, 2020).

[3] As to this photograph, defendant explains that Paul Daversa had "an awkward collision while skiing" where his head landed in Brown's lap, and, later that day, Paul Daversa and Brown merely "reenacted the manner in which [ ] Daversa's head landed in [ ] Brown's lap" and were "not simulating a sex act." Def.'s Suppl. SMF ¶ 79, ECF No. 44-1. As context, defendant further explains that this photograph was taken prior to "a strategic planning leadership meeting" attended by "RSG's partners," with "two or three other partners" present when the reenactment occurred, and all "laughed" at the reenactment, while "one of [the partners] took a photo of it." *Id.*

- "Trust me, the minute you fall from grace I'll have your Chelsea boots ready to step on your neck!!!" (March 23, 2020).
- "Fuck you, don't expose me[.]" (April 6, 2020).
- "[Y]ou are one scary, selfish power hungry fucking BITCH.[]" (April 7, 2020).
- "Grab a pair of balls[.]" (June 2, 2020).

*Id.* (quotation marks and citations omitted). Brown, in deposition testimony, acknowledged that his "style perhaps wasn't the best" and "the way we communicated was very aggressive," Pl.'s Mot., Ex. 1, Sept. 7, 2021, Dep. Tr. of Bruce Brown at 112:5-11 ("Brown Dep."), ECF No. 39-2, and, by way of explanation for his conduct towards plaintiff, stated that: "We drove each other. He never pushed back. And he gave me back what I gave him and vice versa. . . . [I]n our relationship and our 12 months together[,] it was always very much a drive, push each other, push each other's buttons, use whatever terms necessary to get the job done." *Id.* at 112:11-13, 113:16-20.

Defendant highlights, and plaintiff does not dispute, that plaintiff also sent many inappropriate messages to Brown. *See* Def.'s SMF ¶ 36 ("Plaintiff made many inappropriate remarks to Brown as well. For example, Plaintiff called Brown a 'bitch' 32 times, and he also called Brown: 'You little fucker,' 'You sick fuck,' 'twisted MF' and 'Drama Queen.' He also said 'fuck' many times, including: 'Shut the fuck up' and 'FUCK YOU' to Brown, and he once told Brown that he was greedy and wanted to roll in 'money like a dirty little pig' and then said that 'Piggy is getting excited.'"). Plaintiff has explained that, although Brown's "inappropriate and vulgar comments" made him "extremely uncomfortable," he sent messages with similar content to Brown "since this was [his] first job out of college, and Mr. Brown was [his] supervisor as well as the longest standing Partner of Daversa, [so he] felt [he] had no choice other than comply, or else risk angering Mr. Brown and jeopardizing [his] job." Pl's. SMF ¶ 36 (quotation marks omitted); *see also id.* (observing that plaintiff testified that "Brown repeatedly threatened to

destroy [his] career if [he] reported [Brown's] conduct, remarking that [Brown] would leave [him] 'on the side of the road and focus on someone else'") (quotation marks omitted).

As plaintiff avers, and as defendant does not dispute, Brown's conduct was not limited to verbal statements and text messages but also included physical sexual advances. For example, in November of 2019, Brown made a sexual advance asking plaintiff at a dinner if plaintiff "was attracted to him or if [plaintiff] thought [he] could love him," and "whether [plaintiff] wanted to invite him back to [plaintiff's] apartment after the dinner." Def.'s SMF ¶ 35. Brown and plaintiff also shared the same hotel room on at least two work-related trips, though they never slept in the same bed on those trips. *Id.* ¶ 34. Plaintiff asserts that Brown insisted that he and plaintiff share the same hotel room on these trips, and Brown reserved a king bed for the two to share during these encounters. Pl.'s SMF ¶ 34. When plaintiff asked Brown why he could not have his own room, Brown "responded the trip was reward enough and if [plaintiff] wanted his own room he would have to pay for it himself." *Id.* Plaintiff did not sleep on the same bed with Brown; on one occasion, plaintiff slept on the floor and, on the other, he slept a cot on the other side of the room. *Id.*

Plaintiff alleges that Brown battered and sexually assaulted him on three occasions—incidents that defendant does not dispute. The first incident occurred on November 14, 2019, approximately five months into plaintiff's employment with defendant, after Brown and plaintiff had a business-related dinner at a restaurant in Washington, D.C. Def.'s SMF ¶ 35; Brown Dep. at 87:13–87:22 (Brown describing the purpose of the meeting "to give [plaintiff] more feedback, development"); *id*. at 88:19-89:7 (Brown testifying that "We talked about how well he was actually doing in terms of the projects he was supporting me on" and what "he need[ed] to work on to really stay ahead of his pack, in terms of his class. We talked about my experiences when I first started

and the things I did to push myself to be better. So [I] gave him some war stories of my past."). Brown paid for the dinner as a business expense to the company. *Id.* at 90:20-91:5.

The parties do not dispute that, after the dinner meeting, as the two walked to Brown's car, Brown tickled plaintiff, grabbed his groin area outside his pants, and commented about the size of plaintiff's penis. Def's SMF ¶ 33(a). After driving plaintiff home and parking in front of plaintiff's apartment building, the parties also do not dispute that Brown held plaintiff down and attempted to reach his hand into plaintiff's pants. *Id.* The next morning, Brown allegedly called plaintiff and said, "I apologize. I crossed a line last night but if you want to be successful . . . capitalize on our relationships and do whatever it takes. Let's keep this our secret." Pl.'s Opp'n, Ex. 34, Pl.'s Objs. & Resps. to Def. Brown's First Set of Interrog. at 32–33 ("Pl.'s Exhibit 34"), ECF No. 39-27; *accord* Pl.'s Opp'n, Ex. 20, Aug. 18, 2021, Dep. Tr. of Vaughn Feighan at 182:12-22 ("Pl.'s Dep."), ECF No. 39-14.

Brown allegedly physically touched plaintiff a second time, on December 12, 2019, in Fairfield, Connecticut, during a company trip to a hotel to celebrate the business success Brown's team had in 2019. Def.'s SMF ¶ 33(b). The parties do not dispute that while plaintiff was sitting in a sauna by himself, Brown came in and sat next to him, and, after plaintiff moved away, Brown moved closer and put his hand on plaintiff's thigh and moved up his leg. Def.'s SMF ¶ 33(b); Pl.'s Ex. 34 at 33–34. As plaintiff got up to leave, Brown yanked his towel down, exposing plaintiff's buttocks as he left the spa. Def.'s SMF ¶ 33(b); Pl.'s Ex. 34 at 33–34. When plaintiff began to cry as he left the room, plaintiff alleges that Brown proceeded to laugh. Pl.'s Ex. 34 at 34.

Brown's third incident of physically touching plaintiff allegedly occurred on February 7, 2020, during a company trip to Jamaica to reward Brown's team for hitting the $10 million mark in sales during the year. Def.'s SMF ¶ 33(c). The parties do not dispute that, while in the lobby

of the lodging where the team stayed, Brown pressed up against plaintiff and grabbed plaintiff's buttocks with both hands. Def.'s SMF ¶ 33(c); Pl.'s Dep. at 272:3-20. Plaintiff told Brown never to do that again and even threatened to inform Paul Daversa, but plaintiff says—and defendant does not dispute—that Brown responded, "I'm the boss. You're my bitch. I do what I want. . . . Paul is my best friend[;] he's not going to do anything." Pl.'s Dep. at 272:6–273:8.[4]

### *3. Defendant's Relevant Policies and Handling of Reports About Brown's Misconduct Toward Plaintiff*

At the time of plaintiff's employment, defendant's 26-page employee handbook outlined company policies prohibiting and for remediating instances of harassment and discrimination in two pages. Pl.'s Opp'n, Ex. 22 ("Handbook") at 14–16, ECF No. 39-15. The Handbook states that defendant "is committed to providing a work environment free of sexual or any form of unlawful harassment or discrimination [,]" and that "[s]uch conduct by or towards any employee, contract worker, . . . or anyone else who does business with the [c]ompany will not be tolerated[,]" cautioning that "[a]ny employee or contract worker who violates this policy will be subject to disciplinary action, up to and including termination of his or her employment or engagement." *Id.* at 14. "With respect to sexual harassment, [RSG] prohibits the following: "[u]nwelcome sexual advances; requests for sexual favors; and all other verbal or physical conduct of a sexual or otherwise offensive nature . . . ." *Id.* The Handbook lists as prohibited various types of conduct, including touching, grabbing, groping, kissing, lewd, off-color, sexually or racially oriented comments or jokes, foul or obscene language, suggestive or sexually explicit photographs or

[4] Plaintiff contemporaneously discussed Brown's harassment of him with his father, Robert Feighan. Def.'s SMF ¶ 46. On December 3, 2019, plaintiff texted his father, regarding the harassment, that "I'm going to let it happen until I have enough material," to which his father replied, "I will help you." *Id.* ¶ 47. Plaintiff replied, "And with [Daversa], I am going to play this very smart so we have to always be aligned so nothing gets out of control. You are the only one I am talking to about this." *Id.* The two then discussed purchasing recording devices so that plaintiff could record his interactions with Brown. *Id.*; *see also* ¶¶ 49-51 (discussing plaintiff's efforts to procure recording devices).

cartoons, sexually oriented or explicit remarks, questions about one's sex life or experiences, and "[a]ny other related types of conduct or behavior deemed inappropriate by" defendant. *Id.* at 14–15. Employees were instructed that they "have a duty to report any conduct which they believe violates this policy[,]" and defendant "will conduct an investigation and, if improper conduct is found, take appropriate corrective action." *Id.* at 15. Defendant's complaint procedure consisted of a single sentence in the Handbook: "Employees . . . who feel that they have been harassed . . . should immediately report such conduct to their supervisor, to the CEO or any other member of management." *Id.*

Defendant had no human resources department or full-time human resources ["HR"] professional, at least when plaintiff worked at the company, Pl.'s SMF ¶ 5, although some employees worked on HR-related matters, Def.'s SMF ¶ 5. The parties agree that Maryanne Martire, a company partner who had been with the company since 1996, oversaw HR matters, *id.*, but she had no specialized education, training, expertise or background in human resources or handling sexual harassment cases, Pl.'s SMF ¶ 5. Martire was involved in resolving two instances of sexual harassment and misconduct (neither involving plaintiff), Def.'s SMF ¶¶ 12-13, though she admitted, in her deposition, that she investigated just one case of sexual harassment and admitted to having no experience in investigating cases involving other forms of discrimination including sexual orientation discrimination, Pl.'s SMF ¶ 5 (citing Pl.'s Opp'n, Ex. 23, Dep. Tr. of Maryanne Martire at 81:13-82:3, ECF No. 39-17). Defendant says its partners Martire, Laura Kinder, and Paul Daversa formed an internal "grievance committee," which was charged with investigating and responding to employee grievances, including complaints of discrimination and harassment, Def.'s SMF ¶ 6 (citing Daversa Decl. ¶ 3), but plaintiff disputes the existence of this committee during his employment, citing the fact that the Handbook does not mention any such

"grievance committee," nor has defendant produced any evidence that such a committee existed or was made known to its employees during that period, *see* Pl.'s SMF ¶ 6.

On September 18, 2019, defendant held a training session on harassment for employees in several offices, including the Washington, D.C. office, which training was created and presented by the company's outside counsel. Def.'s SMF ¶ 9. Plaintiff and Brown attended the training, at which both had the opportunity to ask questions, *id.* ¶¶ 10-11, though Brown, by his own admission, left the session early, Pl.'s SMF ¶ 9. The training made clear that "acting inappropriately" with an employee in the workplace could constitute harassment. *Id.* ¶ 13. This training session lasted one hour and was the only training that Brown could recall taking place during his previous twenty years of employment at the company. *Id.* ¶ 9. The training did not provide instructions on how to conduct a sexual harassment investigation or spot instances of harassment in the workplace. *Id.* ¶ 11. According to plaintiff, Brown's reaction to the training was to joke about it. *Id.* (citing Pl.'s Opp'n, Ex. 27, Decl. of Vaughn Feighan, May 2, 2022 ("Pl.'s Decl.") ¶ 20 ("After Mr. Brown underwent sexual harassment training in the fall of 2019, he joked about the class and implemented the term 'flag' which he shouted preemptively whenever he was about to make an inappropriate comment. After completing the training, Mr. Brown continued to make inappropriate and harassing comments, but believed if he preceded his comment by announcing 'flag' that his behavior was acceptable."), ECF No. 39-21).

The parties dispute the extent to which defendant, as a company, was notified of Brown's inappropriate behavior towards plaintiff. Plaintiff repeatedly told Brown, who was managing partner of defendant's D.C. office, to stop his behavior, Pl.'s SMF ¶ 7 (citing, *e.g.*, Pl.'s Dep. at 184:14-185:3 (plaintiff stating that he was "very clear" with Brown telling him "many, many times" to stop the harassment); *id.* at 184:1-4 (plaintiff stating he told Brown "multiple times" to stop his

conduct); *id.* at 257:3-6 (similar)), but neither plaintiff nor Brown ever notified Paul Daversa, Martire, or anyone else on defendant's management team about plaintiff's complaints, *see* Def.'s SMF ¶ 64. Paul Daversa acknowledged in his deposition, however, that plaintiff complied with the terms of the company's complaint procedure by notifying his supervisor—Brown himself. Pl.'s SMF ¶ 7 (quoting Pl.'s Opp'n, Ex. 22, Sept. 14, 2021, Dep. Tr. of Paul Daversa at 118:1-5 ("Daversa Dep."), ECF No. 39-16) (Question: "Is it your understanding of the policy that if Mr. Feighan were to report sexual harassment to his supervisor, Mr. Brown, that he would be complying with the terms of the policy?; Paul Daversa: Yes.").

Even though, during his employment, plaintiff never reported Brown's misconduct to other members of management other than to complain directly to Brown, in May 2020, a departing employee, Casey Marx, reported to Martire her observations of Brown's treatment of plaintiff in a seven-page, single-spaced email, stating, in part:

> The way I've seen [Brown] treat [plaintiff] is not only unacceptable for a personal relationship, but it is utterly inappropriate for a working relationship. The entire leadership has commented how inappropriate it is. This makes everyone uncomfortable when [Brown] does this. [Plaintiff] is only one example.

Pl.'s SMF ¶ 13; *see also* Def.'s SMF ¶ 44. Marx's email provided other positive and negative feedback regarding her employment with defendant, including regarding compensation, work hours, leadership and Brown's management of the office. Def.'s SMF ¶ 44. The specifics that Marx offered about Brown's behavior to plaintiff was limited to the following: "(i) Brown 'call[ed] out' plaintiff during team sessions and 'air[ed] out his grievances to the entire office;' (ii) Brown disclosed matters involving Ms. Marx's personal life to [p]laintiff and was 'prying' for information about Ms. Marx, and (iii) Brown once 'screamed' at [p]laintiff and Ms. Marx together during a Zoom call and wrongly blamed them for 'something that didn't even happen.'" *Id.* (quoting Def.' Mot., Ex. 28, Email from Casey Mark to Jonathan Krode, copying Maryanne Martire (May 19,

2020) ("Marx Email"), ECF No. 36-31). Marx also mentioned that Brown acted "extremely inappropriate[ly] and crosse[d] all professional boundaries" by "calling [employees]—intoxicated—and spend[ing] 20/30 minutes 'giving [them] feedback.'" *Id.* at 5. Marx's email did not expressly describe Brown's interactions with plaintiff as sexual harassment.

Martire forwarded Marx's email to Paul Daversa and Brown, who both acknowledged they received it. Pl.'s SMF ¶ 13. Brown, after reviewing Marx's email, stated that he took "full responsibility" for his conduct and that he needed to do "[a] lot of work[.]" *Id.* (emphasis omitted). In response to this report, Paul Daversa made no further inquiry of Brown, Marx, or any other employees in the D.C. or other offices, nor did he direct Martire or anyone else to investigate the report, or discipline Brown. *Id.*

Plaintiff told two co-workers about Brown's misconduct. Specifically, plaintiff told co-workers Kimberly Tuttle and Marx about the first incident in which Brown assaulted him; both Tuttle and Marx were then in their first year working at defendant and neither held management positions at that time. Def.'s SMF ¶¶ 41-42. Tuttle did not tell anyone at the company about plaintiff's comments, *id.* ¶ 43, and Marx only reported Brown's general harassment through her email to Martire on her departure from the company. *See* Pl.'s SMF ¶¶ 43-44.

#### *4. Defendant's Bonus Policy and Brown's Promises to Plaintiff*

As relevant here, defendant's Business Development Bonus Plan ("BD Bonus Plan") allows employees the opportunity to earn "business development bonuses" ("BD bonuses"), amounting to 10 percent of the revenue generated from business developed within the terms of the program. Def's SMF ¶ 27 (citing Def.'s Mot, Ex. 11, Declaration of Paul Daversa ¶ 6 ("Daversa Decl."), ECF No. 36-14). Eligibility for a BD bonus requires an employee to "source" the client, meaning to bring the business client to the company, as "indicated by whether the employee signed

and sent the initial engagement letter to the client." *Id.* (citing Daversa Decl. ¶ 6). "Once a client is retained, the earning of a BD bonus is further conditioned on the successful placement of a candidate with the client, payment in full by the client to RSG, and the expiration of any guarantee period set forth in the client retention without the placed candidate having left the client's employ for a reason [that] would disqualify RSG from retaining the fee." *Id.* ¶ 28 (citing Daversa Decl. ¶ 6). Defendant contends that these bonuses are paid annually, such that if a client pays for a search in one calendar year, the employee entitled to the BD bonus is paid the following year and, accordingly, must be employed at the time the bonus is paid in order to receive it. *Id.* (citing Daversa Decl. ¶ 6). Defendant's first-year recruiters normally do not earn BD bonuses because the company recruits for high-ranking executive and board-level positions for technology companies, and junior-level employees usually do not form those types of client relationships. *Id.* (citing Daversa Decl. ¶ 6).

Plaintiff disputes defendant's characterization of the BD Bonus Plan. According to plaintiff, in practice, Brown made all decisions regarding performance-based bonuses in the D.C. office, and those bonuses were paid from the revenue generated from Brown's profit and loss accounts. Pl.'s SMF ¶ 17 (citing, e.g., Brown Dep. at 157:13–158:17; *id.* at 101:11-20 (Brown confirming "I rewarded [plaintiff.]"); *id.* at 162:12-163:5 (Brown stating, "So based on the revenue of [a] particular search, I would determine how much of the fee [bonus] would go to someone"); *id.* at 163:6-12 (Brown stating, "I determined based on [plaintiff's] work how much of that, given he led the search, he would get like a spot bonus of that search"); *id.* at 168:19-169:3 (Brown stating, "What I do recall is that I would find a way to pay him [plaintiff] [a bonus] now and half at the end of the year . . ."); Pl.'s Opp'n, Ex. 13 (Sealed), Email from Bruce Brown to Plaintiff (Apr. 17, 2020) ("You would lead and I will make sure u get $$$ that I would pay you directly

from my p&l…"), ECF No. 40-9; Pl.'s Opp'n, Ex. 14, Emails Exchanged between Plaintiff and Bruce Brown (May 18, 2020), ECF No. 39-9 ([Plaintiff]: "I saw Paul's workplace post about paying out BD. Like we discussed in SF, I know I am not eligible for the full amount . . . but will I get the $3000 that we agreed upon during that time?"; [Brown]: "Yes . . . but will be splitting in 1/2 . . . 50% now and 50% later."; [Plaintiff]: "Okay wonderful. I totally agree with that. Just let me know when I should look for it."); *see also* Pl.'s SMF ¶¶ 27-29. In short, plaintiff asserts that performance-related bonuses were not confined to the stringent conditions outlined in the BD Bonus Plan.

Based on promises made by Brown, plaintiff believes he is entitled to over $60,000 in bonus payments in connection with the nine executive placements he secured for defendant. Pl.'s SMF ¶ 17 ("Alation ($10,000) ('This $10,000 bonus was promised to me' by Mr. Brown); Big Health ($2,000) ('Bruce [Brown] once again promised the incentive of $2,000 for closing the search'); BirdEye ($10,000) ('I was promised [by Mr. Brown] that I would receive $10,000 upon the search's closure'); Constellation ($5,000); PeerNova ($7,500) ('I was promised [by Mr. Brown] the entire business development commission from this search'); RedMarlin ($5,000) ('Bruce [Brown] promised the $5,000 out of his P&L for the completion of this search'); RedMarlin ($7,500) ('Bruce [Brown] confirm[ed] that I won this search in an email to the entire firm'); Testim ($7,500) ('Bruce [Brown] promised a flat payment of $7,500 to me because he was so elated that the search closed'); and Zycada ($12,500) ('Bruce [Brown] . . . promised me 20% of the retainer price given that it was only him and I working on the search and I was responsible for doing all the work')" (quoting Pl.'s Opp'n, Ex. 2, Pl.'s Objs. & Resps. to Def. Daversa Partners' First Set of Interrogs. at 26–27, ECF No. 39-3)); *accord id.* ¶ 27-31. In support, plaintiff also cites to a slew of contemporaneous statements that Brown made, praising plaintiff for winning and closing those

placements. *Id.* ¶ 17 (collecting statements made by Brown praising plaintiff repeatedly for his executive placements).

Plaintiff did not "source" any of the clients for which he helped secure executive placements, Def.'s SMF ¶¶ 30, 32 and defendant's finance department has no record of any request for a bonus or other monetary award to plaintiff based on his work for Alation, BirdEye, Constellation, PeerNova, Testim, and Zycada. Def.'s Suppl. SMF ¶ 81 (citing Def.'s Reply, Ex. 39, Supp. Aff. of Amy Dolan Salvatore ("Dolan Salvatore Supp. Aff.") ¶ 2), ECF No. 44-7. For example, those records, which defendant does not provide, purportedly reflect that Brown directed that plaintiff be awarded "business development credit for one search for client Red Marlin," but "do not reflect any request for a bonus to Plaintiff for the initial Red Marlin search." *Id.* ¶ 82.

***5. Plaintiff Resigns and Reports Brown's Harassment to Paul Daversa***

Plaintiff resigned from defendant on June 30, 2020, by notifying Brown verbally by phone he was resigning, and following up that verbal resignation by written email, stating that July 17, 2020, would be his last day. Def.'s SMF ¶ 54. On July 1, 2020, plaintiff sent a private email to Brown about his resignation, citing the following reasons for his resignation: (1) plaintiff's feeling that junior managers needed further leadership develop, (2) the heavy workload, (3) lack of consistency in instructions from junior managers, and (4) poor compensation. *Id.* ¶ 56. On July 2, 2020, plaintiff sent a departing email to his coworkers, citing, as the reasons for his resignation that: (1) he felt he was undercompensated for the amount of work he performed, (2) the class-wide bonuses, which he felt did not reward individual performance, and (3) the lack of upward mobility. *Id.* ¶ 57. Plaintiff also documented near the time of his resignation that Brown's refusal to pay the bonuses promised to him led his resignation. *See* Pl.'s SMF ¶ 55 (plaintiff texted, near date of his resignation, another individual that, "[Brown] got shitfaced and told me that I can't get commission

until 2 years. He isn't going to pay me for all the business I have brought in. *I have to officially leave now*.") (quotation marks omitted) (alteration and emphasis in original)); *id.* (plaintiff texted another individual, on June 30, 2020, that "They didn't pay me . . . They have withheld $65k worth of commissions that I brought in. *That was my tipping point*.") (quotation marks omitted) (emphasis in original)). After resigning from defendant, plaintiff began working with his father, a financial advisor with Ameriprise Financial. Def.'s SMF ¶ 62.

After submitting his resignation, plaintiff advised Marx, on July 5, 2020, that he planned to reveal his allegations against Brown to Paul Daversa, texting her that, "Paul has NO IDEA. What is coming. . . . ," "Boom. I am going out with a bang," "Paul HAS SO MUCH SHIT coming," and "this is going to be such a shot I almost feel bad." *Id.* ¶ 61. After plaintiff had terminated his employment with defendant, his counsel alerted Paul Daversa about Brown's misconduct towards him. Specifically, on August 25, 2020, plaintiff's attorney sent a letter to Paul Daversa and attached a draft complaint, in which plaintiff asserted harassment, tort, and wage claims against defendant, the same claims that plaintiff raises in the Amended Complaint. *Id.* ¶ 63. This was the first time that Paul Daversa says he learned of plaintiff's claims of sexual harassment. *Id*. A month later, in approximately late September 2020, Paul Daversa placed Brown on a leave of absence, pending review and investigation with counsel of the allegations made by plaintiff. *Id.* ¶ 65. Then, nearly four months later, on about December 11, 2020, Paul Daversa called Brown and asked him to resign, effective immediately, due to plaintiff's allegations, and Brown resigned from the company the same day. *Id.* ¶ 66.

**B. Procedural Background**

On December 17, 2020, plaintiff initiated the instant lawsuit against defendant and Brown in the Superior Court for the District of Columbia, Civil Division. Def.'s Notice of Removal ¶ 1

("Notice"), ECF. No. 1. Before service on defendant and Brown was effected, defendant removed the case to this Court on diversity jurisdiction grounds, Notice ¶ 1, prompting plaintiff to seek remand on the ground that Brown was a citizen of Washington, D.C. and that plaintiff had yet to serve defendant, so it was improper for the case to be removed to the District Court for the District of Columbia. Pl.'s Mot. Remand at 1, 7, 22, ECF No. 5. This issue of "snap removal," by removing a case to district court before plaintiff has effected service on defendant, was determined to be permissible, under 28 U.S.C. §1441(b)(2), because that statute did not prohibit removal *before* defendant had been served with the complaint, even when one or more defendant is a resident of the state in which the District Court sits. Memorandum Opinion and Order at 6, ECF No. 9. As a result, plaintiff's Motion to Remand was denied, and the case remained in this Court.[5]

During discovery, plaintiff identified his father, Robert Feighan, in his interrogatory answers, as having knowledge of: (i) Brown's harassment of plaintiff through their conversations as father and son and from viewing Brown's text messages to plaintiff, (ii) the emotional, financial and psychological harm plaintiff suffered, and (iii) the father's conversation with Brown about plaintiff's job performance. Def.'s Reply, Corrected Ex. 24, Pl.'s Objs. & Resps. To Def. RSG's First Set of Interrogs. at 5, ECF No. 44-5. Defendant issued a subpoena to the father's business, Def.'s SMF ¶ 68; Pl.'s SMF ¶ 68, where plaintiff was employed, which subpoena plaintiff's father sought to quash in the U.S. District Court for the District of Connecticut, as overbroad, Def.'s SMF ¶ 70; Pl.'s SMF ¶ 70 ("Not in dispute."). During ensuing discussions between counsel for plaintiff's father and for defendant, plaintiff says that defendant's lawyer "made clear to Robert Feighan's attorney, . . . that [defendant] intended to use the discovery process in the instant case

[5] Plaintiff subsequently settled his claims against Brown. Pl.'s Not., ECF No. 34; Minute Order (Feb. 8, 2022) (dismissing "Bruce Brown from this matter, with prejudice").

to develop and prove a case of 'breach of fiduciary duty' against [plaintiff's father]," Pl.'s SMF ¶ 72, even though plaintiff's father "had no relationship of any kind with [RSG], much less a fiduciary one,'" and defendant's lawyer responded, "'[M]aybe we have the wrong brother," referring to plaintiff's uncle, who had previously worked at defendant and now works with plaintiff's father. *Id.*[6] Ultimately, plaintiff's father withdrew his motion to quash, appeared for a deposition on November 9, 2021, and produced an agreed-upon set of records in advance of the deposition. Def.'s SMF ¶¶ 73-74; Pl.'s SMF ¶¶ 73-74 ("Not in dispute.").

On October 8, 2021, plaintiff sought leave to file the Amended Complaint to add a new Count IX, a DCHRA retaliation claim, based on the allegation that the subpoena issued to plaintiff's father and defendant's counsel's suggestion that defendant would bring a breach of fiduciary duty claim against Robert Feighan amounted to unlawful retaliation against plaintiff under the DCHRA. Pl.'s Mot. to file Am. Compl., ("Pl.'s Mot.") ECF No. 23 at 5-9 (Oct. 27, 2021). Over defendant's opposition, plaintiff's motion was granted. *See* Minute Order (Oct. 27, 2021).

Defendant's motion for summary judgment, pursuant to Federal Rule of Civil Procedure Rule 56, is now ripe for resolution.

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[a] party is entitled to summary judgment only if there is no genuine issue of material fact and judgment in the movant's favor is proper as a matter of law." *Soundboard Ass'n v. FTC*, 888 F.3d 1261, 1267 (D.C. Cir. 2018) (quoting *Ctr. for Auto*

---

[6] Defendant's 401(k) retirement plan was managed by plaintiff's uncle and his father's brother—Gregory Feighan, who is a former employee of defendant. Def.'s SMF ¶ 75; Pl.'s SMF ¶ 75 (not disputing this fact). Paul Daversa believed that Gregory and Robert Feighan presently worked together, Def.'s SMF ¶ 75, and in fact, Robert and Gregory Feighan work as financial advisors for Ameriprise, and share the same business address in Valhalla, New York, with Robert's Ameriprise webpage listing Gregory as a member of Robert's "team," Def.'s SMF ¶ 77; Pl.'s SMF ¶ 77.

*Safety v. Nat'l Highway Traffic Safety Admin.*, 452 F.3d 798, 805 (D.C. Cir. 2006)); *see also* Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the "absence of a genuine issue of material fact" in dispute, *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986), while the nonmoving party must present specific facts supported by materials in the record that would be admissible at trial and that could enable a reasonable jury to find in its favor, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allen v. Johnson*, 795 F.3d 34, 38 (D.C. Cir. 2015) (noting that, on summary judgment, appropriate inquiry is "whether, on the evidence so viewed, 'a reasonable jury could return a verdict for the nonmoving party'") (quoting *Liberty Lobby*, 477 U.S. at 248).

"Evaluating whether evidence offered at summary judgment is sufficient to send a case to the jury is as much art as science." *Estate of Parsons v. Palestinian Auth.*, 651 F.3d 118, 123 (D.C. Cir. 2011). This evaluation is guided by the related principles that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment," *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam), and "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *id.* at 651 (quoting *Liberty Lobby*, 477 U.S. at 255 (alteration in original)). Courts must avoid making "credibility determinations or weigh[ing] the evidence," since "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150–51 (2000) (quotation marks omitted); *see also Burley v. Nat'l Passenger Rail Corp.*, 801 F.3d 290, 295–96 (D.C. Cir. 2015). In addition, for a factual dispute to be "genuine," the nonmoving party must establish more than "[t]he mere existence of a scintilla of evidence in support of [its] position," *Liberty Lobby*, 477 U.S. at 252, and cannot rely on "mere allegations" or conclusory statements, *see Equal Rights Ctr. v. Post Props., Inc.*, 633

F.3d 1136, 1141 n.3 (D.C. Cir. 2011). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Liberty Lobby*, 477 U.S. at 249–50, (citations omitted). Moreover, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. at 323. In that situation, "[t]he moving party is 'entitled to a judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Id.* The Court is only required to consider the materials explicitly cited by the parties, but may on its own accord consider "other materials in the record." Fed. R. Civ. P. 56(c)(3).

"As employers rarely maintain records directly evidencing discrimination, 'an added measure of 'rigor,' or 'caution,' is appropriate in applying this standard to motions for summary judgment in employment discrimination cases.'" *Woodruff v. Peters*, 482 F.3d 521, 526-27 (D.C. Cir. 2007) (quoting *Aka v. Wash. Hosp. Ctr.*, 116 F.3d 876, 879-80 (D.C. Cir. 1997), *vacated on other grounds*, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). At the same time, courts need not accept as true claims made by a non-movant that "rest[] entirely upon a conclusory representation," because "accepting such conclusory allegations as true . . . would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial." *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## III. DISCUSSION

Defendant seeks summary judgment in the company's favor on all seven claims against it in the Amended Complaint, but is entitled to such judgment on two counts only. Specifically, defendant is entitled to summary judgment on Count IV (battery claims) and Count IX (DCHRA

retaliation), but the remainder of defendant's motion is denied for the reasons discussed in detail below.

**A. Counts IV and IX: Defendant Is Entitled to Summary Judgment on Plaintiff's Battery and DCHRA Retaliation Claims**

As noted, defendant is entitled to summary judgment on Count IV (battery claims) and on Count IX (DCHRA retaliation), for failing to show any genuine issue of material fact that would permit a reasonable jury to find in plaintiff's favor on either claim.

***1. Count IV For Battery***

In Count IV, plaintiff seeks to hold defendant vicariously liable for Brown's three batteries of plaintiff. Defendant argues that plaintiff's claim for vicarious liability under the doctrine of *respondeat superior* fails because Brown's alleged batteries were not within the scope of his employment. Def.'s Mot. at 28. Defendant is right.

"*Respondeat superior* is a doctrine of vicarious liability that imposes liability on employers for tortious and negligent acts of their employees committed within the scope of their employment." *Blair v. District of Columbia*, 190 A.3d 212, 225 (D.C. 2018) (quotation marks omitted). Conduct is within an individual's scope of employment if, *inter alia*, "it is actuated, at least in part, by a purpose to serve the master[.]" *Schechter*, 892 A.2d at 427–28 (D.C. 2006) (quoting Restatement (2d) of Agency § 228). The seminal D.C. case on the scope of *respondeat superior* liability is *Boykin v. District of Columbia,* 484 A.2d 560, 561 (D.C. 1984), where the D.C. Court of Appeals held, as a matter of law, that an instructor's sexual assault of a student at was not within the scope of the instructor's employment because the assault "not a direct outgrowth of [the instructor's] instructions or job assignment, nor was it an integral part of the school's activities, interests or objectives." Additionally, the court held that the instructor's "assault was in no degree committed

to serve the school's interest, but . . . [was] done solely for the accomplishment of [his] independent, malicious, mischievous and selfish purposes." *Id.*

Plaintiff's case for *respondeat superior* liability against defendant for Brown's batteries fails for the same reasons set out in *Boykin*. Just as in *Boykin*, plaintiff has adduced no facts to show Brown committed these torts in furtherance of the company's interests; rather, all three of Brown's batteries appear to be for his own personal reasons. Plaintiff emphasizes that Brown's batteries occurred adjacent to work-related activities (after a work dinner and during two work trips), *see* Pl.'s Opp'n at 33–35, but even the *Boykin* instructor committed his intentional tort on school grounds, yet that fact was irrelevant to the court's *respondeat superior* analysis. Since no record evidence shows Brown committed these batteries to further defendant's interests, they were not within the scope of his employment, and defendant cannot be held vicariously liable for this conduct by its former partner.

***2. Count IX for Litigation-Related Retaliation under DCHRA***

In Count IX of the Amended Complaint, plaintiff claims that defendant retaliated against him, in violation of the DCHRA, when defense counsel allegedly commented to plaintiff's father's counsel that defendant would pursue a "breach of fiduciary duty" claim against plaintiff's father for not reporting plaintiff's allegations to Paul Daversa. *See* Am. Compl. ¶¶ 194-95, 197.[7] "Under the DCHRA, it is an unlawful discriminatory practice to retaliate against any person on account of having exercised any right granted or protected under the Act." *Rose v. United Gen. Contractors*, 285 A.3d 186, 192 (D.C. 2022) (cleaned up) (quoting *McFarland v. George Washington Univ.*,

[7] While denying that defense counsel made that comment, defendant explains that the theory for suing plaintiff's faither for breach of fiduciary duty is that Gregory Feighan worked for defendant, Paul Daversa believed that Gregory Feighan and plaintiff's father worked together, and plaintiff's father "[might] have violated a duty to [defendant] by conspiring with his son to build a case against the company, including by recording conversations, rather than report the matter to [defendant's] management." Def.'s Mot. at 50.

935 A.2d 337, 355-56 (D.C. 2007)); *see also* D.C. Code § 2-1402.61(a). "To establish a prima facie claim of discriminatory retaliation, a plaintiff must show that '(1) he was engaged in a protected activity. . . , (2) the employer took an adverse personnel action against him, and (3) a causal connection existed between the two.'" *Id.* (quoting *McFarland*, 935 A.2d at 356).

Plaintiff's strained theory for DCHRA retaliation is that: (1) plaintiff filed this lawsuit against defendant, which is protected activity, *Gross v. Akin, Gump, Strauss, Hauer & Feld, LLP*, 599 F. Supp. 2d 23, 33 (D.D.C. 2009); and (2) defendant retaliated against plaintiff for pursuing protected activity by suggesting, through defense counsel, the possibility of filing a breach of fiduciary duty claim against his father. Pl.'s Opp'n at 53. Defendant counters, *inter alia*, that a counsel's mere suggestion of a future claim, even if true, would not amount to an actionable retaliatory action. Def.'s Mot. at 48–49. To be sure, threatening unfounded litigation against the family member witness of a party in the midst of litigation discovery could be perceived as an effort to intimidate the witness into silence and cross professional ethical lines, or worse. *See* D.C. Rule of Professional Conduct 8.4(d) ("It is professional misconduct for a lawyer to . . . (e)ngage in conduct that seriously interferes with the administration of justice[.]"). Yet, the record of what allegedly occurred here falls short of supporting the asserted claim.

Assuming, *arguendo*, that defendant's counsel suggested Paul Daversa intended to bring legal action against plaintiff's father, that comment would not dissuade a reasonable worker from filing a lawsuit, given the context. Plaintiff was the party to name his father as a person having knowledge relevant to the claims asserted and "fronting" his father as a witness, leading inevitably to defendant quite properly seeking relevant testimony and documents from this witness, who resisted such discovery in litigation to quash the defendant's discovery subpoena, which litigation was ultimately withdrawn. Plaintiff's father ultimately produced discovery and was deposed, but

in the midst of this tangential litigation, defense counsel made what plaintiff concedes was a vague purported threat of the possible claim against the father, though plaintiff also concedes that defense counsel also acknowledged at some point that the basis for the possible claim may have been erroneous. Pl.'s SMF ¶ 72 (alleging that defendant's counsel remarked, "'[M]aybe we have the wrong brother," referring to plaintiff's uncle, who had previously worked at defendant and now works with plaintiff's father).

The D.C. Circuit has explained that when assessing retaliation claims, "the significance of any given act of retaliation will often depend upon the particular circumstances[,]" *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 578 (D.C. Cir. 2010) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006)), so "a statement that literally appears to be threatening is not necessarily a materially adverse action[,]" *id.* at 578. Applying that principle to the facts, the *Gaujacq* Court held that the alleged retaliatory statement levied against plaintiff, "[y]our career is dead . . . if you file the claim," was not "a materially adverse action" because "a reasonable worker in [the plaintiff's] position would not have taken [the] brief, fleeting, and unadorned verbal statement as an act or threat of retaliation," especially considering that the company attempted to accommodate plaintiff's employment wishes before and after the comment was made. *Id.*

Under *Gaujacq*, defense counsel's comment, even if true, was merely a "brief, fleeting, and unadorned verbal statement" that cannot support an actionable retaliation claim. *See id*. The alleged statement—that defendant would use the discovery process in this case to build a case of breach of fiduciary duty against plaintiff's father—is a much flimsier comment than the one made in *Gaujacq*, where the plaintiff was told his career would be "dead" if he filed a claim, because counsel never explicitly stated defendant would file that lawsuit. Even plaintiff's father characterized this threat as "vague," as plaintiff observed when he filed his motion for leave to file

an amended complaint. *See* Pl.'s Mot. at 4 (noting that plaintiff's father called the threat of a breach of fiduciary duty lawsuit "vague"). The purported threat was also just as fleeting as in *Gaujacq*: plaintiff has not shown that defendant later again threatened legal action against his father, or that it filed, or even planned to file, any legal or regulatory action against him. *See* Def.'s Reply at 29. Given this context, plaintiff has not provided sufficient evidence to demonstrate that defense counsel's suggestion amounted to an overt threat. Plaintiff also concedes this point in his opposition, *see* Pl.'s Opp'n at 53-55 (never arguing that defendant's threat was concrete or real), so Count IX cannot survive summary judgment.

### B. Count I: Plaintiff's DCHRA Discrimination Claim

Plaintiff claims, in Count I, that defendant is liable for a hostile work environment, Am. Compl. ¶¶ 98, 101; *see also* Pl.'s Opp'n at 1 (characterizing his claim as solely one for "hostile work environment"), and, though not contesting that plaintiff suffered from a hostile work environment during his employment, defendant denies any legal accountability for this circumstance, *see generally* Def.'s Mot. at 16–28.[8] Considering Brown's undisputed interactions with plaintiff, both verbally and physically inappropriate and abusive, a reasonable jury could conclude this conduct adversely altered the conditions of plaintiff's employment. Nonetheless, defendant asserts that any effort to hold it vicariously liable for Brown's conduct would be vitiated

[8] The DCHRA prohibits employers from*, inter alia*, "discriminat[ing] against any individual, with respect to his compensation, terms, conditions, or privileges of employment . . . in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his or her status as an employee" "wholly or partially for a discriminatory reason based upon the actual or perceived . . . sex . . . [or] sexual orientation . . . of [that employee]." D.C. Code Ann. § 2-1402.11(a). A viable hostile environment claim may be asserted under the DCHRA by demonstrating "(1) that [plaintiff] is a member of a protected class, (2) that she has been subjected to unwelcome harassment, (3) that the harassment was based on membership in the protected class, and (4) that the harassment is severe and pervasive enough to affect a term, condition[,] or privilege of employment." *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 888 (D.C. 2003) (cleaned up) (quoting *Daka, Inc. v. Breiner*, 711 A.2d 86, 92 (D.C. 1998)).

by the defendant's affirmative defense, as articulated in *Faragher v. Boca Raton*, 524 U.S. 775 (1998), and *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742, (1998). Def.'s Mot. at 18–21.

When an employee seeks to hold his employer vicariously liable for his supervisor's harassment, an employer may assert an affirmative defense under the *Faragher-Ellerth* framework, at least in Title VII cases, and this affirmative defense is assumed to be available here.[9] In *Faragher* and *Ellerth*, the Supreme Court articulated two categories of harassment claims for which employers may be held liable: "(1) harassment that 'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense." *Pa. State Police v. Suders*, 542 U.S. 129, 143 (2004) (quoting *Ellerth*, 524 U.S. at 765). If a plaintiff can satisfy the first requirement, the employer is strictly liable, *Jones*, 429 F.3d at 278 (quoting *Ellerth*, 524 U.S. at 761), but if he cannot, the employer may assert the *Farragher-Ellerth* affirmative defense, which, if proven true, absolves the employer of vicarious liability for the hostile work environment suffered by an employee due to the conduct of a supervisor. *Ellerth*, 524 U.S. at 765; *see infra* at Section III.B.2 (outlining requirements for the affirmative defense).

Here, the parties dispute whether plaintiff suffered a tangible adverse employment action and, if not, whether defendant satisfies the requirements for a *Faragher-Ellerth* affirmative defense.

---

9 When interpreting the DCHRA, the D.C. Court of Appeals has held that cases construing Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq*, are persuasive, though not always dispositive. *Rose*, 285 A.3d at 192; *see also Jones v. D.C. Dep't of Corr.*, 429 F.3d 276, 278-79 (D.C. Cir. 2005) (analyzing DCHRA and Title VII claims using the same standards). The *Faragher-Ellerth* framework has been applied to DCHRA hostile work environment claims in other decisions reached in this Court but no binding precedent so requires. *See, e.g.*, *Craig v. D.C.*, 74 F. Supp. 3d 349, 369 (D.D.C. 2014) (applying same legal standards to plaintiff's Title VII and DCHRA claims); *Byrd v. D.C.*, 807 F. Supp. 2d 37, 57-58 (D.D.C. 2011) ("Because it is well-established that the DCHRA and Title VII employment discrimination actions are evaluated under the same legal standard, the following analysis applies to both claims where implicated."). Here, the *Faragher-Ellerth* is assumed to be an available affirmative defense to a DCHRA hostile work environment claim.

These disputes present sufficient genuine issues of material fact to defeat defendant's motion for summary judgment on plaintiff's hostile work environment claim.

***1. A Jury Could Reasonably Find that Plaintiff Suffered a "Tangible Employment Action."***

To avoid the *Faragher-Ellerth* affirmative defense and hold defendant strictly liable for Brown's conduct, plaintiff must demonstrate he suffered a "tangible employment action," which has two components. First, plaintiff must show he suffered "significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Jones*, 429 F.3d at 278 (quoting *Ellerth*, 524 U.S. at 761). Second, plaintiff must "establish[] the requisite link between a supervisor's injurious conduct in the workplace and the employing enterprise; it must be an action *done by the supervisor* whose conduct has generated the employee's claim." *Jones*, 429 F.3d at 279 (emphasis in original); *see also Suders at* 131 (quoting *Ellerth*, 524 U.S. at 758) ("A tangible employment action . . . is an 'official act of the enterprise' and 'fall[s] within the special province of the supervisor.'") (alterations in original).

A jury could find plaintiff has satisfied both requirements to show he suffered a tangible employment action. First, plaintiff suffered a "significant change in benefits," *Jones*, 429 F.3d at 278, when he was denied bonuses that he alleges Brown promised him and he earned. *See Douglas v. Preston*, 559 F.3d 549, 552 (D.C. Cir. 2009) ("[A] bonus is a tangible, quantifiable award, more analogous to one's salary or to a benefit of one's employment than to a performance evaluation. It has a more direct, measurable, and immediate effect, meaning the denial of even a purely discretionary bonus can be actionable.") (quotation marks omitted). Additionally, plaintiff suffered a "significant change in employment status," *Jones*, 429 F.3d at 278, when he says that

he was constructively discharged due to the nonpayment of those promised bonuses.[10] Second, Plaintiff has satisfied the "requisite link" requirement because Brown's bonus denials—which plaintiff also says culminated in his constructive discharge, *see* Pl.'s Opp'n at 14–16; *see also* Pl.'s SMF ¶ 55—if true, were undoubtedly actions taken by the harassing supervisor. *See Jones*, 429 F.3d at 279.

Defendant makes two counterarguments, both attacking plaintiff's satisfaction of the "requisite link" requirement, but neither are persuasive. First, defendant says that Brown's denial of bonuses were not "official act[s]" on behalf of defendant because those bonus payments would have come from Brown's own pay and not defendant's pocket. Def.'s Mot. at 19 (citing *Suders*, 542 U.S. at 141). Put another way, defendant's argument is that bonus payment promises about which defendant was unaware cannot be attributed to defendant, and neither can the failure to pay such bonuses. Yet, defendant cannot rely on such alleged willful blindness to Brown's actions as a defense to liability here because an "official act" is merely "the means by which the supervisor brings the official power of the enterprise to bear on subordinates." *Suders*, 542 U.S. at 141 (quoting *Ellerth*, 524 U.S. at 760). Brown was the head of the D.C. Office and plaintiff's direct supervisor, *see Vance v. Ball State Univ.*, 570 U.S. 421, 434 (2013) ("[T]he ability to supervise includes the ability to take tangible employment actions[.]"), with the position and authority to make bonus payment decisions. Further, plaintiff has proffered significant record evidence that Brown oversaw plaintiff's bonus-related decisions on behalf of defendant and made explicit promises to plaintiff about payment of bonus compensation for securing executive placements,

---

10 Defendant argues that the denial of plaintiff's bonuses were purely discretionary, so any denial of payment (which also formed the basis for plaintiff's constructive discharge) cannot amount to a significant change in benefits, *see* Def.'s Reply at 2–3, but defendant is wrong for the same reasons that Brown's alleged bonus-denials may be "owed" and not "discretionary" under the DCHRA, *see infra* Section III.C.

notwithstanding the BD Bonus Plan's requirements. *See* Pl.'s SMF ¶¶ 17, 27-31. A jury could thus find that Brown's denial of bonuses he allegedly promised to plaintiff, which plaintiff says, in turn, precipitated plaintiff's constructive discharge, amounted to "official act[s]" taken by defendant. *See Suders*, 542 U.S. at 141.

Second, defendant argues that, even if plaintiff's denied bonuses and constructive discharge were tangible employment actions, "that is not enough to support a claim of harassment in this case because there is no causal connection between the alleged harassment and the denied moneys," Def.'s Reply at 4–5, but defendant's argument misses the mark. So long as plaintiff can show that the harassing supervisor took an "official act" by "us[ing] his managerial or controlling position to the employee's disadvantage" when he exacted the tangible employment action, defendant cannot resort to the *Faragher-Ellerth* defense. *See Suders*, 542 U.S. at 147–48; *see also Vance*, 570 U.S. at 424 ("If the supervisor's harassment *culminates* in a tangible employment action, the employer is strictly liable.") (emphasis added).[11] As discussed above, a reasonable jury could find that Brown engaged in an "official act" by denying him bonuses he promised, which also resulted in plaintiff's decision to leave the company, so defendant can still be held strictly liable for Brown's creation of a hostile work environment since it culminated in two tangible employment actions.

Even if defendant were right that plaintiff must show a causal link between Brown's harassment and the tangible employment actions, plaintiff has satisfied that burden at this stage. Plaintiff explained that he felt that he had to accept and even go along with Brown's insistent

---

[11] The cases that defendant relies upon for its causation argument, *see* Def.'s Reply at 4, are distinguishable because the harassing supervisors in those cases were not involved in the plaintiff's alleged tangible employment actions. *See Williams v. Verizon Wash., DC, Inc.*, 266 F. Supp. 2d 107, 118 (D.D.C. 2003) (explaining that plaintiff showed no evidence that the harassing supervisor "'participated' in the decision to suspend her"); *Helm v. Kansas*, 656 F.3d 1277, 1287 (10th Cir. 2011) ("[Plaintiff] has offered no evidence that connects *Judge Stewart's harassment* to *Chief Judge King's termination decision*.") (emphasis in original).

inappropriate and harassing statements because speaking out would risk angering Brown and jeopardizing his career. *See* Pl.'s SMF ¶ 36. Yet, when plaintiff told Brown to stop harassing him, *see* Pl.'s SMF ¶ 7, and rejected Brown's sexual advances, *see* Def.'s SMF ¶¶ 33-34; Pl.'s SMF ¶¶ 33-34, Brown eventually reneged on his promised bonuses to plaintiff, *see* Pl.'s SMF ¶ 55. A jury could accordingly infer that Brown's decision to renege on those bonuses was causally related to plaintiff telling Brown to end his harassment and rejecting his sexual advances.

***2. Defendant Is Not Entitled to Summary Judgment on its Faragher-Ellerth Defense.***

If plaintiff were unable to show any tangible employment action, about which genuine issues of material fact must be resolved by a trier of fact, defendant further claims the benefits of the *Faragher-Ellerth* affirmative defense. The "defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior *and* (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 807 (emphasis added); *see also Jones*, 429 F.3d at 279 ("[T]he *Faragher–Ellerth* defense is explicitly an 'affirmative defense' as to which the employer has the burden of proof.").

For the first element, defendant must show that it "took reasonable care both to prevent *and* correct harassment." *Frederick v. Sprint/United Mgmt. Co.*, 246 F.3d 1305, 1314 (11th Cir. 2001) (emphasis in original); *see also Brokenborough v. District of Columbia*, 236 F. Supp. 3d 41, 53 (D.D.C. Feb. 17, 2017) ("[T]he existence of an anti-harassment policy may not be, by itself, sufficient."). As to preventing harassment, the employer "must show that its sexual harassment policy was effectively published, that [the policy] contained reasonable complaint procedures, and that [the policy] contained no other fatal defect." *Frederick*, 246 F.3d at 1314. For example, in

*Faragher*, the employer could not raise the affirmative defense due to failure to disseminate an anti-harassment policy to the relevant employees, monitor the conduct of the harassing supervisors, or provide any assurances that harassing supervisors could not be bypassed in registering complaints. 524 U.S. at 808. As to correcting harassment, defendant must demonstrate "that [it] acted reasonably promptly on [plaintiff's] complaint when it was given proper notice of [his] allegations as required under its complaint procedures." *Frederick*, 246 F.3d at 1314.

Contrary to defendant's arguments, *see* Def.'s Mot. at 22–23, a reasonable jury could find that defendant failed to take reasonable care to both prevent and correct harassment. To start, defendant's reporting policy—directing employees who feel they had been harassed to report the conduct to the supervisor, CEO, or other unnamed and unspecified members of management—suffered from a "fatal defect," *see Frederick*, 246 F.3d at 1314, in that the policy was impractical in situations when the harassing supervisor was Brown or the CEO, given their prominence within defendant's management hierarchy and their close personal friendship. Plaintiff faced the conundrum that Brown—his direct supervisor and a twenty-year prized veteran within the management of the company—was harassing him and was known to have a long-standing close friendship with CEO Paul Daversa. Considering that Brown sent plaintiff an image that plaintiff reasonably understood to depict Daversa simulating a sex act with Brown, and that Brown told plaintiff that Daversa would do nothing if plaintiff complained to him because they were best friends, *see* Pl.'s Dep. at 272:6–273:8, defendant's reporting policy gave plaintiff limited recourse to report Brown's misconduct.[12] Just as in *Faragher*, defendant, too, failed to monitor the conduct

[12] Defendant emphasizes that the policy instructed employees to reach out to "any other member of management," and plaintiff failed to do so. Def.'s Mot. at 22–23; Def.'s Reply at 18. This point may be as persuasive to a jury as defendant urges, but, in context, is insufficient to be determinative as showing that the policy was reasonable for at least four factual reasons based on record evidence. First, the "other member[s] of management" to be contacted were unnamed and unspecified as having any particular authority, role, or expertise in properly handling and resolving harassment complaints. Second, relatedly, Martire—the defendant partner apparently tasked with investigating allegations of harassment, though not named as such in the formal policy—admittedly had no formal

of harassing supervisors or provide assurances that its complaint system would function effectively for complaints against those in management.[13]

Second, genuine issues of material fact have been presented on the issue of whether defendant took sufficient steps to correct harassing behavior. Specifically, plaintiff has shown evidence that, after learning from Marx about Brown's inappropriate behavior with plaintiff, defendant's management—Paul Daversa, Martire, and Brown himself—failed to take any remedial action, such as investigating Marx's statements, asking plaintiff about Brown's behavior, or questioning Brown himself. *See* Pl.'s SMF ¶ 13. To be sure, Marx's email did not specify that Brown was sexually harassing plaintiff, as defendant points out, *see* Def.'s Mot. at 24–25, but Marx's email made clear that Brown was engaging in inappropriate behavior towards plaintiff, and Martire conceded that acting inappropriately with other employees, even short of sexual

HR title, no relevant human resources background, and had only investigated one prior incident of sexual harassment and no instances of sexual orientation harassment. *Cf. Baldwin v. Blue Cross/Blue Shield of Alabama*, 480 F.3d 1287, 1303 (11th Cir. 2007) (holding that the defendant employer, as a matter of law, took reasonable steps to correct harassment because the human resource officer "in charge of investigating" complaints of harassment "had personally been involved in at least a half dozen investigations of sexual harassment complaints"). Third, "two or three" of defendant's other partners were present when the photograph of Paul Daversa simulating a sex act with Brown was taken and even "laughed" at Brown and Paul Daversa as they engaged in inappropriate conduct on a business trip, *see* Def.'s Suppl. SMF ¶ 79, suggesting that members of management might not have taken allegations of inappropriate conduct or harassment against Brown seriously, even if plaintiff had raised his complaints with them. Fourth, despite its size, defendant had no human resources department or full-time human resources professional to respond to complaints of harassment. *See* Pl.'s SMF ¶ 5. A jury may view these aspects of defendant's operation as intentional design deficiencies reflecting a general laissez-faire attitude towards harassment, including sexual harassment, that ultimately rendered defendant's policy unreasonable.

[13] Defendant seeks credit for its "grievance committee" charged with investigating claims of harassment in the workplace and the single hour of sexual harassment training instituted in 2019, *see* Def.'s Mot. at 22–23, 35, but genuine issues of material fact exist as to the existence of the former and the effectiveness of the latter. First, defendant has put forth no contemporaneous evidence that the so-called grievance committee existed at the time of plaintiff's employment with defendant or that plaintiff and other employees were made aware of the committee's existence, *see* Pl.'s SMF ¶ 6, so defendant cannot be credited for that committee at the summary judgment stage. *See Frederick*, 246 F.3d at 1314 (denying summary judgment for defendant on *Faragher-Ellerth* because "there were material issues of disputed fact regarding what Sprint's complaint procedures were during the relevant period"). Meanwhile, while the sexual harassment training undoubtedly took place in 2019, a reasonable factfinder could determine that the training was not a serious or effective one because Brown admitted that the training was the first such training he had seen in his twenty-year tenure at the company, the session was merely an hour long, and Brown not only left the training early but also joked about the training afterwards, with no apparent management correction or critique of that conduct as irresponsible or otherwise unacceptable. *See* Pl.'s SMF ¶ 13.

harassment, violates the anti-harassment policy, *see* Pl.'s SMF ¶ 13. A reasonable jury could thus find that defendant lacked the requisite policies to investigate allegations of sexual assault and correct such inappropriate conduct given that defendant was told that Brown was engaging in inappropriate conduct and took no steps to investigate those allegations beyond alerting Brown to Marx's email.[14]

In summary, plaintiff's DCHRA hostile work environment claim survives summary judgment due to disputed issues of material fact.

### C. Count VII: Plaintiff's Claim for Unpaid Wages

Plaintiff claims, in Count VII, that he is entitled to over $60,000 in unpaid bonuses for nine executive placements he secured during his employment with defendant. The DCWPCL establishes requirements "regarding how and when employers must pay their employees' wages" and "a framework for recovery against an employer who violates its provisions." *Driscoll v. George Washington Univ.*, 938 F. Supp. 2d 19, 22–23 (D.D.C. 2013); *see also* D.C. Code § 32-1308. Section 32-1301(3) of the DCWPCL states that the term "wages" encompasses "all monetary compensation after lawful deductions, *owed* by an employer, whether the amount owed is determined on a time, task, piece, commission, or other basis of calculation," *id.* § 32-1301(3) (emphasis added), including "[b]onus[es]" and "[o]ther remuneration promised or owed . . . [p]ursuant to a contract for employment, whether written or oral[,]" *id.* §§ 32-1301(3)(A), (E).

[14] The three cases upon which defendant relies to show the reasonableness of its policies, *see* Def.'s Mot. at 22, are plainly distinguishable. For instance, in *Taylor v. Solis*, unlike here, the plaintiff never challenged the adequacy of the company's complaint procedure. 571 F.3d 1313, 1316 (D.C. Cir. 2008). Likewise, in *Turner v. Washington Metro Transit Authority*, unlike here, the plaintiff admitted that defendant had "a detailed policy against harassment and detailed procedures for the reporting and handling of claims." No. CV 09-812 (JEB), 2011 WL 13266591, at *5 (D.D.C. Nov. 21, 2011), *aff'd*, 534 F. App'x 2 (D.C. Cir. 2013). Finally, in *EEOC v. Barton Protective Services, Inc.*, by contrast to defendant's barebones policy and general reporting processes, the defendant's harassment policy had a formal complaint process, directing employees to file complaints with the "Branch Manager" if their complaint was about their supervisor, the "Account Manager," or file a complaint "directly to the Corporate Personnel Manager" if they felt "dissatisfied with the Branch Manager's action." 47 F. Supp.2d 57, 58–61 (D.D.C. 1999).

Defendant asserts that Brown's promised performance-related bonuses were not "owed" to plaintiff within the meaning of Section 32-1301(3), and were, at most, discretionary, since plaintiff could only receive bonuses under the Plan for "sourc[ing]" the underlying clients, which he admittedly failed to do. Def.'s Mot. at 39–40.

"A 'discretionary payment' does not constitute a 'wage' under the DCWPCL because such payments 'are not owed, but are given only by leave of the employer.'" *Ronaldson v. Nat'l Ass'n of Home Builders*, 502 F. Supp. 3d 290, 297 (D.D.C. 2020), *amended on reconsideration*, No. CV 19-1034 (CKK), 2021 WL 7210781 (D.D.C. June 3, 2021) (quoting *Dorsey v. Jacobson Holman, PLLC*, 756 F. Supp. 2d 30, 36 (D.D.C. 2010), *aff'd*, 476 F. App'x 861 (D.C. Cir. 2012)). Whether a payment is "discretionary" turns on "the conditions set for the award of such compensation" and if "the former employee was actually entitled or owed the payment." *Rothberg v. Xerox Corp.*, Civ. No. 12-617 (BAH), 2016 WL 10953882, at *16 (D.D.C. Feb. 3, 2016), *aff'd*, 709 F. App'x 1 (D.C. Cir. 2017); *see also Molock v. Whole Foods Market, Inc.*, 297 F. Supp. 3d 114, 134 (D.D.C. 2018) (denying dismissal motion and finding plaintiffs stated a claim for lost "wages" under the DCWPCL in suit for unpaid bonuses because they "sufficiently alleged that payment of a [ ] bonus was not subject to any employer discretion, but rather automatic and mandatory upon satisfaction" of certain conditions that plaintiffs alleged they satisfied).

Based on plaintiff's proffered evidence, the performance-related bonuses he seeks were not discretionary because Brown made explicit promises to plaintiff that he would be given bonuses for completing executive placements. Given that Brown was plaintiff's direct supervisor and managing partner of defendant's D.C. Office, a factfinder could reasonably construe Brown's promises as an oral agreement between plaintiff and defendant to pay plaintiff upon completion of certain executive placements. Since plaintiff has demonstrated he completed those executive

placements, *see* Pl.'s SMF ¶¶ 17, 27-31, a jury could reasonably find that the bonuses that Brown orally promised plaintiff were "owed" to him by defendant and not subject to its discretion, much like the program in *Molock*.

**D. Counts V and VI: Plaintiff's Negligent Supervision Claims**

Plaintiff claims, in Counts V and VI, that defendant negligently supervised and retained Brown.[15] "In an action against an employer for negligent supervision, liability is 'predicated upon the employer's direct negligence, rather than under a theory of vicarious liability based on the employee's negligence.'" *Blair v. D.C.*, 190 A.3d 212, 229 (D.C. 2018) (quoting *Phelan v. City of Mount Rainier*, 805 A.2d 930, 937 (D.C. 2002)). "To establish a cause of action for negligent supervision, a plaintiff must show: that the employer knew or should have known its employee behaved in a dangerous or otherwise incompetent manner, and that the employer . . . failed to adequately supervise the employee." *Id.* (quotation marks omitted). Defendant's sole argument is that no breach of the duty of reasonable care towards plaintiff could be leveled at defendant because defendant did not know, nor should have known, of Brown's conduct. Def.'s Reply at 24–25.

Defendant's argument fails because a jury could reasonably find that defendant had either actual or constructive knowledge of Brown's sexual harassment of plaintiff. For one thing, the sexual harassment policy explicitly told defendant's employees that they could go to their supervisor to complain about harassment, and plaintiff did just that. *See* Handbook at 15 ("Employees . . . who feel that they have been harassed . . . should immediately report such conduct

[15] More precisely, Count V claims defendant's negligent supervision and retention of Brown, and Count VI claims defendant's negligent or grossly negligent supervision and retention of Brown, predicated on a theory that defendant failed to protect plaintiff from Brown's harassment. *Compare* Am. Compl. ¶¶ 143-45, with *id.* ¶ 165. Both claims arise under the same theory—that defendant breached its duty of reasonable care by failing to oversee and supervise Brown—so both claims are considered together. *See Islar v. Whole Foods Mkt. Grp., Inc.*, 217 F. Supp.3d 261, 265 n.1 (D.D.C. 2016) (observing that D.C. law does not distinguish between negligent supervision and retention claims).

to their supervisor, to the CEO *or* any other member of management") (emphasis added). Defendant dismisses this argument as "preposterous," Def.'s Reply at 15–16, but has only itself to blame for the instructions set out in its own harassment policy. In this case, the harassing supervisor, Brown, explicitly told plaintiff that the CEO of the company, Paul Daversa, would do nothing if plaintiff were to report Brown's harassment to him, Pl.'s Dep. at 272:6–273:8—a message only confirmed by the photograph sent to plaintiff depicting Brown and Daversa simulating a sex act, with Brown's accompanying commentary stating, in part, "Screw Integrity!!!!" and "nothing is off limits with you!", Pl.'s SMF ¶ 7. Even with the catchall "any other member of management," the policy failed to address a situation in which either Brown or the CEO were engaging in sexual harassment—especially when Brown threatened plaintiff's career and engaged in physical batteries, *see* Pl.'s SMF ¶¶ 18, 36; *see also supra* n.12—and members of management might not have taken plaintiff's claims seriously, given that that several of defendant's other partners were present and "laughed" at Brown and Paul Daversa as the two reenacted what appeared to be a simulated sex act, while on a business trip, *see* Def.'s Suppl. SMF ¶ 79. A jury could reasonably find that defendant bears responsibility for its policy failure, such that plaintiff's complaints to Brown impute actual knowledge to defendant as a company, given the apparent lack of alternative mechanisms for effectively reporting misconduct.[16]

---

[16] Defendant relies on several cases, Def.'s Reply at 16–19, that are unpersuasive or inapposite because, unlike the circumstances at issue here, the plaintiffs in those cases either (1) reasonably could have, but failed to, report the alleged harassment to upper-level management; or (2) faced no credible threat of reprisal by reporting the harassment to the designated individuals outlined in the employer's policy. *See Chapman v. Carmike Cinemas*, 307 F. App'x 164, 173 (10th Cir. 2009) ("[T]he record indicates that the [harassing supervisor] was supervised by the complex general manager, Mr. Curry, who was supervised by the city manager, Mr. Dunaway. Apparently [plaintiff] also did not complain to either Mr. Curry or Mr. Dunaway, although there does not appear to be any reason why she could not have done so."); *Stapp v. Curry Cnty. Bd. of Cnty. Commissioners*, No. 15-CV-356 GBW/CG, 2016 WL 8839431, at *7 (D.N.M. Mar. 29, 2016) (observing that plaintiff unreasonably failed to comply with the "anti-harassment policy" because she did not, as the policy required, report the harassing conduct to the "Personnel Coordinator," who she also met with "multiple times during the course of her employment"), *aff'd*, 672 F. App'x 841 (10th Cir. 2016); *Taylor*, 571 F.3d at 1319 (rejecting plaintiff's argument that plaintiff was reasonably deterred from reporting her harasser's conduct, based on his statement that "no one would believe her," because the harasser "did not threaten [plaintiff] with an adverse employment action and, indeed, he could not have done [so] because he was not her supervisor and did not

Moreover, the Marx Email could reasonably be read to give defendant constructive knowledge of Brown's harassment. Although Marx did not specify that Brown was *sexually* harassing plaintiff, this lengthy email made clear that Brown was "acting inappropriate[ly]" with plaintiff, and "the entire leadership had commented how inappropriate [the relationship] [was]." Pl.'s SMF ¶ 13. Considering that Martire conceded that acting inappropriately could constitute harassment in the workplace, and both Brown and Paul Daversa received the Marx email, with Brown stating "I take full responsibility. A lot of work that needs to be done to on my part," *id.*, neither Paul Daversa nor Martire made further inquiry of plaintiff, Brown, or anyone else about Marx's reported harassment. Armed with these facts, a reasonable jury could impute constructive notice on defendant for failing to investigate Brown upon learning that he engaged in conduct that, if true, violates the company's anti-harassment policy.

### E. Count VIII: Plaintiff's Claim for IIED

Finally, in Count VIII, plaintiff claims that defendant is liable for Brown's intentional infliction of emotional distress. To prevail on an IIED claim at summary judgment, plaintiff must show that a reasonable jury could find for him on each of these elements: "'(1) extreme and outrageous conduct on the part of the defendant[], which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980, 995 (D.C. Cir. 2014) (quoting *Futrell v. Dep't of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)).

Plaintiff says that Brown's hostile work environment amounted to extreme and outrageous conduct, and that defendant is liable for Brown's actions under *respondeat superior*. Pl.'s Opp'n

---

have the authority to evaluate her performance or to take any action against her"); *Barrett v. Applied Radiant Energy Corp.*, 240 F.3d 262, 265, 267–68 (4th Cir. 2001) (rejecting employee's fear of retaliation and concern that report would be futile due to friendship between harasser and company president because the policy specifically allowed employees to "contact any [of the twelve] member[s] of the management team, male or female, with whom [they] feel comfortable discussing the situation" and assured that "complaint[s] will be dealt with immediately and will be kept as confidential as possible").

at 51–53. Defendant disputes that Brown's conduct amounted to "extreme or outrageous" behavior since plaintiff "also engaged in the same verbal and text conduct and participated in Brown's alleged conduct," and also contends that Brown's misconduct was outside the scope of his employment, obviating any legal responsibility of defendant under *respondeat superior.* Def.'s Mot. at 38. Neither argument presented by defendant suffices to prevail on summary judgement.

As to whether Brown was acting within the scope of his employment, plaintiff presented evidence—in the form of Brown's testimony—that Brown engaged in outrageous conduct towards plaintiff, like calling him a "fucker," "bitch," and other derogatory terms that targeted his sexual orientation, and threatening physical violence against plaintiff, because he thought it would push plaintiff and drive him to work harder for the company. *See* Pl.'s Opp'n at 52; *see also* Brown Dep. at 108:9–113:20. Unlike plaintiff's sexual assault and battery claims, where plaintiff adduced no evidence to show Brown committed those torts to further any of defendant's business interests, a jury could reasonably understand Brown's explanations for his conduct towards plaintiff as due to his belief, at least in part, that repeatedly harassing plaintiff using derogatory language was intended to "further[] [defendant's] business" by incentivizing and prodding plaintiff. *See Boykin*, 484 A.2d at 564 (quotation marks omitted).

Notwithstanding plaintiff's own unprofessional and inappropriate messages, he has presented enough evidence to show Brown engaged in "extreme and outrageous" conduct. In the context of plaintiff's DCHRA claim, defendant does not contest that Brown created a hostile work environment through his derogatory and sexually charged comments and behavior that targeted plaintiff because of his sexual orientation. *See supra* at III.B; *see also supra* at I.A.2 (summarizing Brown's harassment). Given that creating a hostile work environment satisfies the "extreme or outrageous" element for IIED under D.C. law, *see Purcell v. Thomas*, 928 A.2d 699, 711 (D.C.

2007) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 986 (D.C. 1984)) ("Creation of a hostile work environment by racial or sexual harassment may, upon sufficient evidence, constitute a *prima facie* case of intentional infliction of emotional distress."), plaintiff has minimally provided enough evidence to survive summary judgment on that element. Defendant's defense—that plaintiff also engaged in inappropriate banter with Brown that led him to believe his conduct was appropriate—is, at the very best, a question for the jury because a reasonable factfinder could accept plaintiff's proffered explanation for his behavior: that he sent inappropriate messages back to Brown "since this was [his] first job out of college, and Mr. Brown was [his] supervisor as well as the longest standing Partner of Daversa, [so he] felt [he] had no choice other than comply, or else risk angering Mr. Brown and jeopardizing [his] job." Pl.'s' SMF ¶ 36 (quotation marks omitted); *see also id.* ¶ 18 (collecting Brown's various statements towards plaintiff, some of which included threats of physical violence). A reasonable jury could reasonably believe plaintiff's testimony and believe he had to parry back in kind with Brown to fit in, or otherwise risk damage to his career.

## IV. CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment is GRANTED IN PART and DENIED IN PART. Defendant is entitled to summary judgment on plaintiff's claims, in Counts IV and IX, for battery and retaliation under the DCHRA, respectively, while plaintiff's remaining claims against defendant in Counts I, V, VI, VII, and VIII survive defendant's motion for summary judgment. An order consistent with this opinion will be filed contemporaneously.

Date: March 30, 2023

BERYL A. HOWELL
U.S. District Court Judge